URGENT
CC. JUDGE

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 05-1046(E)-DSF |
| Plaintiff, | F I F T H |
| v. | S U P E R S E D I N G |
| | I N D I C T M E N T |
| ANTHONY PELLICANO, MARK ARNESON, RAYFORD EARL TURNER, KEVIN KACHIKIAN, ABNER NICHERIE, and TERRY CHRISTENSEN, | [18 U.S.C. § 1962(c): Racketeer Influenced and Corrupt Organizations (RICO); 18 U.S.C. § 1962(d): RICO Conspiracy; 18 U.S.C. §§ 1343, 1346: Honest Services Wire Fraud; 18 U.S.C. § 1030(a)(2)(B), (c)(2)(B)(i): Unauthorized Computer Access of United States Agency Information; 18 U.S.C. § 1028(a)(7): Identity Theft; 18 U.S.C. § 1030(a)(4): Computer Fraud; 18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 2511(1)(a), (d): Interception of Wire Communications; 18 U.S.C. § 2512(1)(b): Possession of Wiretapping Device; 18 U.S.C. § 1001(a)(2): False Statements; 18 U.S.C. § 1512(c)(1): Destruction of Evidence; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to Be Done; 18 U.S.C. § 1963: RICO Forfeiture] |
| Defendants. | |

2007 DEC -6 PM 3:01

FILED

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1962(c)]

[Racketeering]

[Defendants PELLICANO, ARNESON, and TURNER]

I.   INTRODUCTION

At all times relevant to this Fifth Superseding Indictment (this "Indictment"):

A.   Defendants and Their Associates

1.   Defendant ANTHONY PELLICANO was a private investigator doing business under the names of Pellicano Investigative Agency, Ltd., Anthony J. Pellicano Negotiations, Forensic Audio Lab, and Syllogistic Research Group, all located at 9200 Sunset Boulevard, Suite 322, Los Angeles, California 90210.  Defendant PELLICANO was licensed as a private investigator from in or around 1983 until on or about February 2, 2004, by the California Department of Consumer Affairs' Bureau of Security and Investigative Services.

2.   Defendant MARK ARNESON was a public official and sworn law enforcement officer employed by the City of Los Angeles, California, as an officer of the Los Angeles Police Department ("LAPD").  On or about June 10, 1974, defendant ARNESON took his oath of office as an LAPD officer, swearing that he would well and faithfully discharge the duties of his office.  After taking this oath, defendant ARNESON became an LAPD police officer in June 1974, became an LAPD Detective in September 1984, and became an LAPD Sergeant in April 1996.  As a public official and sworn

2

1  law enforcement officer, defendant ARNESON owed a duty of honest

2  services to the LAPD and the citizens he was sworn to serve.

3          3.    Defendant RAYFORD EARL TURNER was, prior to his

4  retirement on or about December 15, 2001, employed by SBC and its

5  predecessor company, Pacific Bell (collectively "SBC") as a field

6  technician.

7          4.    Craig Stevens was a public official and sworn law

8  enforcement officer employed by the City of Beverly Hills,

9  California, as an officer of the Beverly Hills Police Department

10  ("BHPD").  As a public official and sworn law enforcement

11  officer, Stevens owed a duty of honest services to the BHPD and

12  the citizens he was sworn to serve.

13          5.    Teresa Wright was, prior to her termination on or about

14  November 21, 2003, employed by SBC as a sales support manager.

15  B.    THE LAPD AND BHPD COMPUTER SYSTEMS

16          6.    From on or about June 10, 1974, through on or about

17  October 10, 2003, as a result of his position as an LAPD officer,

18  defendant ARNESON was authorized to access LAPD's computer system

19  in the Los Angeles Pacific Division offices and elsewhere to

20  obtain criminal history and other law enforcement information

21  from computer systems and databases maintained exclusively for

22  law enforcement uses, including the National Crime Information

23  Center ("NCIC") and the California Department of Motor Vehicles

24  ("DMV").  Defendant ARNESON was authorized to access these law

25  enforcement computer systems and databases only for official LAPD

26  purposes related to his official investigative duties.

27          7.    As part of his LAPD oath of office, defendant ARNESON

28  swore that he would adhere to the standards of conduct set forth

1  in the LAPD Manual.  The LAPD Manual prohibits an LAPD officer
2  from making unauthorized use of information obtained through
3  employment with the LAPD, disclosing law-enforcement information
4  except as required in the performance of official duties, using
5  LAPD computer systems and information obtained through them for
6  non-official purposes, releasing criminal history information to
7  individuals lacking legal authority to have access to such
8  information, and/or engaging in outside employment without prior
9  approval.

10      8.   From on or about May 5, 1982, through on or about
11  January 6, 2006, as a result of his position as a BHPD officer,
12  Craig Stevens was authorized to access BHPD's computer system in
13  the BHPD offices and elsewhere to obtain criminal history and
14  other law enforcement information from computer systems and
15  databases maintained exclusively for law enforcement uses,
16  including NCIC and DMV.  Craig Stevens was authorized to access
17  these law enforcement computer systems and databases only for
18  official BHPD purposes related to his official investigative
19  duties.

20      9.   NCIC is accessed remotely by law enforcement computer
21  terminals located throughout the United States and is therefore
22  used in interstate communication.  NCIC, which is operated by the
23  Federal Bureau of Investigation, maintains a database of
24  electronically stored information located in Clarksburg, West
25  Virginia.

26      10.  The LAPD and BHPD computer systems are exclusively for
27  the use of the LAPD and BHPD respectively and are used in
28  interstate communication.

4

C.   SBC'S CONFIDENTIAL AND PROPRIETARY INFORMATION

11. SBC's written Code of Business Conduct requires that employees maintain the privacy of customer records, including the number and type of customers' telephone lines and records of customers' telephone usage.  SBC employees are prohibited from accessing, using or disclosing customer records, reports or proprietary information without a valid business reason.

12.   In her capacity as a sales support manager for SBC, Teresa Wright was authorized to access SBC's computer system in the SBC offices and elsewhere to obtain confidential information on SBC's residential customers, including telephone toll records, telephone numbers, and home addresses, from computer systems and databases maintained exclusively for law enforcement uses, including the Billing and Order Support System ("BOSS"), the Premises Information System ("PREMIS"), and the Service Order Retrieval and Distribution System ("SORD").  Teresa Wright was authorized to access these computer systems and databases only for valid SBC business reasons.

13.   In his capacity as a field technician for SBC, defendant TURNER had authorization to obtain confidential information on SBC's residential customers from other SBC employees with access to SBC computer systems and databases, including Teresa Wright.  Defendant TURNER was authorized to obtain this confidential information only for valid SBC business reasons.  Defendant TURNER's authorization to obtain any such confidential information for any purpose ended with his retirement from SBC on or about December 15, 2001.

## II.   THE ENTERPRISE

14.   At all times relevant to this Indictment, defendants ANTHONY PELLICANO, MARK ARNESON, and RAYFORD EARL TURNER, together with other individuals known and unknown to the Grand Jury, and the Pellicano Investigative Agency, Ltd., together with other legal entities known and unknown to the Grand Jury, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals and legal entities associated in fact (the "Enterprise").  The Enterprise was bound together by the common purpose of earning income through the conduct of diverse criminal activities including, but not limited to, illegal wiretapping, unauthorized access of protected computers, wire fraud, bribery, identity theft, and obstruction of justice.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The Enterprise operated primarily in Los Angeles, California, within the Central District of California.  The Enterprise was engaged in, and its activities affected, interstate commerce.

## III.   PURPOSES OF THE ENTERPRISE

15.   The purposes of the Enterprise included:

a.   Enriching the members and associates of the Enterprise through obtaining private, personal, and confidential information regarding defendant PELLICANO's investigative targets and litigative opponents through illegal means, including but not limited to identity theft, wire fraud, bribery, and unauthorized access of protected computer databases.

6

b.   Enriching the members and associates of the Enterprise through using the illegally obtained information to subvert and corrupt the judicial process.

c.   Enriching the members and associates of the Enterprise through using the illegally obtained information to strengthen and expand defendant PELLICANO's reputation and ongoing relationship with lucrative clients, including entertainment celebrities and executives, attorneys, and law firms.

d.   Promoting and enhancing the Enterprise and its members' and associates' activities.

IV.   <u>MANNER AND MEANS OF THE ENTERPRISE</u>

16.   Defendants and their associates conducted and participated in the conduct of the management, operation, and affairs of the Enterprise in the manner and by the means described below.

17.   Defendant PELLICANO was the organizer and leader of the Enterprise and directed other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs.  Defendant PELLICANO was responsible for securing clients who were willing and able to pay large sums for the purpose of obtaining personal information of a confidential, embarrassing, or incriminating nature regarding other individuals, including opponents or witnesses in criminal or civil litigation, who became the Enterprise's investigative targets.

18.   Defendant PELLICANO paid bribes to corrupt public officials, including defendant ARNESON, Craig Stevens, and others

7

1  known and unknown to the Grand Jury, and to corrupt telephone

2  company employees, including defendant TURNER, Teresa Wright, and

3  others known and unknown to the Grand Jury, for purposes of

4  obtaining confidential and proprietary information regarding the

5  Enterprise's investigative targets.

6      19.  With respect to defendant ARNESON:

7          a.  Defendant PELLICANO provided defendant ARNESON

8  with names and/or other personal identifying information of

9  individuals whom defendant PELLICANO was investigating and as to

10 whom he wished to obtain confidential law enforcement

11 information.

12         b.  Defendant ARNESON accessed without authorization,

13 and in excess of his authorized access, the LAPD computer system

14 to obtain and provide criminal history and other law enforcement

15 information for the use of defendant PELLICANO.

16         c.  Defendant ARNESON solicited, and defendant

17 PELLICANO provided to defendant ARNESON, payment for obtaining

18 and providing criminal history and other law enforcement

19 information.  In particular, defendant PELLICANO made payments to

20 defendant ARNESON by means of Pellicano Investigative Agency,

21 Ltd. business checks in at least the following amounts in return

22 for obtaining and providing criminal history and other law

23 enforcement information:

| Year | Minimum Payment |
|------|-----------------|
| 1997 | $8,875 |
| 1998 | $47,915 |
| 1999 | $38,325 |
| 2000 | $34,500 |

8

1      2001        $32,250

2      2002        $27,500

3  Defendant ARNESON solicited and received from defendant PELLICANO

4  additional payments in cash in order to conceal these additional

5  payments received from defendant PELLICANO.

6          d.    Defendant ARNESON failed to obtain permission from

7  LAPD to engage in employment for defendant PELLICANO.

8      20.    With respect to Craig Stevens:

9          a.    Defendant PELLICANO provided Stevens with names

10 and/or other personal identifying information of individuals whom

11 defendant PELLICANO was investigating and as to whom he wished to

12 obtain confidential law enforcement information.

13         b.    Stevens accessed without authorization, and in

14 excess of his authorized access, the BHPD computer system to

15 obtain and provide criminal history and other law enforcement

16 information for the use of defendant PELLICANO.

17         c.    Stevens solicited, and defendant PELLICANO

18 provided to Stevens, payment for obtaining and providing criminal

19 history and other law enforcement information.

20         d.    Stevens failed to obtain permission from BHPD to

21 engage in employment for defendant PELLICANO.

22     21.    With respect to defendant TURNER and Teresa Wright:

23         a.    Defendant PELLICANO provided defendant TURNER with

24 names and/or other personal identifying information of

25 individuals whom defendant PELLICANO was investigating and as to

26 whom he wished to obtain confidential and proprietary telephone

27 company information from SBC.

28

9

   b. Defendant TURNER would access without authorization, and in excess of his authorized access, and cause Wright to access without authorization, and in excess of both his and her authorized access, the SBC computer system in order, under the guise of performing legitimate work-related duties, to obtain confidential and proprietary telephone company information for the use of defendant PELLICANO.

   c. Defendant TURNER solicited, and defendant PELLICANO provided to defendant TURNER, payment for obtaining and providing confidential and proprietary telephone company information. In particular, defendant PELLICANO made payments to defendant TURNER by means of Pellicano Investigative Agency, Ltd. business checks in at least the following amounts in return for obtaining and providing confidential and proprietary telephone company information:

| Year | Minimum Payment |
| --- | --- |
| 1997 | $10,100 |
| 1998 | $8,625 |
| 1999 | $8,975 |
| 2000 | $4,000 |
| 2001 | $3,080 |
| 2002 | $1,875 |

Defendant TURNER solicited and received from defendant PELLICANO additional payments in cash in order to conceal these additional payments received from defendant PELLICANO.

  22. Defendant PELLICANO provided the criminal history and other law enforcement information received from defendant ARNESON, Craig Stevens, and other corrupt public officials, and

the confidential and proprietary telephone company information received from defendant TURNER and others, to the Enterprise's clients in return for payment.

23. In many instances, defendant PELLICANO used and sought to use this illegally obtained information to facilitate further criminal conduct to enrich the Enterprise, including threats, blackmail, and illegal wiretapping directed against the Enterprise's investigative targets. In particular, at defendant PELLICANO's direction, defendant TURNER and others known and unknown to the Grand Jury used their expertise and access to proprietary telephone company equipment to assist defendant PELLICANO in using the illegally obtained information to implement illegal wiretaps, which defendant PELLICANO accomplished through the use of computer software and hardware designed by Kevin Kachikian.

24. Defendant PELLICANO provided the information obtained by these and other legal and illegal means to the Enterprise's clients, both known and unknown to the Grand Jury, who would use the illegally obtained information provided by defendant PELLICANO for their own purposes, including preparation for and conduct of civil and criminal litigation.

25. In return, defendant PELLICANO would secure payments from these clients, which payments were used, in part, to promote and expand the Enterprise's criminal and other operations.

V. CONDUCT OF THE AFFAIRS OF THE ENTERPRISE THROUGH
A PATTERN OF RACKETEERING ACTIVITY

26. Beginning on a date unknown to the Grand Jury and continuing until in or around December 2002, within the Central

11

District of California and elsewhere, defendants ANTHONY
PELLICANO, MARK ARNESON, and RAYFORD EARL TURNER, together with
others known and unknown to the Grand Jury, being persons
employed by and associated with the Enterprise, which was engaged
in, and the activities of which affected, interstate commerce,
knowingly conducted and participated, directly and indirectly, in
the conduct of the affairs of that enterprise through a pattern
of racketeering activity as defined in Title 18, United States
Code, Sections 1961(1) and 1961(5), that is, through the
commission of Racketeering Acts One through Two Hundred Thirty-
Two as set forth in paragraphs 27 through 33 below.

<u>Racketeering Acts One Through Sixty-Five</u>

(Wire Fraud)

27.   On or about each of the following dates, within the
Central District of California, in violation of Title 18, United
States Code, Sections 1343, 1346, and 2, defendants PELLICANO and
ARNESON, aiding and abetting each other, having knowingly and
with intent to defraud devised and participated in a scheme to
defraud and deprive the LAPD and the citizens of the City of Los
Angeles of their right to defendant ARNESON's honest services by
using defendant ARNESON's authority and official position as an
LAPD officer to enrich themselves by receiving payments in return
for obtaining and providing criminal history and other law
enforcement information, as described in paragraphs 19 and 22
through 25 of this Indictment, for the purpose of executing and
attempting to execute this scheme, transmitted and caused to be
transmitted by means of wire communication in interstate commerce
writings, signs, and signals, that is, computer transmissions

12

from Los Angeles, California searching NCIC in Clarksburg, West
Virginia for criminal history and other law enforcement
information on the following persons:

| ACT | DATE | PERSON |
|---|---|---|
| 1 | January 11, 1999 | Jane Doe #4 in People v. John Gordon Jones, Los Angeles County Superior Court Case No. BA109907 |
| 2 | January 11, 1999 | Jane Doe #5 in People v. John Gordon Jones, Los Angeles County Superior Court Case No. BA109907 |
| 3 | January 20, 1999 | Garry Shandling |
| 4 | January 20, 1999 | Mariana Grant |
| 5 | January 25, 1999 | Jane Doe #6 in People v. John Gordon Jones, Los Angeles County Superior Court Case No. BA109907 |
| 6 | January 25, 1999 | Jane Doe #7 in People v. John Gordon Jones, Los Angeles County Superior Court Case No. BA109907 |
| 7 | February 9, 1999 | Jane Doe #8 in People v. John Gordon Jones, Los Angeles County Superior Court Case No. BA109907 |
| 8 | February 10, 1999 | James Nielsen |
| 9 | March 2, 1999 | Darcy LaPier |
| 10 | March 4, 1999 | Kevin Nealon |
| 11 | March 4, 1999 | Linda Nealon |
| 12 | March 4, 1999 | Linda Doucett |
| 13 | March 9, 1999 | Gavin DeBecker |
| 14 | March 15, 1999 | Bilal Baroody |
| 15 | May 4, 1999 | Ali Amghar |
| 16 | May 4, 1999 | Vanessa Etourneau |
| 17 | May 4, 1999 | Lea Dabany |
| 18 | May 4, 1999 | Felicia Fuller |
| 19 | May 4, 1999 | Bonita Jones |
| 20 | May 11, 1999 | Lilian Pinho |
| 21 | July 30, 1999 | Monika Zsibrita |

13

| ACT | DATE | PERSON |
|-----|------|--------|
| 22 | October 16, 1999 | Christopher Pair |
| 23 | October 16, 1999 | Suzanne Pair |
| 24 | October 16, 1999 | Michael Rosen |
| 25 | October 21, 1999 | Carol Rosen |
| 26 | May 15, 2000 | Kissandra Cohen |
| 27 | May 15, 2000 | Michael Cohen |
| 28 | August 2, 2000 | Peter Kuhns |
| 29 | August 2, 2000 | Erin Finn |
| 30 | August 31, 2000 | Paul Rusconi |
| 31 | November 22, 2000 | Laura Buddine |
| 32 | January 3, 2001 | Lisa Gores |
| 33 | January 3, 2001 | Thomas Gores |
| 34 | February 6, 2001 | Vincent Zenga |
| 35 | February 6, 2001 | Jerome Zenga |
| 36 | February 13, 2001 | Jessica Schutte |
| 37 | February 14, 2001 | Stacy Codikow |
| 38 | February 14, 2001 | Paul Durazzo |
| 39 | February 20, 2001 | Zorianna Kit |
| 40 | March 13, 2001 | Gregory Dovel |
| 41 | March 15, 2001 | John LaViolette |
| 42 | April 26, 2001 | Keith Carradine |
| 43 | April 26, 2001 | Hayley Dumond |
| 44 | August 24, 2001 | Sandra Rodriguez |
| 45 | August 24, 2001 | Ester Pina |
| 46 | August 24, 2001 | Mirella Lavorin |
| 47 | August 24, 2001 | Carrie Cagle |
| 48 | October 18, 2001 | George Kalta |
| 49 | February 19, 2002 | Kevin Templeton |
| 50 | March 15, 2002 | Patrick Theohar |
| 51 | March 18, 2002 | Laura Moreno |

| ACT | DATE | PERSON |
|---|---|---|
| 52 | March 18, 2002 | Marcus Moreno |
| 53 | April 3, 2002 | Pamela Miller |
| 54 | April 19, 2002 | Michael Kolesa |
| 55 | May 9, 2002 | Arthur Bernier |
| 56 | May 16, 2002 | James Casey |
| 57 | May 16, 2002 | Andrew Miller |
| 58 | May 16, 2002 | Anita Busch |
| 59 | May 16, 2002 | Bernard Weinraub |
| 60 | May 16, 2002 | Richard Miller |
| 61 | May 16, 2002 | Joyce Miller |
| 62 | September 4, 2002 | Timea Zsibrita |
| 63 | October 29, 2002 | Lucille Salter |
| 64 | October 29, 2002 | David Salter |
| 65 | October 29, 2002 | Cindy Salter |

### Racketeering Acts Sixty-Six Through Sixty-Seven

#### (Wire Fraud)

28. On or about each of the following dates, within the Central District of California, in violation of Title 18, United States Code, Sections 1343, 1346, and 2, defendant PELLICANO and Craig Stevens, aiding and abetting each other, having knowingly and with intent to defraud devised and participated in a scheme to defraud and deprive the BHPD and the citizens of the City of Beverly Hills of their right to Stevens' honest services by using Stevens' authority and official position as a BHPD officer to enrich themselves by receiving payments in return for obtaining and providing criminal history and other law enforcement information, as described in paragraphs 20 and 22 through 25 of this Indictment, for the purpose of executing and attempting to execute this scheme, transmitted and caused to be transmitted by

15

means of wire communication in interstate commerce writings, signs, and signals, that is, computer transmissions from Beverly Hills, California searching NCIC in Clarksburg, West Virginia for criminal history and other law enforcement information on the following persons:

| ACT | DATE | PERSON |
|-----|------|--------|
| 66 | November 9, 2001 | Max Russo |
| 67 | December 18, 2001 | Adam Sender |

### Racketeering Acts Sixty-Eight Through Eighty

#### (Identity Theft)

29.  On or about each of the following dates, within the Central District of California and elsewhere, in violation of Title 18, United States Code, Section 1028(a)(7), defendants PELLICANO and ARNESON knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, the following means of identification, with the intent to commit, and to aid and abet, and in connection with, an unlawful activity that constituted a violation of Federal law, namely, Title 18, United States Code, Section 1030(a)(4) (computer fraud), and a felony under applicable State law, namely, California Penal Code Section 502(c)(2) (unauthorized access to computer data):

| ACT | DATE | MEANS OF IDENTIFICATION |
|-----|------|-------------------------|
| 68 | January 20, 1999 | Name of Warren Grant |
| 69 | January 21, 1999 | Name of Jane Doe #3 in People v. John Gordon Jones, Los Angeles County Superior Court Case No. BA109907 |

16

| ACT | DATE | MEANS OF IDENTIFICATION |
|-----|------|-------------------------|
| 70 | January 22, 1999 | Name of Jane Doe #2 in <u>People v. John Gordon Jones</u>, Los Angeles County Superior Court Case No. BA109907 |
| 71 | February 9, 1999 | Name of Julie Westby |
| 72 | February 22, 1999 | Name of Jane Doe #1 in <u>People v. John Gordon Jones</u>, Los Angeles County Superior Court Case No. BA109907 |
| 73 | May 28, 1999 | Name of George Mueller |
| 74 | May 15, 2000 | Name of Mandy Cohen |
| 75 | August 18, 2000 | Name of Aaron Mestman |
| 76 | April 26, 2001 | Name of Jude Green |
| 77 | August 10, 2001 | Name of Bryan Lourd |
| 78 | August 10, 2001 | Name of Kevin Huvane |
| 79 | March 18, 2002 | Name of Loretta Moreno |
| 80 | March 21, 2002 | Name of Steven Roman |

## <u>Racketeering Acts Eighty-One Through Eighty-Seven</u>

### (Identity Theft)

30.  On or about each of the following dates, within the Central District of California and elsewhere, in violation of Title 18, United States Code, Section 1028(a)(7), defendant PELLICANO knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, the following means of identification, with the intent to commit, and to aid and abet, and in connection with, an unlawful activity that constituted a violation of Federal law, namely, Title 18, United States Code, Section 1030(a)(4) (computer fraud), and a

felony under applicable State law, namely, California Penal Code Section 502(c)(2) (unauthorized access to computer data):

| ACT | DATE | MEANS OF IDENTIFICATION |
|---|---|---|
| 81 | November 3, 1999 | Name of Christopher Pair |
| 82 | November 3, 1999 | Name of Suzanne Pair |
| 83 | February 1, 2000 | Name of Ami Shafrir |
| 84 | April 4, 2001 | Name of Aaron Russo |
| 85 | April 4, 2001 | Name of Heidi Gregg |
| 86 | April 4, 2001 | Name of Maxwell Russo |
| 87 | April 4, 2001 | Name of Samuel Russo |

## Racketeering Acts Eighty-Eight Through Ninety-Two

### (Identity Theft)

31.   On or about each of the following dates, within the Central District of California and elsewhere, in violation of Title 18, United States Code, Section 1028(a)(7), defendants PELLICANO and TURNER knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, the following means of identification, with the intent to commit, and to aid and abet, and in connection with, an unlawful activity that constituted a violation of Federal law, namely, Title 18, United States Code, Section 1030(a)(4) (computer fraud), and a felony under applicable State law, namely, California Penal Code Section 502(c)(2) (unauthorized access to computer data):

| ACT | DATE | MEANS OF IDENTIFICATION |
|---|---|---|
| 88 | August 2, 2000 | Name and Telephone Number of Erin Finn |

| ACT | DATE | MEANS OF IDENTIFICATION |
|-----|------|-------------------------|
| 89 | February 13, 2001 | Name of and Telephone Number of Bo Zenga |
| 90 | April 2, 2001 | Name and Telephone Number of Heidi Gregg |
| 91 | February 12, 2002 | Name and Telephone Number of Johnny Friendly |
| 92 | May 16, 2002 | Name and Telephone Number of Anita Busch |

<u>Racketeering Acts Ninety-Three Through One Hundred And Two</u>

(Giving or Offering Bribes)

32.   On or about each of the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant PELLICANO knowingly gave and offered bribes to an executive officer of the City of Los Angeles, with intent to influence that officer in respect to an act as such officer, to wit, the use of proprietary law enforcement databases to obtain criminal history and other law enforcement information, in violation of California Penal Code § 67:

| ACT | DATE | AMOUNT |
|-----|------|--------|
| 93 | June 29, 1999 | $2500 |
| 94 | September 21, 1999 | $2500 |
| 95 | April 20, 2000 | $2500 |
| 96 | July 20, 2000 | $2500 |
| 97 | April 20, 2001 | $2500 |
| 98 | August 9, 2001 | $2500 |
| 99 | October 16, 2001 | $2500 |
| 100 | March 14, 2002 | $2500 |
| 101 | April 9, 2002 | $2500 |
| 102 | May 10, 2002 | $2500 |

19

### Racketeering Acts One Hundred And Three Through One Hundred And Twelve

#### (Asking or Receiving Bribes)

33. On or about each of the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ARNESON, being an executive officer of the City of Los Angeles, knowingly asked, received, and agreed to receive a bribe upon an agreement and understanding that his action upon matters then pending and that might be brought before him in his official capacity, to wit, the use of proprietary law enforcement databases to obtain criminal history and other law enforcement information, would be influenced thereby, in violation of California Penal Code § 68:

| ACT | DATE | AMOUNT |
| --- | --- | --- |
| 103 | June 29, 1999 | $2500 |
| 104 | September 21, 1999 | $2500 |
| 105 | April 20, 2000 | $2500 |
| 106 | July 20, 2000 | $2500 |
| 107 | April 20, 2001 | $2500 |
| 108 | August 9, 2001 | $2500 |
| 109 | October 16, 2001 | $2500 |
| 110 | March 14, 2002 | $2500 |
| 111 | April 9, 2002 | $2500 |
| 112 | May 10, 2002 | $2500 |

COUNT TWO

[18 U.S.C. § 1962(d)]

[Racketeering Conspiracy]

[Defendants PELLICANO, ARNESON, and TURNER]

34.   The Grand Jury hereby realleges Paragraphs 1 through 25 and 27 through 33 of this Indictment as though fully set forth herein.

35.   Beginning on a date unknown to the Grand Jury and continuing until in and about December 2002, in the Central District of California and elsewhere, defendants ANTHONY PELLICANO, MARK ARNESON, and RAYFORD EARL TURNER, together with other individuals known and unknown to the Grand Jury, and the Pellicano Investigative Agency, Ltd., together with other legal entities known and unknown to the Grand Jury, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, as defined in paragraph 14 of this Indictment, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), namely, the acts set forth in paragraphs 27 through 33 of this Indictment, with each defendant agreeing that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

COUNTS THREE THROUGH THIRTY-THREE

[18 U.S.C. §§ 1343, 1346, 2]

[Honest Services Wire Fraud]

[Defendants PELLICANO and ARNESON]

36.   The Grand Jury hereby realleges Paragraphs 1-2, 6-7, 9-10, 19 and 22-25 of this Indictment as though fully set forth herein.

37.   On or about each of the following dates, within the Central District of California, defendants ANTHONY PELLICANO and MARK ARNESON, and others known and unknown to the Grand Jury, aiding and abetting each other, having knowingly and with intent to defraud devised and participated in a scheme to defraud and deprive the LAPD and the citizens of the City of Los Angeles of their right to defendant ARNESON's honest services by using defendant ARNESON's authority and official position as an LAPD officer to enrich themselves by receiving payments in return for obtaining and providing criminal history and other law enforcement information, as described in paragraphs 19 and 22-25 of this Indictment, for the purpose of executing and attempting to execute this scheme, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, and signals, that is, computer transmissions from Los Angeles, California searching NCIC in Clarksburg, West Virginia for criminal history and other law enforcement information on the following persons:

| COUNT | DATE | PERSON |
|---|---|---|
| 3 | February 6, 2001 | Vincent Zenga |
| 4 | February 6, 2001 | Jerome Zenga |

22

| COUNT | DATE | PERSON |
|-------|------|--------|
| 5 | February 13, 2001 | Jessica Schutte |
| 6 | February 14, 2001 | Stacy Codikow |
| 7 | February 14, 2001 | Paul Durazzo |
| 8 | February 20, 2001 | Zorianna Kit |
| 9 | March 13, 2001 | Gregory Dovel |
| 10 | April 26, 2001 | Keith Carradine |
| 11 | April 26, 2001 | Hayley Dumond |
| 12 | August 24, 2001 | Sandra Rodriguez |
| 13 | August 24, 2001 | Ester Pina |
| 14 | August 24, 2001 | Mirella Lavorin |
| 15 | August 24, 2001 | Carrie Cagle |
| 16 | October 18, 2001 | George Kalta |
| 17 | February 19, 2002 | Kevin Templeton |
| 18 | March 15, 2002 | Patrick Theohar |
| 19 | March 18, 2002 | Laura Moreno |
| 20 | March 18, 2002 | Marcus Moreno |
| 21 | April 3, 2002 | Pamela Miller |
| 22 | April 19, 2002 | Michael Kolesa |
| 23 | May 9, 2002 | Arthur Bernier |
| 24 | May 16, 2002 | James Casey |
| 25 | May 16, 2002 | Andrew Miller |
| 26 | May 16, 2002 | Anita Busch |
| 27 | May 16, 2002 | Bernard Weinraub |
| 28 | May 16, 2002 | Richard Miller |
| 29 | May 16, 2002 | Joyce Miller |
| 30 | September 4, 2002 | Timea Zsibrita |
| 31 | October 29, 2002 | Lucille Salter |
| 32 | October 29, 2002 | David Salter |
| 33 | October 29, 2002 | Cindy Salter |

COUNTS THIRTY-FOUR THROUGH SIXTY-FOUR

[18 U.S.C. § 1030(a)(2)(B), (c)(2)(B)(i); 18 U.S.C. § 2]

[Unauthorized Computer Access of United States Agency

Information]

[Defendants PELLICANO and ARNESON]

38.   The Grand Jury hereby realleges Paragraphs 1-2, 6-7, 9-10, 19 and 22-25 of this Indictment as though fully set forth herein.

39.   On or about each of the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant MARK ARNESON, aided and abetted by defendant ANTHONY PELLICANO, intentionally accessed a computer without authorization and in excess of his authorized access and thereby obtained information from a department and agency of the United States for purposes of private financial gain, that is, defendant ARNESON, aided and abetted by defendant PELLICANO, accessed and caused to be accessed the LAPD computer system without authorization and in excess of his authorized access to obtain criminal history and other law enforcement information for the persons named below from the NCIC database maintained by the Federal Bureau of Investigation, an agency of the United States Government, for purposes of obtaining payment from defendant PELLICANO:

| COUNT | DATE | PERSON |
|-------|------|--------|
| 34 | February 6, 2001 | Vincent Zenga |
| 35 | February 6, 2001 | Jerome Zenga |
| 36 | February 13, 2001 | Jessica Schutte |
| 37 | February 14, 2001 | Stacy Codikow |

24

| COUNT | DATE | PERSON |
|---|---|---|
| 38 | February 14, 2001 | Paul Durazzo |
| 39 | February 20, 2001 | Zorianna Kit |
| 40 | March 13, 2001 | Gregory Dovel |
| 41 | April 26, 2001 | Keith Carradine |
| 42 | April 26, 2001 | Hayley Dumond |
| 43 | August 24, 2001 | Sandra Rodriguez |
| 44 | August 24, 2001 | Ester Pina |
| 45 | August 24, 2001 | Mirella Lavorin |
| 46 | August 24, 2001 | Carrie Cagle |
| 47 | October 18, 2001 | George Kalta |
| 48 | February 19, 2002 | Kevin Templeton |
| 49 | March 15, 2002 | Patrick Theohar |
| 50 | March 18, 2002 | Laura Moreno |
| 51 | March 18, 2002 | Marcus Moreno |
| 52 | April 3, 2002 | Pamela Miller |
| 53 | April 19, 2002 | Michael Kolesa |
| 54 | May 9, 2002 | Arthur Bernier |
| 55 | May 16, 2002 | James Casey |
| 56 | May 16, 2002 | Andrew Miller |
| 57 | May 16, 2002 | Anita Busch |
| 58 | May 16, 2002 | Bernard Weinraub |
| 59 | May 16, 2002 | Richard Miller |
| 60 | May 16, 2002 | Joyce Miller |
| 61 | September 4, 2002 | Timea Zsibrita |
| 62 | October 29, 2002 | Lucille Salter |
| 63 | October 29, 2002 | David Salter |
| 64 | October 29, 2002 | Cindy Salter |

COUNTS SIXTY-FIVE THROUGH SIXTY-NINE

[18 U.S.C. §§ 1028(a)(7), 2]

[Identity Theft]

[Defendants PELLICANO and ARNESON]

40.   The Grand Jury hereby realleges Paragraphs 1-2, 6-7, 9-10, 19 and 22-25 of this Indictment as though fully set forth herein.

41.   On or about each of the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants ANTHONY PELLICANO and MARK ARNESON knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, the following means of identification of another person with the intent to commit, and to aid and abet, and in connection with, an unlawful activity that constituted a violation of Federal law, to wit, Title 18, United States Code, Section 1030(a)(4) (computer fraud), and a felony under applicable State law, to wit, California Penal Code Section 502(c)(2) (unauthorized access to computer data):

| COUNT | DATE | MEANS OF IDENTIFICATION |
|-------|------|-------------------------|
| 65 | April 26, 2001 | Name of Jude Green |
| 66 | August 10, 2001 | Name of Bryan Lourd |
| 67 | August 10, 2001 | Name of Kevin Huvane |
| 68 | March 18, 2002 | Name of Loretta Moreno |
| 69 | March 21, 2002 | Name of Steven Roman |

COUNTS SEVENTY THROUGH SEVENTY-FOUR

[18 U.S.C. §§ 1030(a)(4), 2]

[Computer Fraud]

[Defendants PELLICANO and ARNESON]

42.  The Grand Jury hereby realleges Paragraphs 1-2, 6-7, 9-10, 19 and 22-25 of this Indictment as though fully set forth herein.

43.  On or about each of the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant MARK ARNESON, aided and abetted by defendant ANTHONY PELLICANO, knowingly and with intent to defraud, accessed without authorization and in excess of his authorized access a protected computer, namely, a computer in the LAPD computer system, and by means of accessing the protected computer furthered the intended fraud and obtained something of value, namely, DMV information for the following persons:

| COUNT | DATE | PERSON |
|-------|------|--------|
| 70 | April 26, 2001 | Jude Green |
| 71 | August 10, 2001 | Bryan Lourd |
| 72 | August 10, 2001 | Kevin Huvane |
| 73 | March 18, 2002 | Loretta Moreno |
| 74 | March 21, 2002 | Steven Roman |

COUNTS SEVENTY-FIVE THROUGH SEVENTY-SIX

[18 U.S.C. § 1343, 1346, 2]

[Honest Services Wire Fraud]

[Defendant PELLICANO]

44.   The Grand Jury hereby realleges Paragraphs 1, 4, 8-10, 20, and 22-25 of this Indictment as though fully set forth herein.

45.   On or about each of the following dates, within the Central District of California, defendant ANTHONY PELLICANO and Craig Stevens, and others known and unknown to the Grand Jury, aiding and abetting each other, having knowingly and with intent to defraud devised and participated in a scheme to defraud and deprive the BHPD and the citizens of the City of Beverly Hills of their right to Stevens' honest services by using Stevens' authority and official position as a BHPD officer to enrich themselves by receiving payments in return for obtaining and providing criminal history and other law enforcement information, as described in paragraphs 20 and 22-25 of this Indictment, for the purpose of executing and attempting to execute this scheme, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, and signals, that is, computer transmissions from Los Angeles, California searching NCIC in Clarksburg, West Virginia for criminal history and other law enforcement information on the following persons:

| COUNT | DATE | PERSON |
|-------|------|--------|
| 75 | November 9, 2001 | Max Russo |
| 76 | December 18, 2001 | Adam Sender |

28

COUNTS SEVENTY-SEVEN THROUGH SEVENTY-EIGHT

[18 U.S.C. § 1030(a)(2)(B), (c)(2)(B)(i); 18 U.S.C. § 2]

[Unauthorized Computer Access of United States Agency Information]

[Defendant PELLICANO]

46.   The Grand Jury hereby realleges Paragraphs 1, 4, 8-10, 20, and 22-25 of this Indictment as though fully set forth herein.

47.   On or about each of the following dates, in Los Angeles County, within the Central District of California and elsewhere, defendant ANTHONY PELLICANO aided and abetted Craig Stevens to intentionally access a computer without authorization and in excess of his authorized access and thereby obtain information from a department and agency of the United States for purposes of private financial gain, that is, defendant PELLICANO aided and abetted Craig Stevens to access and cause to be accessed the BHPD computer system without authorization and in excess of his authorized access to obtain criminal history and other law enforcement information for the persons named below from the NCIC database maintained by the Federal Bureau of Investigation, an agency of the United States Government, for purposes of obtaining payment from defendant PELLICANO:

| COUNT | DATE | PERSON |
|-------|------|--------|
| 77 | November 9, 2001 | Max Russo |
| 78 | December 18, 2001 | Adam Sender |

COUNTS SEVENTY-NINE THROUGH EIGHTY-TWO

[18 U.S.C. §§ 1028(a)(7), 2]

[Identity Theft]

[Defendant PELLICANO]

48.   The Grand Jury hereby realleges Paragraphs 1, 4, 8-10, 20, and 22-25 of this Indictment as though fully set forth herein.

49.   On or about each of the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANTHONY PELLICANO knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, the following means of identification of another person with the intent to commit, and to aid and abet, and in connection with, an unlawful activity that constituted a violation of Federal law, to wit, Title 18, United States Code, Section 1030(a)(4) (computer fraud), and a felony under applicable State law, to wit, California Penal Code Section 502(c)(2) (unauthorized access to computer data):

| COUNT | DATE | MEANS OF IDENTIFICATION |
| --- | --- | --- |
| 79 | April 4, 2001 | Name of Aaron Russo |
| 80 | April 4, 2001 | Name of Heidi Gregg |
| 81 | April 4, 2001 | Name of Maxwell Russo |
| 82 | April 4, 2001 | Name of Samuel Russo |

COUNTS EIGHTY-THREE THROUGH EIGHTY-SIX

[18 U.S.C. §§ 1030(a)(4), 2]

[Computer Fraud]

[Defendant PELLICANO]

50.   The Grand Jury hereby realleges Paragraphs 1, 4, 8-10, 20, and 22-25 of this Indictment as though fully set forth herein.

51.   On or about each of the following dates, in Los Angeles County, within the Central District of California and elsewhere, defendant ANTHONY PELLICANO aided and abetted Craig Stevens to knowingly and with intent to defraud access without authorization and in excess of his authorized access a protected computer, namely, a computer in the BHPD computer system, and by means of accessing the protected computer further the intended fraud and obtain something of value, namely, DMV information for the following persons:

| COUNT | DATE | MEANS OF IDENTIFICATION |
|-------|------|-------------------------|
| 83 | April 4, 2001 | Name of Aaron Russo |
| 84 | April 4, 2001 | Name of Heidi Gregg |
| 85 | April 4, 2001 | Name of Maxwell Russo |
| 86 | April 4, 2001 | Name of Samuel Russo |

31

COUNTS EIGHTY-SEVEN THROUGH NINETY

[18 U.S.C. §§ 1028(a)(7), 2]

[Identity Theft]

[Defendants PELLICANO and TURNER]

52.   The Grand Jury hereby realleges Paragraphs 1, 3, 5, 11-13, and 21-25 of this Indictment as though fully set forth herein.

53.   On or about each of the following dates, in Los Angeles County, within the Central District of California and elsewhere, defendants ANTHONY PELLICANO and RAYFORD EARL TURNER knowingly transferred, possessed, and used, and caused to be transferred, possessed, and used, without lawful authority, a means of identification of another person with the intent to commit, and to aid and abet, and in connection with, an unlawful activity that constituted a violation of Federal law, to wit, Title 18, United States Code, Section 1030(a)(4) (computer fraud), and a felony under applicable State law, to wit, California Penal Code Section 502(c)(2) (unauthorized access to computer data):

| COUNT | DATE | MEANS OF IDENTIFICATION |
|-------|------|-------------------------|
| 87 | February 13, 2001 | Name of and Telephone Number of Bo Zenga |
| 88 | April 2, 2001 | Name and Telephone Number of Heidi Gregg |
| 89 | February 12, 2002 | Name and Telephone Number of Johnny Friendly |
| 90 | May 16, 2002 | Name and Telephone Number of Anita Busch |

COUNTS NINETY-ONE THROUGH NINETY-FOUR

[18 U.S.C. §§ 1030(a)(4), 2]

[Computer Fraud]

[Defendants PELLICANO and TURNER]

54.   The Grand Jury hereby realleges Paragraphs 1, 3, 5, 11-13, and 21-25 of this Indictment as though fully set forth herein.

55.   On or about each of the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants ANTHONY PELLICANO and RAYFORD EARL TURNER aided and abetted Teresa Wright to knowingly and with intent to defraud access without authorization and in excess of her authorized access a protected computer, namely, a Dell Latitude notebook computer, model number CP1A366XT, serial number VK70N, located at SBC, 1010 Wilshire Boulevard, Room 800, Los Angeles, California 90017, and by means of accessing the protected computer further the intended fraud and obtain something of value, namely, telephone subscriber information for the following SBC customers:

| COUNT | DATE | SBC CUSTOMER |
|-------|------|--------------|
| 91 | February 13, 2001 | Bo Zenga |
| 92 | April 2, 2001 | Heidi Gregg |
| 93 | February 12, 2002 | Johnny Friendly |
| 94 | May 16, 2002 | Anita Busch |

COUNT NINETY-FIVE

[18 U.S.C. § 371]

[Conspiracy]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

A.   OBJECTS OF THE CONSPIRACY

56.   Beginning on a date unknown to the Grand Jury and continuing until on or about November 21, 2002, in Los Angeles County, within the Central District of California, and elsewhere, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN, and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to:

a.   intentionally intercept, endeavor to intercept, and procure other persons to intercept and endeavor to intercept wire communications, in violation of Title 18, United States Code, Section 2511(1)(a); and

b.   intentionally use, and endeavor to use, the contents of wire communications, knowing and having reason to know that the information was obtained through the interception of wire communications, in violation of Title 18, United States Code, Section 2511(1)(d).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

57.   The objects of the conspiracy were to be accomplished, in substance, as follows:

58.   At defendant PELLICANO's direction, defendant KACHIKIAN would and did develop, implement, and maintain a computer software program to facilitate the illegal interception of telephone calls.

34

59.  Defendant PELLICANO would and did permit himself to be retained by individuals and entities known and unknown to the Grand Jury ("the clients") for the purpose of implementing illegal wiretaps of individuals, including the clients' litigative opponents.

60.  At defendant PELLICANO's direction, defendant TURNER, a field technician for telephone company SBC (formerly Pacific Bell), would and did access, and cause others known and unknown to the Grand Jury to access, proprietary telephone company databases and equipment to implement the illegal wiretaps.

61.  Defendant PELLICANO would and did furnish the computer hardware and software used to implement the illegal wiretaps, including the hardware and software designed by defendant KACHIKIAN, review the contents of intercepted conversations, and provide the contents of those conversations to the clients.

62.  Defendant PELLICANO and the clients would and did use the information for their own purposes, including securing a tactical advantage in litigation by learning their opponents' plans, strategies, perceived strengths and weaknesses, settlement positions, and other confidential information.

C.  OVERT ACTS

63.  On or about each of the following dates, within the Central District of California and elsewhere, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants PELLICANO, TURNER, and KACHIKIAN, and others known and unknown to the Grand Jury, committed the following overt acts, among others:

35

64. Beginning in or around 1995, defendant KACHIKIAN began developing for defendant PELLICANO "Telesleuth," a computer software program to be used for the purpose of intercepting telephonic communications.

65. On or about March 11, 1996, defendant PELLICANO requisitioned engineering services necessary for the completion of hardware to be used in connection with the "Telesleuth" wiretapping program.

66. From in or around January 1997 to in or around May 2002, defendant PELLICANO paid defendant TURNER at least $36,655 for the purpose of obtaining proprietary telephone company information and facilitating illegal wiretaps.

67. In or around May 1997, defendants PELLICANO and TURNER used the "Telesleuth" program to intercept telephone communications of Robert Maguire.

68. Between in or around September 1997 and in or around March 1998, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Mark Hughes.

69. In or around January 1998, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of James Orr.

70. In or around October 1999, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Michael Rosen.

71. On or about July 19, 2000, defendants PELLICANO and KACHIKIAN requisitioned Amuneal Manufacturing Corp. to create new metal housings for the circuit boards used in connection with the "Telesleuth" wiretapping program.

72.   In or around July 2000, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Kissandra Cohen.

73.   On or about August 2, 2000, defendant TURNER caused an inquiry to be made of a proprietary SBC computer database to obtain telephone information regarding Erin Finn.

74.   Between on or about August 2, 2000, and on or about November 6, 2000, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Erin Finn.

75.   In or around August 2000, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Charles Roven.

76.   Between in or around August 2000 and in or around December 2000, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Ami Shafrir.

77.   Between in or around October 2000 and in or around November 2000, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Paul Rusconi.

78.   In or around January 2001, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Lisa Gores.

79.   Between in or around January 2001 and in or around June 2001, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Laura Buddine.

80.   On or about February 13, 2001, defendant TURNER caused an inquiry to be made of a proprietary SBC computer database to obtain telephone information regarding Vincent Bo Zenga.

37

81.   Between in or around February 2001 and in or around April 2001, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Vincent Bo Zenga.

82.   Between in or around March 2001 and in or around April 2001, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of John LaViolette.

83.   On or about April 2, 2001, defendant TURNER caused an inquiry to be made of a proprietary SBC computer database to obtain telephone information regarding Aaron Russo.

84.   In or around April 2001, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Aaron Russo.

85.   In or around May 2001, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Keith Carradine.

86.   On or about October 17, 2001, unindicted coconspirator George Kalta paid defendant PELLICANO $25,000 to intercept telephone communications of Laura Moreno.

87.   Between on or about February 8, 2002, and on or about April 30, 2002, defendant KACHIKIAN charged defendant PELLICANO more than $13,425 for continued work on the "Telesleuth" hardware and software.

88.   On or about February 12, 2002, defendant TURNER caused an inquiry to be made of a proprietary SBC computer database to obtain telephone information regarding "Johnny Friendly."

89.   In or around February 2002, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Sylvester Stallone.

90.   On or about May 16, 2002, defendant TURNER caused an inquiry to be made of a proprietary SBC computer database to obtain telephone information regarding Anita Busch.

91.   Beginning on a date unknown to the Grand Jury, and continuing to on or about November 5, 2002, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Anita Busch.

COUNT NINETY-SIX

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

92.   Beginning on or about August 2, 2000, and continuing until at least on or about November 6, 2000, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Erin Finn.

COUNT NINETY-SEVEN

[18 U.S.C. §§ 2511(1)(a), 2]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, KACHIKIAN, and NICHERIE]

93.   Beginning in or around August 2000 and continuing until in or around December 2000, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN, aided and abetted by defendant ABNER NICHERIE, intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Ami Shafrir.

41

COUNT NINETY-EIGHT

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

94.   On or about January 8, 2001, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Lisa Gores.

COUNT NINETY-NINE

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

95.   Between in or around January 2001 and in or around June 2001, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Laura Buddine.

COUNT ONE HUNDRED

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

96.   Between in or around February 2001 and in or around April 2001, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Vincent Bo Zenga.

44

COUNT ONE HUNDRED AND ONE

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

97.   In or around April 2001, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Aaron Russo.

45

COUNT ONE HUNDRED AND TWO

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

98.   In or around May 2001, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Keith Carradine.

46

COUNT ONE HUNDRED AND THREE

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

99.   In or around February 2002, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Sylvester Stallone.

COUNT ONE HUNDRED AND FOUR

[18 U.S.C. § 2511(1)(a)]

[Interception of Wire Communications]

[Defendants PELLICANO, TURNER, and KACHIKIAN]

100. Beginning on a date unknown to the Grand Jury, and continuing to on or about November 5, 2002, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO, RAYFORD EARL TURNER, and KEVIN KACHIKIAN intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Anita Busch.

COUNT ONE HUNDRED AND FIVE

[18 U.S.C. §§ 2512(1)(b), 2]

[Possession of Wiretapping Device]

[Defendants PELLICANO and KACHIKIAN]

101. From in or around July 2000 to on or about November 21, 2002, in Los Angeles County, within the Central District of California, defendants ANTHONY PELLICANO and KEVIN KACHIKIAN intentionally manufactured, assembled, and possessed, and caused to be manufactured, assembled, and possessed, an electronic, mechanical, and other device, knowing and having reason to know that the design of such device rendered it primarily useful for the purpose of the surreptitious interception of wire communications, and that such device and any component thereof had been sent through the mail and transported in interstate and foreign commerce.

COUNT ONE HUNDRED AND SIX

[18 U.S.C. § 371]

[Conspiracy]

[Defendants PELLICANO and CHRISTENSEN]

A.   OBJECTS OF THE CONSPIRACY

102. Beginning on or about March 15, 2002, and continuing until on or about May 16, 2002, in Los Angeles County, within the Central District of California, and elsewhere, defendants ANTHONY PELLICANO and TERRY CHRISTENSEN, and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to:

a.   intentionally intercept, endeavor to intercept, and procure other persons to intercept and endeavor to intercept wire communications, in violation of Title 18, United States Code, Section 2511(1)(a); and

b.   intentionally use, and endeavor to use, the contents of wire communications, knowing and having reason to know that the information was obtained through the interception of wire communications, in violation of Title 18, United States Code, Section 2511(1)(d).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

103. The objects of the conspiracy were to be accomplished, in substance, as follows:

104. Defendant PELLICANO would implement and maintain an illegal wiretap on the telephone of Lisa Bonder Kerkorian, who was engaged in litigation with a client of defendant CHRISTENSEN, an attorney licensed in the State of California.

50

105. Defendant PELLICANO would listen to Lisa Bonder Kerkorian's intercepted telephone conversations, and would provide the contents of those conversations, including summaries of privileged attorney-client communications between Lisa Bonder Kerkorian and her attorneys, to defendant CHRISTENSEN and others known and unknown to the Grand Jury.

106. Defendant CHRISTENSEN, and others known and unknown to the Grand Jury, would use the information gleaned from the illegal wiretap to secure a tactical advantage in litigation by learning Lisa Bonder Kerkorian's plans, strategies, perceived strengths and weaknesses, settlement position, and other confidential information.

107. Defendant PELLICANO would discuss with defendant CHRISTENSEN how long the illegal wiretap should remain in place and when the illegal wiretap should be brought to an end.

108. Defendant CHRISTENSEN would pay defendant PELLICANO at least $100,000 for defendant PELLICANO's services in connection with the illegal wiretap.

C.   OVERT ACTS

109. On or about each of the following dates, within the Central District of California and elsewhere, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants PELLICANO and CHRISTENSEN, and others known and unknown to the Grand Jury, committed the following overt acts, among others:

110. On or about March 15, 2002, defendant PELLICANO received a telephone call from an attorney who instructed defendant PELLICANO to contact defendant CHRISTENSEN regarding

51

"going after" Lisa Bonder Kerkorian's attorney, who had referred defendant CHRISTENSEN to the State Bar of California.

111. On or about March 18, 2002, defendant CHRISTENSEN authorized defendant PELLICANO to implement an illegal wiretap of Lisa Bonder Kerkorian's telephone in order to discover the father of Lisa Bonder Kerkorian's child in connection with a child support case involving defendant CHRISTENSEN's client.

112. On or about March 18, 2002, after agreeing to implement the illegal wiretap of Lisa Bonder Kerkorian's telephone, defendant CHRISTENSEN told defendant PELLICANO that "one of the criteria is that no name ever surfaces anywhere" because "the people related to me don't want to do this."

113. On or about March 18, 2002, after agreeing to implement the illegal wiretap of Lisa Bonder Kerkorian's telephone, defendant PELLICANO assured defendant CHRISTENSEN that "the conversations are only between you and I" and that defendant PELLICANO would be "feeding you information that you'd never get in a million years."

114. On or about March 18, 2002, after agreeing to implement the illegal wiretap to discover the father of Lisa Bonder Kerkorian's child, defendant PELLICANO said that he would be providing defendant CHRISTENSEN with other information that might help with the case, and defendant CHRISTENSEN stated, "I'll take it."

115. On or about March 25, 2002, defendant CHRISTENSEN paid $25,000 to defendant PELLICANO for the purpose of implementing an illegal wiretap to intercept the telephone calls of Lisa Bonder Kerkorian, including calls between her and her attorneys.

116. In or around April and May 2002, defendant PELLICANO used the "Telesleuth" program to intercept telephone communications of Lisa Bonder Kerkorian.

117. On or about April 18, 2002, defendant PELLICANO related to defendant CHRISTENSEN, in order to "help" defendant CHRISTENSEN with a hearing that day, the contents of intercepted telephone calls between Lisa Bonder Kerkorian and her attorneys in which they discussed their reactions to a prior court ruling, their litigation strategies, and their settlement position.

118. On or about April 22, 2002, defendant PELLICANO related to defendant CHRISTENSEN the contents of intercepted telephone calls between Lisa Bonder Kerkorian and her attorneys and warned defendant CHRISTENSEN to "be very careful about this because there is only one way for me to know this."

119. On or about April 22, 2002, defendant PELLICANO told defendant CHRISTENSEN that he "could hear the sigh of relief in [Lisa Bonder Kerkorian's attorney's] voice" during an intercepted telephone conversation between Lisa Bonder Kerkorian and her attorney.

120. On or about April 22, 2002, defendant PELLICANO, after relating to defendant CHRISTENSEN the contents of intercepted telephone conversations between Lisa Bonder Kerkorian and her attorneys, told defendant CHRISTENSEN that "if we continue to get this kind of information with their strategy, we're really killing 'em."

121. On or about April 22, 2002, defendant PELLICANO told defendant CHRISTENSEN that Lisa Bonder Kerkorian's child "gets on

1 the phone maybe five or six times a week and just cries into the

2 phone."

3      122. On or about April 26, 2002, defendant CHRISTENSEN asked

4 defendant PELLICANO what he had heard and noted that defendant

5 PELLICANO had been waiting to find out what "to listen about."

6      123. On or about April 26, 2002, defendant PELLICANO related

7 to defendant CHRISTENSEN the contents of intercepted telephone

8 calls between Lisa Bonder Kerkorian and her attorneys in which

9 they discussed their settlement position.

10      124. On or about April 27, 2002, defendant CHRISTENSEN asked

11 defendant PELLICANO what Lisa Bonder Kerkorian was discussing

12 with her attorneys.

13      125. On or about April 27, 2002, defendant PELLICANO related

14 to defendant CHRISTENSEN the contents of intercepted telephone

15 calls between Lisa Bonder Kerkorian and her attorneys in which

16 they discussed their settlement position, including quoting to

17 defendant CHRISTENSEN Lisa Bonder Kerkorian's "exact words."

18      126. On or about April 27, 2002, defendant PELLICANO related

19 to defendant CHRISTENSEN the contents of an intercepted call

20 between Lisa Bonder Kerkorian and her father, and reminded

21 defendant CHRISTENSEN that "there is no way, except with my

22 unique techniques, that you would know this."

23      127. On or about April 28, 2002, defendant PELLICANO related

24 to defendant CHRISTENSEN the contents of intercepted telephone

25 calls between Lisa Bonder Kerkorian and her attorneys in which

26 Lisa Bonder Kerkorian discussed the identity of her child's

27 biological father.

28

128. On or about April 28, 2002, while discussing whether mediator Debra Simon had accurately relayed the position of defendant CHRISTENSEN's client to Lisa Bonder Kerkorian and her attorneys, defendant PELLICANO said, "I'm going to find out for sure, without any question," and defendant CHRISTENSEN agreed, "Yeah, you will."

129. On or about April 28, 2002, defendant PELLICANO asked defendant CHRISTENSEN what settlement position had been communicated by the mediator to Lisa Bonder Kerkorian, stating, "I'm going to hear it for myself."

130. On or about April 28, 2002, defendant CHRISTENSEN told defendant PELLICANO that the most important thing was to discover the truth about the father of Lisa Bonder Kerkorian's child, adding, "not that this other stuff hasn't proven to be very helpful."

131. On or about April 28, 2002, defendant PELLICANO told defendant CHRISTENSEN that he had 80 intercepted telephone calls to listen to "just from today."

132. On or about April 28, 2002, defendant PELLICANO told defendant CHRISTENSEN that he was "hearing both sides, you know, I'm hearing her talk to Kirk [Kerkorian] too.  That's not for attribution, I mean for distribution, but I'm hearing both of them, I'm hearing all of it, the whole nine yards."

133. On or about April 29, 2002, defendant PELLICANO related to defendant CHRISTENSEN the contents of intercepted telephone calls between Lisa Bonder Kerkorian and mediator Debra Simon relating to the litigation between Lisa Bonder Kerkorian and defendant CHRISTENSEN's client.

134. On or about April 29, 2002, defendant CHRISTENSEN discussed with defendant PELLICANO the words that Lisa Bonder Kerkorian had used in a conversation with her attorney.

135. On or about April 29, 2002, defendant PELLICANO assured defendant CHRISTENSEN that "I know everything that's going on, and obviously they don't know I know. Nobody knows except you and me."

136. On or about May 3, 2002, defendant PELLICANO related to defendant CHRISTENSEN the contents of intercepted telephone calls between Lisa Bonder Kerkorian and her attorneys in which they discussed their reactions to a previous court hearing.

137. On or about May 3, 2002, defendant PELLICANO told defendant CHRISTENSEN that he had another 364 intercepted telephone conversations that he had to listen to.

138. On or about May 3, 2002, defendant PELLICANO told defendant CHRISTENSEN about a conversation between Lisa Bonder Kerkorian and her attorney that was "worth its weight in gold."

139. On or about May 8, 2002, defendant PELLICANO related to defendant CHRISTENSEN the contents of intercepted telephone calls between Lisa Bonder Kerkorian and her attorneys in which they discussed their settlement expectations.

140. On or about May 8, 2002, defendant CHRISTENSEN told defendant PELLICANO that he liked what he had learned from defendant PELLICANO and that he was thinking about sending "a little more expense money" to cover the cost of the wiretap.

141. On or about May 9, 2002, defendant PELLICANO related to defendant CHRISTENSEN the contents of intercepted telephone calls between Lisa Bonder Kerkorian and mediator Debra Simon.

56

142. On or about May 10, 2002, defendant PELLICANO related to defendant CHRISTENSEN the contents of intercepted telephone calls between Lisa Bonder Kerkorian and her attorneys in which they discussed the tax returns of defendant CHRISTENSEN's client.

143. On or about May 10, 2002, defendant PELLICANO told defendant CHRISTENSEN about the "elation" that Lisa Bonder Kerkorian felt after a telephone call with Debra Simon, and defendant CHRISTENSEN said that he would pass the information on to his client.

144. On or about May 14, 2002, defendant CHRISTENSEN told defendant PELLICANO that it would be "interesting" to know what Lisa Bonder Kerkorian's lawyers would tell her about the court proceedings that day, ordered Pellicano to listen to that day's intercepted conversations, and said that they would decide the next day whether to continue with the wiretap.

145. On or about May 14, 2002, defendant CHRISTENSEN paid $75,000 to defendant PELLICANO as additional payment for services in connection with the illegal wiretap.

146. On or about May 15, 2002, defendant CHRISTENSEN instructed defendant PELLICANO to "wrap up" the illegal wiretap of Lisa Bonder Kerkorian, and defendant PELLICANO told defendant CHRISTENSEN that it would be "too difficult" and "too dangerous" to reinitiate the wiretap once it was disconnected.

147. On or about May 16, 2002, defendant CHRISTENSEN told defendant PELLICANO that he had been "great," and defendant PELLICANO confirmed that "the switch gets shut."

COUNT ONE HUNDRED AND SEVEN

[18 U.S.C. §§ 2511(1)(a), 2]

[Interception of Wire Communications]

[Defendants PELLICANO and CHRISTENSEN]

148. In or around April and May 2002, in Los Angeles County, within the Central District of California, defendant ANTHONY PELLICANO, aided and abetted by defendant TERRY CHRISTENSEN, intentionally intercepted, endeavored to intercept, and procured another person to intercept and endeavor to intercept, wire communications of Lisa Bonder Kerkorian.

58

COUNT ONE HUNDRED AND EIGHT

[18 U.S.C. § 1001(a)(2)]

[False Statements]

[Defendant ARNESON]

149. On or about July 9, 2003, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the United States Department of Justice, Federal Bureau of Investigation ("FBI"), an agency of the executive branch of the Government of the United States, defendant MARK ARNESON knowingly and willfully made a materially false, fictitious, and fraudulent statement, in that, during an interview conducted by the FBI, defendant ARNESON claimed that he had conducted inquiries of law enforcement databases on the name "Anita Busch" based on his belief that Anita Busch was involved in gambling or other organized crime activities, when in fact, as defendant ARNESON well knew, he had conducted those inquiries at the behest of Anthony Pellicano and for no legitimate law enforcement interest.

COUNT ONE HUNDRED AND NINE

[18 U.S.C. § 1001(a)(2)]

[False Statements]

[Defendant TURNER]

150. On or about January 28, 2003, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the United States Department of Justice, Federal Bureau of Investigation ("FBI"), an agency of the executive branch of the Government of the United States, defendant RAYFORD EARL TURNER knowingly and willfully made a materially false, fictitious, and fraudulent statement, in that, during an interview conducted by the FBI, defendant TURNER claimed that he had never assisted Anthony Pellicano in wiretapping telephones or making proprietary telephone company information available to Pellicano, when in fact, as defendant TURNER well knew, he had regularly assisted Pellicano in wiretapping telephones and in making proprietary telephone company information available to Pellicano.

COUNT ONE HUNDRED AND TEN

[18 U.S.C. § 1512(c)(1)]

[Destruction of Evidence]

[Defendant KACHIKIAN]

151. In or around December 2002, in Los Angeles County, within the Central District of California, defendant KEVIN KACHIKIAN corruptly altered, destroyed, mutilated, and concealed a record, document, and other object, namely, computer files, hardware, and software relating to the "Telesleuth" computer program, and attempted to do so, with the intent to impair the object's integrity and availability for use in an official proceeding.

61

COUNT ONE HUNDRED AND ELEVEN

[18 U.S.C. § 1963]

[RICO Forfeiture]

[Defendants PELLICANO, ARNESON, and TURNER]

152. The allegations contained in Counts One and Two of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Counts One and Two of this Indictment.

153. Defendants ANTHONY PELLICANO, MARK ARNESON, and RAYFORD EARL TURNER:

a.    have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1); and

b.    have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

154. The interests of defendants PELLICANO, ARNESON, and TURNER subject to forfeiture to the United States pursuant to

62

Title 18, United States Code, Section 1963(a)(1) and (3), include but are not limited to at least $2,079,250.

155. If any of the property described in the immediately preceding paragraph, as a result of any act or omission of a defendant --

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value;  or

      e.    has been commingled with other property which cannot be divided without difficulty,

the court shall order the forfeiture of any other property of the defendants up to the value of any property set forth in paragraph 154 above.

156. The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

157. All pursuant to Title 18, United States Code, Section 1963.

A TRUE BILL

/s/
_____
Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Violent & Organized Crime Section

DANIEL A. SAUNDERS
KEVIN M. LALLY
Assistant United States Attorneys
Deputy Chiefs, Violent & Organized Crime Section