# DUE TO THE SIZE OF THIS DOCUMENT, IT HAS BEEN DIVIDED INTO PARTS FOR E-FILING PURPOSES.

# PART 2

M.   <u>State Law Bribery (racketeering acts ninety-three through one-hundred twelve)</u>

1.   <u>Statutory Language</u>

California Penal Code Section 67 (giving or offering a bribe) provides, in pertinent part:

[E]very person who gives or offers any bribe to any executive officer of this state, with intent to influence him in respect to any act, decision, vote, opinion or other proceeding as to such officer is punishable by imprisonment in the state prison for two, three or four years . . . .

California Penal Code Section 68 (asking for or receiving a bribe) provides, in pertinent part:

[E]very executive or ministerial officer, employee or appointee of the State of California, county or city therein or political subdivision thereof, who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby, is punishable by imprisonment in the state prison for two, three or four years . . . .

California Penal Code Section 7(6) defines bribe as:

[A]nything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity.

California Penal Code Section 7(3) defines corruptly as:

42

1    [A] wrongful design to acquire or cause some pecuniary or
2    other advantage to the person guilty of the act or omission
3    referred to, or some other person.

4    2.   Elements

5    In order for a defendant to be found guilty of giving or
6    offering a bribe under California Penal Code Section 67, the
7    government must prove the following: (1) the defendant gave or
8    offered a bribe; (2) the defendant did so with the specific
9    intent corruptly to influence another person in his official
10   capacity as to some act, decision, vote, opinion or other
11   proceeding; and (3) the person to whom the bribe was given or
12   offered was an executive officer of the State of California.

13   In order for a defendant to be guilty of asking for or
14   receiving a bribe, the government must prove the following: (1)
15   the defendant was an executive officer; (2) the defendant asked
16   for, received, or agreed to receive, a bribe; and (3) the
17   defendant's request for, receipt of, or agreement to receive a
18   bribe was upon an agreement or understanding that his official
19   action would be influenced thereby.

20   3.   Applicable Law

21   It is well established that a police officer qualifies as an
22   "executive officer" under Sections 67 and 68 of the California
23   Penal Code.   People v. Pacheco, 263 Cal. App. 2d 555, 557 (1968)
24   (recognizing that the term executive officer as used in the
25   bribery statutes has "long been held to include police
26   officers").

27

28                              43

1       It is equally well established that "linkage between a
2   payment and a specific official decision is not required under
3   California bribery law."[4]   Frega, 179 F.3d at 805.   Therefore,
4   under Section 67, the offense of bribery of an executive officer
5   is complete when the gift or offer is made with the corrupt
6   intent required.   Id. at 805.   Similarly, under Section 68, the
7   crime is complete when the executive officer "asks, receives or
8   agrees to receive any bribe.   No action on the part of the
9   victim, such as payment, delivery or otherwise, is necessary to
10  complete the offense."   People v. Bringham, 72 Cal. App.2d 1, 6-7
11  (2d Dist. 1945).   As a result, the question of intent must focus
12  on the party that offers or seeks the bribe and not on the victim
13  who is asked to receive or to pay the bribe and thus, there need
14  not be a meeting of the minds between the two parties.   Id.

15      It is essential to the crime of bribery that the subject
16  matter upon which the bribe is to operate actually exists and has
17  been or can be brought before the executive officer.   It is not
18  necessary, however, that the proposed act which is influenced or
19  done by the bribe be a part of the performance of the duties
20  imposed by law upon the officer in question.   It is sufficient
21  that the act sought to be influenced is within the general scope
22  of the officer's duties and within his apparent ability to
23  perform.   CALJIC 7.10.

---

26      [4]      In this regard, the California bribery statutes differ
    from the federal bribery/anti-gratuity statutes.   Frega, 179 F.3d
27  at 805.

28                                    44

1  N.    RICO Forfeiture (Count one-hundred-eleven)

2       Title 18, United States Code, Section 1963(a)(1) provides,

3  in pertinent part:

4       [W]hoever violates any provision of section 1962 of this

5  chapter shall be fined under this title or imprisoned not more

6  than twenty years, or both, and shall forfeit to the United

7  States, irrespective of any provision of State law, any interest

8  the person has maintained in violation of section 1962.

9       Title 18, United States Code, Section 1963(a)(3) provides,

10  in pertinent part:

11      [W]oever violates any provision of section 1962 of this

12  chapter . . . shall forfeit to the United States, irrespective of

13  any provision of State law any property constituting, or derived

14  from, any proceedings which the person obtained, directly or

15  indirectly, from racketeering activity or unlawful debt

16  collection in violation of Section 1962.

17      Title 18, United States Code, Section 1963(m) provides, in

18  pertinent part:

19      [I]f any of the property described in subsection (a), as a

20  result of any act or omission of the defendant: (1) cannot be

21  located upon the exercise of due diligence; (2) has been

22  transferred or sold to, or deposited with, a third party; (3) has

23  been placed beyond the jurisdiction of the court; (4) has been

24  substantially diminished in value; or (5) has been comingled with

25  other property which cannot be divided without difficulty; the

26  court shall order the forfeiture of any other property of the

27

28                              45

1  defendant up to the value of any property described in paragraphs
2  (1) through (5).

3      1.   Elements

4      For a RICO forfeiture judgment to be imposed against a
5  defendant convicted under Sections 1962(c) or (d), the government
6  must prove the following: (1) it is more likely than not that the
7  property at issue was acquired or maintained through racketeering
8  activity; or (2) it is more likely than not that the property
9  constitutes the proceeds of racketeering activity.

10     2.   Applicable Law

11     The Supreme Court has recognized that "Congress plainly
12 intended forfeiture of assets to operate as punishment for
13 criminal conduct in violation of the federal drug and
14 racketeering laws . . . ." Libretti v. United States, 516 U.S.
15 29, 38-39 (1995). The forfeiture provisions set forth in Section
16 1963 operate in personam against the assets of the defendant and
17 serve as part of the defendant's sentence following conviction.[5]
18 Libretti, 516 U.S. at 38-39; Alexander v. United States, 509 U.S.
19 544, 559 (1993).

20     Section 1963(a)(1) provides for forfeiture of interests that
21 the enterprise acquired or maintained, legitimately or
22 illegitimately, in the course of its racketeering activity.

23

24     [5]    As forfeiture relates to sentencing and not the
25 question of guilt or innocence, the government respectfully
   submits that the trial should be bifurcated with the forfeiture
26 proceeding being tried to the same jury immediately following the
   return of either a RICO or RICO conspiracy conviction against
27 defendants Pellicano, Arneson and/or Turner.

28                              46

1  Russello v. United States, 464 U.S. 16, 22 (1983).   Although
2  Section 1963(a)(1) was construed by the Supreme Court in Russello
3  as providing for the forfeiture of the enterprise's proceeds,[6]
4  Congress codified the Russello holding in Section 1963(a)(3),
5  which effectively allows for money judgments by expressly
6  extending the reach of RICO forfeiture to all illicitly obtained
7  proceeds directly or indirectly obtained by the enterprise as
8  well as any property purchased using such proceeds.   Furthermore,
9  Section 1963(m) permits forfeiture of substitute assets up to the
10 value of the illicitly obtained proceeds in the event that the
11 defendant lacks sufficient funds to satisfy the forfeiture
12 judgment.   Likewise, if the defendant no longer has assets at the
13 time forfeiture is ordered, the court can issue a monetary
14 judgment to be satisfied out of future earnings of the
15 individual.   See e.g., United States v. Casey, 444 F.3d 1071,
16 1073-74 (upholding monetary judgment in Section 853 forfeiture[7]
17 against individual who had spent all of the illicitly obtained
18 funds and noting that "requiring imposition of a money judgment
19 on a defendant who currently possesses no assets furthers the
20 remedial purposes of the forfeiture statute by ensuring that all

21

22      [6]    Under Section 1963(a)(3), the term proceeds encompasses
   the gross, not net, receipts of the racketeering activity.   See,
23 e.g., United States v. Simmons, 154 F.3d 765 (8th Cir. 1998)
   (defendant liable for gross amount of bribe and cannot deduct
24 overhead expenses); United States v. DeFries, 129 F.3d 1293,
   1314-15 (D.C. Cir. 1997) (RICO forfeiture includes federal taxes
25 paid on salaries earned through racketeering activity).

26      [7]    See United States v. Nava, 404 F.3d 1119, 1124 n.1 (9th
   Cir. 2005) (noting that section 853 is "substantially identical"
27 to RICO forfeiture).

28                                    47

1  eligible criminal defendants receive the mandatory forfeiture

2  sanction Congress intended and disgorge all ill-gotten gains,

3  even those already spent"); United States v. Ginsburg, 773 F.3d

4  798, 802 (7th Cir. 1985) (en banc) (finding that "a racketeer who

5  dissipates the profits or proceeds of his racketeering activity

6  on wine, women and song has profited from . . . crime to the

7  same extent as if he had put the money in his bank account").

8      As RICO forfeiture serves as a part of a defendant's

9  sentence, the government's burden of proof is set at the

10  preponderance of the evidence standard.  United States v. Garcia-

11  Guizar, 160 F.3d 511, 517 (9th Cir. 1998) (applying preponderance

12  standard in analogous Section 853 proceeding); United States v.

13  Corrado, 227 F.3d 543, 553 (6th Cir. 2000) (preponderance

14  standard applies to RICO forfeiture proceedings).  Furthermore,

15  RICO forfeiture judgments apply jointly and severally to all

16  defendants who are convicted under Section 1962.  United States

17  v. Browne, 505 F.3d 1229, 1278-79 (11th Cir. 2007) (citing

18  holding in United States v. Caporale, 806 F.2d 1487 (11th Cir.

19  1986) that "imposition of joint and several liability in a

20  forfeiture order upon RICO co-conspirators is not only

21  permissible but necessary [] to effectuate the purpose of the

22  forfeiture provision"); United States v. Edwards, 303 F.3d 606,

23  643-44 (5th Cir. 2002) (same); Corrado, 227 F.3d at 553 (same).

24

25

26

27

28                                48

1                              III.

2                    **STATEMENT OF FACTS**

3        The government intends to introduce evidence at trial to

4   establish the following facts, among others:

5   A.   THE ENTERPRISE

6        Operating under a veneer of legitimacy created by his

7   position as the head of Pellicano Investigative Agency ("PIA"),

8   defendant Anthony Pellicano ("Pellicano") obtained a vaunted

9   reputation as a private investigator who reliably obtained

10  information that other investigators could not.  As a result,

11  Pellicano was able to charge PIA's clients fees that started at

12  $25,000 and frequently escalated into the hundreds of thousands

13  of dollars.

14       Underneath this veneer, however, was a racketeering

15  enterprise that prospered by trafficking in illegally acquired

16  confidential personal information.[8]  Through systematic bribes

17  paid to both law enforcement and telephone company employees,

18  Pellicano created a network of associates who would provide him

19  with access to confidential law enforcement and telephone company

20  information that he was not legally entitled to possess.  For

21  example, to obtain ready access to confidential criminal history

22  information (i.e., rap sheets) and police reports, Pellicano paid

23  Sergeant Mark Arneson ("Arneson") of the Los Angeles Police

24  _____

25       [8]    As witness testimony will establish that Pellicano
    often demanded and received cash payments, the $2,079,250 in RICO
26  forfeiture sought in count one-hundred-eleven constitutes a
    conservative calculation of the proceeds collected by the
27  enterprise in connection with the charged conduct.

28                              49

Department ("LAPD") a monthly retainer of $2,500,[9] as well as additional cash payments.  In return, Arneson, after being provided with names of investigative targets, would access LAPD's protected law enforcement databases to acquire criminal history and other confidential information on the targets, which he then would fax to Pellicano.[10]  Moreover, to conceal the fact that Arneson illegally was providing Pellicano with this information, Pellicano implemented procedures at PIA whereby Arneson would be shielded from the public when at PIA's offices and whereby the information faxed to PIA by Arneson would be reformatted so that the original documents could be shredded and the remaining documents would have no mention of Arneson as the source of the information.[11]

---

[9]    If limited just to payments made by check, Pellicano paid Arneson $8,875 in 1997, $47,915 in 1998, $38,325 in 1999, $34,500 in 1999, $32,250 in 2001, and $27,500 in 2002.  A series of the $2,500 monthly payments serve as the basis of racketeering acts 93 through 112, which charge either offering or receiving a bribe.

[10]    From 1999 (as far back as LAPD retained records) through Pellicano's arrest in 2002, Arneson conducted more than 2,500 inquiries on more than 300 Pellicano investigative targets. The numbers of inquiries exceeds the number of investigative targets because the same name may be run against multiple law enforcement databases (e.g., NCIC, DMV, etc.) or a series of inquiries would be made using multiple iterations of the same name.  Given that several databases were used, several different statutes were violated by Arneson's runs.  For example, inquiries made on California-based databases violated the identity theft provisions of 18 U.S.C. § 1028(a)(7), while those that traveled across state lines also violated the wire fraud provisions set forth in 18 U.S.C. §§ 1343, 1346.

[11]    Occasionally, these internal procedures would break down.  For example, recovered from PIA's computers were scanned computer printouts of DMV and criminal history information for

1    Furthermore, as Arneson was not always available and further
2   lacked access to police reports in areas outside of LAPD's
3   jurisdiction, Pellicano developed other sources in other law
4   enforcement agencies.  For example, Pellicano utilized Beverly
5   Hills Police Officer Craig Stevens to occasionally conduct
6   database inquiries and obtain police reports on his behalf.
7   Stevens has pled guilty to two counts of honest services wire
8   fraud, four counts of computer fraud, and one count of making a
9   false statement to the FBI in connection with having illegally
10   provided Pellicano with confidential information from protected
11   law enforcement databases.

12    In addition to his paid sources at local police departments,
13   Pellicano also had paid sources at SBC who would provide him with
14   confidential telephone company information, such as subscriber
15   information, telephone bills, and cable pair information, which,
16   in turn, could be used to implement a wiretap.  As with Arneson,
17   defendant Rayford Earl Turner served as Pellicano's "on-call"
18   source at SBC.[12]  However, as Turner lacked access to SBC's
19   confidential databases, he, in turn, developed sources with the
20   requisite access, including Teresa Wright and Michelle Malkin.
21   Wright has pled guilty to computer fraud in connection with

22   ─────────────────────

23   Bryan Lourd and Kevin Huvane bearing Arneson's name and a date of
     August 10, 2001, which comports with the date when Arneson
24   conducted database inquiries on these individuals.

25       [12]    While Pellicano employees will testify that Turner
     frequently received cash payments, Pellicano's bank records
26   reflect payments to Turner of $10,100 in 1997, $8,625 in 1998,
     $8,975 in 1999, $4,000 in 2000, $3,080 in $2001 and $1,875 in
27   2002.

28                                  51

1 | illegally transferring SBC confidential information to Turner,

2 | and both Wright and Malkin will testify that they provided such

3 | information to Turner during and after his retirement from SBC.

4 | Finally, while historical confidential information was

5 | valuable to the enterprise and its clients, the gold standard for

6 | confidential information was real-time private communications,

7 | and such information could only be systematically obtained

8 | through illegal wiretaps.  To that end, Pellicano and defendant

9 | Kevin Kachikian ("Kachikian") devised and constructed wiretapping

10 | hardware and software that they called "Telesleuth."  Beginning

11 | in approximately 1995, Pellicano and Kachikian built

12 | approximately 50 of the Telesleuth interface boxes[13] and, over the

13 | years, Kachikian continued to provide Pellicano with technical

14 | assistance for the Telesleuth program as problems would arise

15 | during Pellicano's illegal use of this program.  With the

16 | additional aid of Turner, Pellicano repeatedly implemented

17 | wiretaps against investigative targets and thereby

18 | surreptitiously stole their most intimate and confidential

19 | secrets.  This information was used to the personal or litigative

20 | benefit of PIA's clients, which, in turn, permitted the

21 | enterprise to both maintain its vaunted reputation and thrive

22 | financially.

---

26 | [13]    This conduct serves as the basis for count one-hundred-
five, which charges a violation of 18 U.S.C. § 2512
27 | (manufacturing or possessing a wiretapping device).

28

B.   THE WORKINGS OF THE ENTERPRISE[14]

1.   The Enterprise's Investigation of Robert Maguire (count 95 ¶ 67)

In 1996, Susan Reddan Maguire initiated divorce proceedings from Los Angeles real estate developer Robert Maguire.  In August 1996, Ms. Maguire was advised by her attorneys that: (1) Pellicano should be retained to obtain evidence confirming Robert Maguire's ongoing affair with his mistress, Rosa Serrano; and (2) to rebut Mr. Maguire's persistent claims that his real estate empire was on the verge of bankruptcy and that he therefore lacked the necessary resources to provide Ms. Maguire with the settlement to which she believed she was entitled after two decades of marriage.  During the course of this investigation, confidential information regarding multiple investigative targets was acquired through, among other means, confidential database inquiries and illegal wiretaps.  For these services, Ms. Maguire paid PIA hundreds of thousands of dollars in cash, checks and jewelry.

Ms. Maguire will testify that, during the course of this representation, Pellicano: (1) showed her lists of telephone numbers and addresses, which he claimed to have obtained from sources in the phone company; (2) provided her with a DMV photograph of Rosa Serrano; (3) played her wiretapped telephone calls that Robert Maguire had with his psychiatrist, various

---

[14]   Given the number of counts at issue, the government has not addressed every count but rather has provided a representative overview of the type of evidence that will be presented at trial.

1  business associates, and Rosa Serrano, as well as calls that Rosa
2  Serrano had with members of her family; (4) advised her that he
3  had set up the wiretapping program in a house in Pasadena near
4  where Robert Maguire was living with Rosa Serrano during the
5  divorce proceedings; and (5) repeatedly warned her of the legal
6  problems that would arise should she disclose the existence of
7  the wiretapping.

8      Several PIA employees also will testify as to the
9  wiretapping that occurred during the course of this
10  investigation.  For example, former PIA employee Lily LeMasters
11  will testify that: (1) she listened to and translated several
12  calls between Rosa Serrano and her Spanish-speaking family
13  members for Ms. Maguire; (2) she went with Pellicano to rent a
14  studio apartment in the Pasadena area, near where Robert Maguire
15  was living; (3) Pellicano set up a computer in the apartment,
16  telling her that it was for the Maguire case; and (4) while at
17  the apartment on another occasion to check on the computer, she
18  heard Pellicano call Turner and instruct him to come by the
19  apartment.

20      2.  The Enterprise's Investigation of Jane Does 1-9
            (racketeering acts 1-2, 5-7, and 69-72)
21

22      In October 1998, John Gordon Jones was charged by the Los
23  Angeles County District Attorney's Office with raping nine women
24  whom he allegedly met at nightclubs, drugged, and sexually
25  assaulted.  PIA was hired to assist in the defense of Jones, who
26  was acquitted following trial in 2001.  During the course of this
27

28                              54

1 investigation, confidential information regarding multiple
2 investigative targets, including the rape victims, was acquired
3 through, among other means, protected law enforcement database
4 inquiries.[15]

5      The identities of the rape victims, who were identified at
6 trial only as "Jane Does One Through Nine," were obtained from
7 Deputy District Attorney Kerlin and matched with inquiries run by
8 Arneson, whom Kerlin will testify had no involvement to the
9 Jones' prosecution.[16]  For example, on January 11, 1999, Arneson
10 conducted NCIC database inquiries on Jane Doe Four and Jane Doe
11 Five.  On January 21, 1999, Arneson conducted a DMV database
12 inquiry on Jane Doe Three.  On January 22, 1999, Arneson
13 conducted a DMV database inquiry on Jane Doe Two.  On January 25,
14 1999, Arneson conducted NCIC database inquiries on Jane Doe Six
15 and Jane Doe Seven.  On February 9, 1999, Arneson conducted an
16 NCIC database inquiry on Jane Doe Eight and a DMV database
17 inquiry on Julie Westby, who was the roommate of Jane Doe One.
18 On February 22, 1999, Arneson conducted a DMV database inquiry on
19 Jane Doe One.

20

21      [15]    From documents generated during the course of the
   criminal and civil cases arising from the Jones matter, as well
22 from statements made by Jones' attorneys, it is known that
   illegal wiretapping occurred in this case.  However, due to
23 statute of limitations issues, no wiretapping charge was filed.

24      [16]  Pellicano employees have stated that, in late 1999 or
   early 2000, Pellicano became so concerned that Deputy District
25 Attorney Karla Kerlin was going to execute search warrants at his
   offices that he ordered that all files be examined and purged of
26 DMV information, placing particular emphasis on documents that
   could be tied back to Arneson.
27

28                               55

1    Additional evidence of the illicit database inquiries will
2 be presented in the form of documents obtained from the files of
3 Jones' defense attorneys, which include: (1) reports on PIA
4 letterhead, dated February 23, 1999, giving personal address and
5 DMV information for Jane Does One and Eight, as well as for Julie
6 Westby; and (2) a summary of information on Jane Doe Two that
7 included DMV and other personal information that was attributed
8 to the "Pellicano Report."

9       3.   The Enterprise's Investigation of Kissandra Cohen
             (racketeering acts 26-27, 74; count 95 ¶ 72)
10
11       In the spring of 2000, attorney Edward Masry hired PIA to
12 investigate Kissandra Cohen, a former associate who had filed a
13 sexual harassment and wrongful termination suit against Masry
14 after being terminated on December 26, 1999.  During the course
15 of this investigation, confidential information regarding
16 multiple investigative targets was acquired through, among other
17 means, protected law enforcement database inquiries and illegal
18 wiretaps. For these services, Masry paid PIA $34,250.

19       On May 15, 2000, Arneson conducted NCIC database inquiries
20 on Kassandra Cohen [sic] and her father, Michael Cohen, and
21 further conducted a DMV database inquiry on Kissandra's mother,
22 Mandy Cohen.   Former PIA employee LeMasters will testify that she
23 recalled reformatting DMV reports on Kissandra Cohen and seeing a
24 DMV photo of her.

25       With respect to the use of illegal wiretaps, a summary of
26 intercepted calls recovered from PIA's computers will be
27 introduced at trial.   In addition, former PIA employees LeMasters

28                                    56

1  and Tarita Virtue will testify that they personally listened to
2  wiretapped calls involving Cohen.  Of note, Virtue will testify
3  that she listened to hundreds of Cohen's telephone calls over
4  approximately a two-month period in the summer of 2000, including
5  calls between Cohen and her own attorney in which they discussed
6  legal strategy and case developments.  Virtue also recalled a
7  conversation in which Cohen told her mother that she had sued the
8  dog groomer at Petco who had harmed her dog.  Cohen will testify
9  that, in mid-2000, shortly after she had filed her lawsuit
10  against Masry, she began noticing strange clicking and buzzing
11  noises on her phone, as well as random disconnections.  Cohen
12  also will testify about telephone conversations that she had in
13  mid-2000 with Petco management and potential witnesses regarding
14  an injury to her family's dog that had occurred while the dog was
15  being groomed at Petco and which resulted in Cohen's father
16  filing suit against Petco.

17          4.   The Enterprise's Investigation of Erin Finn
                 (racketeering acts 28-29, 75, 88; count 96; count 95
18               ¶¶ 73-74)

19          In approximately July of 2000, former music executive Robert
20  Pfeifer hired PIA to investigate Erin Finn, a former girlfriend
21  of Pfeifer's who had served as a witness against him in pending
22  civil litigation.  During the course of this investigation,
23  confidential information regarding multiple investigative targets
24  was acquired through, among other means, protected law
25  enforcement database inquiries and illegal wiretaps.  For these
26  services, Pellicano was paid $100,000.

27

28                                    57

1       Pfeifer made his initial payment of $25,000 to PIA on July
2  28, 2000.  On August 2, 2000, Arneson conducted NCIC database
3  inquiries on Erin Finn and associates Peter Kuhns, David Holly,
4  and Deborah Krey.  Furthermore, on August 18, 2000, Arneson
5  conducted DMV and local databases inquiries on Aaron Mestman, who
6  also had been assisting Pfeifer in matters relating to Finn.

7       With respect to the use of illegal wiretaps, Pfeifer has
8  pleaded guilty to aiding and abetting the illegal wiretapping of
9  Finn and further has admitted that he hired Pellicano to wiretap
10 Finn.  In addition, considerable additional evidence of the
11 wiretap exists, which includes, but is not limited to the
12 following: (1) on August 2, 2000 (date of the Arneson inquiries
13 of Finn and her associates), SBC employee Teresa Wright, at the
14 request of Turner, conducted a database inquiry on SBC's
15 proprietary BOSS system on Erin Finn and entered "ERR" to serve
16 as cover for the illicit inquiry; (2) Finn, after receiving
17 anonymous e-mails reflecting the subject matter of telephone
18 conversations that she had with her attorney, attempted to defeat
19 the interception of her calls by playing talk radio into her
20 phone for hours at a time; (3) former PIA employee Virtue will
21 testify that she was tasked with listening to and transcribing
22 the wiretapped calls, including the calls in which Finn attempted
23 to defeat the program by playing her radio non-stop into the
24 receiver; and (4) documents recovered from Pellicano's computer
25 contain summaries of calls involving Finn, including a call
26 between Finn and her friend Richard Weilburg that states:  "At

27

28                              58

the end of the call, both parties hear a 'click' and become
concerned that Erin's phone might be tapped."

### 5. The Enterprise's Investigation of Ami Shafrir (Racketeering Act 83; count 97; count 95 ¶ 76)

In the spring of 2000, brothers Daniel and Abner Nicherie
hired PIA to investigate Ami Shafrir in connection with a
business dispute between the parties.  During the course of this
investigation, confidential information regarding multiple
investigative targets was acquired through, among other means,
protected law enforcement database inquiries and illegal
wiretaps. For these services, the Nicheries paid PIA $154,000.

Beverly Hills Police Officer Craig Stevens, who has pled
guilty in this case to multiple felonies arising from the
database inquiries that he conducted on Pellicano's behalf, will
testify that he conducted an NCIC database inquiry for
information regarding Ami Shafrir at Pellicano's request on
February 1, 2000.  With respect to the use of illegal wiretaps,
admissions by defendant Nicherie, third-party witnesses and PIA
employees will establish the use of wiretaps in this
investigation.  Specifically, during multiple interviews, Abner
Nicherie admitted that, after he and his brother Daniel[17] retained
the services of PIA, he would go to the offices of PIA to
translate intercepted calls involving Ami Shafrir, including

---

[17]    Daniel Nicherie has pleaded guilty to multiple counts
of fraud and to aiding and abetting the wiretapping of Ami
Shafrir.  Specifically, Daniel Nicherie admitted in his guilty
plea that Pellicano wiretapped Ami Shafrir with Daniel Nicherie's
knowledge and approval, and that he listened to and translated
the intercepted conversations at Pellicano's office.

calls between Shafrir and his attorney, that were in Hebrew. Similarly, Sarit Shafrir, who was Ami Shafrir's wife but who at the time was in a relationship with Abner Nicherie, will testify that Abner translated wiretapped calls for Pellicano and that, on occasion, he would play some of the calls for her.  In addition, former PIA employee Virtue will testify that she saw the Nicherie brothers listening to wiretapped calls, which she knew to be in a foreign language.

 6.    The Enterprise's Investigation of Lisa & Tom Gores
        (racketeering acts 32-33; count 98; count 95 ¶ 78)

At the end of 2000, venture capitalist Alec Gores hired PIA to investigate the nature of his wife Lisa's relationship with his younger brother, Tom.  During the course of this investigation, confidential information regarding investigative targets Lisa and Tom Gores was acquired through, among other means, protected law enforcement databases inquiries and illegal wiretaps.  For these services, Alec Gores paid PIA at least $160,000.[18]

As was the Enterprise's practice, Pellicano, after being retained, tasked Arneson with conducting criminal history database inquiries on Lisa and Tom Gores.  On January 3, 2001, Arneson conducted NCIC database inquiries for information on Lisa

---

[18]    This amount is based upon wire transfers provided by Alec Gores to Pellicano.  Gores will testify that, in addition to this amount, he: (1) made several large cash payments to Pellicano during the course of the investigation; (2) paid for a Pellicano family trip to Hawaii at Pellicano's request, as a bonus for his work on the case; and (3) provided Pellicano with a loan of $50,000, which Pellicano never has repaid.

Gores, Tom Gores, Tewisik Gores (a misspelling of Tom Gores'
middle name), and Lisa Cobb (Lisa Gores' maiden name).   In
addition, reformatted California DMV reports for Tom and Lisa
Gores, dated January 15, 2001, were recovered from Pellicano's
computers.

With respect to the use of illegal wiretaps, Alec Gores will
testify that in early 2001, Pellicano confirmed the nature of the
relationship between Tom and Lisa, and in connection with doing
so, played him wiretapped calls involving these individuals on
approximately three separate occasions.   In addition, during the
November 21, 2002 search of PIA, the FBI seized, among other
items, a compact disc containing a recording of a telephone call
between Lisa Gores and Tom Gores.   Both Lisa and Tom Gores will
testify that the recording in question was, in fact, a telephone
call between the two that was intercepted without their consent.
In addition, Lisa Gores will testify that, after Alec Gores
confronted Tom and Lisa with evidence gathered by Pellicano, she
received several telephone calls from Pellicano, who advised her,
among other things, that he had been listening to her telephone
calls from an apartment in the "Valley" which he had set up as a
listening post.   Additional evidence of the wiretap will come in
the form of documents that were recovered from PIA's computer.
For example, the government will introduce a one-page list of
"phone data" including Alec Gores' contact information and
entries for "Lisa's Line," "Cell," "Car," and "Home Line" and a
separate one-page cost breakdown with headings for "Tom" and

"House" and itemized entries such as "Rent" ($13,200), "Setup" ($15,000 per line), "1st Line 4 Weeks @ $2500," and "2nd Line 4 Weeks @ $2500," with a total cost of $138,200.

    7.   The Enterprise's Investigation of Vincent "Bo" Zenga (racketeering acts 34-40, 89; counts 3-9, 34-40, 87, 91, 100; count 95 ¶¶ 80-81)

In July 2000, screenwriter Vincent Bo Zenga sued Brad Grey for breach of contract and fraud.  The defense team representing Grey retained PIA in early February 2001.[19]  During the course of the subsequent investigation, confidential information regarding multiple investigative targets was acquired through, among other means, protected law enforcement database inquiries and illegal wiretaps.  For these services, Grey's attorneys paid Pellicano $25,000, which cost was then passed on to Grey as part of the firm's monthly bill for litigation costs.

Again, Pellicano, at the outset of the investigation, tasked Arneson with obtaining criminal history information on the investigative targets.  On February 6, 2001, Arneson conducted an

_____

[19]   Grey, upon the advice of his attorneys, previously had hired PIA in January 1999 in connection with a civil proceeding involving former client Garry Shandling.  On January 20, 1999, Arneson conducted NCIC databse inquiries for information on Garry Shandling and his personal assistant Mariana Grant, and conducted a DMV database inquiry for information on Shandling's accountant Warren Grant.  On February 10, 1999, Arneson conducted an NCIC database inquiry for information on Shandling's private investigator James Nielsen, Nielsen's wife, daughter, and investigative partner.  On March 4, 1999, Arneson conducted an NCIC database inquiry for information on Shandling's friends Kevin and Linda Nealon and Shandling's girlfriend Linda Doucett.  On March 9, 1999, Arneson conducted an NCIC database inquiry for information on Shandling's friend Gavin DeBecker.  These inquiries serve as the foundation for racketeering acts 3-4, 8, 10-13.

NCIC database inquiry on Vincent Zenga and his brother, Jerome
Zenga.   Notably, a report on Vincent Zenga containing reformatted
DMV and criminal history information as of 2/6/00[20] was recovered
from Pellicano's computers.   In addition, on February 13, 2001,
Arneson conducted an NCIC database inquiry for information on
Jessica Schutte.   The following day, Arneson conducted NCIC
database inquiries on Stacy Codikow and Paul Durazzo.   Schutte,
Codikow, and Durazzo were all associates of Zenga whose
depositions were noticed during the litigation, with Codikow's
deposition taking place on the very day, February 14, 2001, that
Arneson conducted the database inquiry on Codikow.   In addition,
on February 20, 2001, Arneson conducted an NCIC database inquiry
for information on Zorianna Kit, Zenga's wife, who was deposed in
March 2001.   Finally, on March 13, 2001, Arneson conducted an
NCIC database inquiry on Gregory Dovel, Zenga's attorney.

      With respect to the use of illegal wiretaps, SBC employee
Teresa Wright will testify that she accessed the SBC proprietary
BOSS database to obtain information on Bo Zenga's telephone
number on February 13, 2001.   Wright also will testify that she
obtained this information for Turner, which is corroborated by
the fact that Turner's home phone records reflect that he called
Wright twice on that date.   In addition, numerous summaries of
Zenga's intercepted telephone calls, including calls between
Zenga and his attorneys, were recovered from PIA's computers and

---

[20]      The year identifier of 00 appears to be a typographical
error.

1 PIA former employee Virtue will testify that she listened to
2 hundreds of Zenga's phone calls over a two-to-three-month period.

3        8.   The Enterprise's Investigation of Keith Carradine
             (racketeering acts 42-43; counts 10-11, 41-42, 102;
4            count 95 ¶ 85)

5        In approximately February 2001, Sandra Carradine hired PIA
6 to investigate her husband in connection with property issues in
7 her then-pending divorce proceedings.  During the course of this
8 investigation, confidential information regarding multiple
9 investigative targets was acquired through, among other means,
10 protected law enforcement database inquiries and illegal
11 wiretaps.

12       Specifically, on April 26, 2001, Arneson conducted an NCIC
13 database inquiry for information on Keith Carradine and his
14 girlfriend, Hayley Dumond.[21]  As to the use of illegal wiretaps,
15 Sandra Carradine, who pled guilty to perjury for lying about the
16 existence of PIA-implemented wiretaps when questioned before the
17 grand jury, has since admitted that Pellicano wiretapped Keith
18 Carradine's telephone and that Pellicano played wiretapped
19 conversations for her.  Carradine's admissions are corroborated
20 by a telephone conversation recovered from Pellicano's computer,
21 dated May 17, 2001, in which Pellicano told Sandra Carradine that
22 "what I'm hoping to get the next time I go and gather all this
23 stuff that I'm gathering is that there is a conversation between
24 he and Hayley."  Pellicano and Carradine then discussed the

25 ───────────────────────

26       [21]   On this date, Arneson also conducted a DMV inquiry on
   Jude Green, who was in divorce proceedings with Pellicano client
27 Leonard Green.

28                                   64

1   contents of the conversation he had just played for her.   In
2   doing so, Pellicano reminded Carradine that he "had to do this
3   twice" because "they cut the f****** cables."

4           9.   The Enterprise's Investigation of Aaron Russo
                 (racketeering acts 50, 66-67, 84-87, 90;
5                counts 18, 49, 75-86, 88, 92, 101; count 95 ¶¶ 83-84)

6           Hedge fund manager Adam Sender entered into a contract with
7   movie producer and Nevada gubernatorial candidate Aaron Russo
8   that called for the two to create a movie production company.
9   Ultimately, after Sender spent more than $1,000,000 in start-up
10  costs, the production company never materialized and Sender hired
11  attorney Bertram Fields to represent him in a civil suit against
12  Russo.   On Fields' recommendation, Sender retained PIA in March
13  of 2001.   During the course of the subsequent investigation,
14  confidential information regarding multiple investigative targets
15  was acquired through, among other means, protected law
16  enforcement database inquiries and illegal wiretaps.   For these
17  services, Sender paid PIA $500,000.

18          Of this amount, Sender wired an initial $25,000 payment to
19  PIA on March 30, 2001.   On April 2, 2001, SBC employee Wright
20  queried the SBC proprietary BOSS database for information on
21  Aaron Russo and his wife, Heidi Gregg, on behalf of Turner.   Two
22  days later, Beverly Hills Police Officer Craig Stevens conducted
23  DMV database inquiries on Russo, Gregg, and Russo's two sons,
24  Maxwell and Samuel.   Reformatted DMV reports for Max Russo and
25  Sam Russo (dated April 12, 2001) and for Heidi Gregg (dated April
26  17, 2001) were recovered from Pellicano's computers.   Stevens

27

28                                    65

1 further conducted NCIC database inquiries for information on Max

2 Russo on November 9, 2001, and conducted a separate NCIC database

3 inquiry on Adam Sender on December 18, 2001.   Stevens, who has

4 pled guilty to multiple felony counts relating to these database

5 inquiries, has admitted that he conducted all of these inquiries

6 for Pellicano.

7     With respect to the use of illegal wiretaps, Sender will

8 testify that, during the course of the litigation, Pellicano

9 played him five to ten recordings of wiretapped telephone calls

10 between Russo, his sons, and his political contacts.   In doing

11 so, Pellicano identified the calls as being recorded telephone

12 calls that he reviewed every twenty-four hours and instructed

13 Sender not to discuss the calls with anyone.   In addition, PIA

14 employees will testify that they personally listened to thousands

15 of wiretapped calls involving Russo, his wife, family and

16 political backers.   Furthermore, a 78-page report on Aaron Russo

17 recovered from PIA's computers, captioned "RUSSO MATTER Complete

18 Notes as of 08/01/2001," which includes numerous summaries and

19 excerpts of Russo's telephone conversations, will be introduced

20 into evidence.

21     Moreover, two PIA employees will testify about how this

22 wiretap was used to serve legal process on Russo outside of the

23 Giuseppe Franco Salon in Beverly Hills on April 21, 2001.   After

24 learning that Russo would be at this location from the wiretap,

25 the employees traveled to the salon, where they subsequently

26

27

28                              66

1  chased Russo through several buildings before effecting service
2  on him.

3      After a default judgment was entered against Russo, Russo
4  claimed that he had never been served with the subpoena.  On
5  March 14, 2002, Patrick Theohar, a hairstylist formerly employed
6  at Giuseppe Franco's, signed a declaration for Russo regarding
7  the events of April 21, 2001, in which he stated that he had seen
8  Russo refuse to take the envelope from the process server.  On
9  March 15, 2002, Arneson conducted an NCIC database inquiry (as
10  well as DMV, fingerprint, and out-of-state warrant checks) on
11  Theohar.  According to LAPD records, officers from LAPD Pacific
12  Division (where Arneson was stationed) went to Theohar's
13  residence the next day to arrest him on an outstanding warrant.
14  Theohar was not at home.  On March 18, Theohar filed a second
15  declaration recanting his earlier one.  No further attempts were
16  made to arrest him on this outstanding warrant.

17      10.  The Enterprise's Investigation of Prosecution Witnesses
            in The Murder Trial of Kami Hoss (racketeering acts 44-
18           47; counts 12-15, 43-46)

19      On trial for murder in connection with the death of Sandra
20  Rodriguez, who plunged to her death from the balcony of the Long
21  Beach Hyatt following a night of partying, Kami Hoss hired PIA to
22  investigate potential prosecution witnesses.  During the course
23  of this investigation, confidential information regarding
24  multiple investigative targets was acquired through, among other
25  means, protected law enforcement database inquiries. For these

26
27
28                              67

1  services, Hoss, who was acquitted of all charges, paid PIA

2  $60,000.

3       Hoss' first payment consisted of a $25,000 check dated

4  August 14, 2001.  Ten days later, Pellicano engaged in a recorded

5  phone conversation with Arneson, in which Arneson discussed

6  criminal history and DMV information he had obtained on victim

7  Sandra Rodriguez.  In the same recorded call, Pellicano asked

8  Arneson to conduct checks on Ester Pina, Mirella Lavorin, and

9  Carrie Cagle, who were potential witnesses in the case.  On the

10 same date -- August 24, 2001 -- Arneson conducted NCIC database

11 inquiries for information on Ester Pina, Mirella Lavorin, Carrie

12 Cagle, and Sandra Rodriguez.  Furthermore, DMV information on all

13 five individuals was recovered from PIA's computers and former

14 PIA employee Denise Ward will testify that, while reviewing the

15 Kami Hoss files to obtain information for Pellicano, she saw that

16 Pellicano had criminal history and DMV information, including

17 photographs, on every person in the case file, with Arneson's

18 name and serial number at the top of every printout.

19       11.  The Enterprise's Investigation of Pamela Miller
              (racketeering acts 53-54, 57, 60-61; counts 21-22,
20            25, 28-29, 52-53, 56, 59-60)

21       In April 2002, Canadian publishing heiress Taylor Thomson

22 hired PIA to investigate Pamela Miller, who had served as her

23 child's nanny, and Michael Kolesa, the child's father, after

24 Miller had advised Kolesa about Miller's concerns with the

25 child's care under Thomson.  During the course of this

26 investigation, confidential information regarding multiple

27

28                                68

1  investigative targets was acquired through, among other means,

2  protected law enforcement database inquiries.   For these

3  services, Thomson paid PIA $50,000.

4      Pellicano's bank records reflect an initial $25,000 check

5  from Thomson dated April 2, 2002.   The following day, Arneson

6  conducted an NCIC database inquiry for information on Pamela

7  Miller.   Also on that date, in a recorded conversation recovered

8  from Pellicano's computer, Pellicano tells Jennifer Megarry,

9  Thomson's personal assistant, that "we did a nationwide search

10  for any criminal records, we found her driver's license

11  information from Pennsylvania . . . , no criminal record here,

12  got her driver's license and information here, found where her

13  parents are, got a ton of information."

14      In another recorded conversation dated April 18, 2002,

15  Pellicano tells Megarry that he needs a retainer of $25,000 to

16  investigate Kolesa, apart from what he was already paid to

17  investigate Miller.   Pellicano's bank records reflect a second

18  $25,000 check from Thomson dated April 19, 2002.   On that same

19  date, Arneson conducted an NCIC database inquiry for information

20  on Kolesa.   Approximately one month later, on May 16, 2002,

21  Arneson conducted NCIC database inquiries for information on

22  Andrew Miller (Pamela's brother) and Richard and Joyce Miller

23  (Pamela's parents)[22] and also requested DMV photographs of Richard

24  and Joyce Miller by Express Mail.   Reformatted DMV reports on

25  _____

26      [22]    These inquiries were conducted at the same time that
    Arneson also conducted database inquires of Anita Busch and
27  Bernard Weinraub.

1 Pamela, Andrew, Joyce and Richard Miller subsequently were

2 recovered from PIA's computers.

3     12.   The Enterprise's Investigation of Anita Busch
           (racketeering acts 55, 56, 58, 59, 92; counts 23-24,

4            26-27, 54-55, 57-58, 90, 94, 104; count 95 ¶¶ 90-91)

5     In May of 2002, PIA was retained by attorneys representing

6 Michael Ovitz to assist in separate lawsuits against Ovitz's

7 business, Artists Management Group ("AMG"), by sports promoter

8 Arthur Bernier and sports agent James Casey.[23]  During the course

9 of this representation, confidential information regarding

10 multiple investigative targets was acquired through, among other

11 means, protected law enforcement databases inquiries.  PIA was

12 paid $25,000 for its services in each case.

13     In addition to the specific matters for which PIA was

14 retained, Pellicano and Ovitz discussed individuals within the

15 entertainment community who were the source of bad press against

16 Ovitz.  During these conversations, Ovitz and Pellicano discussed

17 Ovitz's belief that New York Times writer Bernard Weinraub had

18 been recycling negative stories about him and that, on occasion,

19 he was assisted by Los Angeles Times writer Anita Busch.

20     AMG billing records reflect that the payments for the

21 Bernier and Casey litigation matters were made on May 10, 2002.

22 On May 9, 2002, Arneson conducted an NCIC database inquiry for

23 information on Arthur Bernier.  On May 16, 2002, Arneson

24

25     [23]   At the same time, PIA was retained in connection with a

26 trademark lawsuit brought by Warner Scott, for which PIA was paid
an additional $25,000.  No charges have been filed in connection

27 with this retention.

28                              70

conducted NCIC database inquiries for information on James Casey,
Anita Busch, and Bernard Weinraub.  On that same day, Arneson
also requested DMV photos for Casey, Busch, and Weinraub by
Express Mail.[24]  Reformatted DMV reports on Bernier, Casey, and
Busch, as well as a six-page computer printout showing all of
their respective runs, were recovered from Pellicano's computers,
with the Casey and Busch reports being dated May 31, 2002.

Also on May 16, 2002, SBC employee Teresa Wright conducted
an inquiry on the SBC proprietary BOSS database for information
on Anita Busch, entering "ERR" as her reason for access.  Wright
has pleaded guilty to computer fraud for conducting this inquiry
unlawfully, has admitted that she did so on Turner's behalf, and
further has stated that she used the term "ERR" (error) to
"cover" for the inquiries that she conducted on Turner's behalf.
Turner's home telephone records reflect that he called Wright
twice on May 16, 2002, and Wright called Turner three times on
the same date.  Turner had retired from SBC months earlier.

After noticing persistent problems with her telephone line,
Busch, on November 5, 2002, contacted SBC and asked the phone
company to investigate the problem.  Later that day, SBC
technician Clifford Shillingford discovered a wiretap on Busch's
telephone and further confirmed that there was no court order
authorizing the wiretap.  Shillingford then had the wiretap

[24]      As discussed above, Arneson, during this series of
inquiries, also obtained information for Pellicano investigative
targets in the Taylor Thomson/Pamela Miller investigation and
further sought DMV information for Miller's parents.

71

1   removed.  Shortly thereafter, however, Busch's problems with her

2   telephone line returned, which led Busch to recontact SBC.  On

3   November 18, 2002, SBC employee Teresa Henry discovered yet

4   another unauthorized wiretap on Busch's telephone.

5   C.   EFFORTS TO CONCEAL INVOLVEMENT IN, OR EVIDENCE OF, THE
         ENTERPRISE

6

7        1.   Arneson False Statement (count 108)

8        On July 9, 2003, Mark Arneson, who previously had resigned

9   from the LAPD rather than participate in a compelled interview

10  with Internal Affairs regarding his database inquiries, was

11  interviewed at the United States Attorney's Office in the

12  presence of his counsel.  The interview was governed by a

13  standard "proffer" agreement providing that Arneson's statements

14  could not be used against him as long as he was completely

15  truthful.  He was not.

16       Specifically, when asked about his inquiries of law

17  enforcement databases on the name "Anita Busch," Arneson

18  affirmatively asserted that his inquiries on Busch were related

19  to a legitimate gambling investigation he was working on in his

20  capacity as a vice squad detective in the LAPD Pacific Division.

21  Arneson stated that as part of that investigation he and other

22  detectives conducted surveillances at previously identified

23  gambling and organized crime hangouts, including Enzo's Pizzeria

24  and Matteo's Restaurant.  Arneson recalled seeing a woman he

25  believed to have been Busch at Enzo's and Matteo's on repeated

26  occasions, and said that he conducted inquiries on her in order

27

28                          72

1  to determine whether or not she was involved in gambling or other
2  organized crime activities.  Arneson further claimed that no
3  surveillance reports were generated documenting his observations
4  of Busch, and said that whatever documentation he received as a
5  result of his inquiries would have been discarded when Busch was
6  eliminated as a potential suspect in the investigation.

7  The evidence will show that this Arneson's story regarding
8  Busch was a complete fabrication.  For example, Busch will
9  testify that she has never eaten at Enzo's Pizzeria, and did not
10 eat at Matteo's Restaurant on or around May 16, 2002, the date
11 that Arneson conducted his computer inquiries of Busch and his
12 daily report indicated that he spent the day in an alcohol sales
13 decoy operation and in "prostitution" enforcement.  Moreover, as
14 noted above, Arneson conducted these database inquiries as part
15 of a series of runs that he conducted on PIA investigative
16 targets, including occasional Busch writing partner Bernard
17 Weinraub.

18      2.   Turner False Statement (count 109)

19 On January 28, 2003, Turner was interviewed by the FBI.
20 During the interview, Turner denied assisting Pellicano in
21 wiretapping telephones or in making telephone company information
22 on subscribers available to Pellicano.  Turner further maintained
23 that his outside work for Pellicano was limited to sweeping
24 Pellicano's telephones for bugs about three times a year and
25 working in Pellicano's forensic lab identifying voices.  Turner's
26 statements are flatly contradicted by former SBC employees Teresa
27

28                      73

1  Wright and Michelle Malkin, who both will testify that they

2  provided proprietary SBC customer information to Turner,[25]

3  including at times when Turner no longer worked at SBC, so that

4  such information could be provided to Pellicano.  In addition,

5  several former Pellicano employees will testify that Turner was

6  Pellicano's source for SBC phone company information who provided

7  PIA with confidential SBC customer information and assisted

8  Pellicano with the implementation of wiretaps.  According to

9  these witnesses, Pellicano would regularly instruct them to page

10  Turner with a code, at which time they would provide Turner with

11  lists of names or telephone numbers provided by Pellicano.

12  Shortly thereafter, Turner would fax toll records or other

13  confidential telephone company information to Pellicano's office.

14       3.   <u>Kachikian's Destruction of the Telesleuth Wiretapping
            Program (count 110)</u>

15

16       Kachikian was subpoenaed to appear before the grand jury on

17  April 17, 2003.  Pursuant to the terms of the subpoena, Kachikian

18  was directed to produce "all documents related to the creation

19  and/or utilization of the 'Telesleuth' software program,

20  including software, source codes, manuals, encryption data,

21  correspondence, etc."  Kachikian brought none of the requested

22  materials to the grand jury, stating that he had returned the

23  materials to Pellicano or destroyed them after the search warrant

24  was executed at PIA in November 2002 and Pellicano was arrested

25  on explosives charges.  Kachikian then proceeded to explain that,

26  _____

27       [25]    Both women were fired for doing so.

28                               74

1 in approximately December 2002 or January 2003, acting out of
2 paranoia, he deleted the entire Telesleuth program from his
3 computer and used a Norton wipe program to ensure that the code
4 could not be recovered with retrieval software. Kachikian
5 further explained that, in connection with wiping the code from
6 his drive, he also broke and threw away his CD backup to this
7 program, thereby leaving him with none of the Telesleuth
8 materials responsive to the grand jury subpoena.

9 **IV.**

10 **EVIDENTIARY ISSUES**

11 A.   ADMISSIBILITY OF PHYSICAL EVIDENCE

12      1.   Authentication and Identification/Chain of Custody

13      Federal Rule of Evidence 901(a) provides that "[t]he
14 requirement of authentication or identification as a condition
15 precedent to admissibility is satisfied by evidence sufficient to
16 support a finding that the matter in question is what its
17 proponent claims." As such, issues of authenticity and
18 identification are treated under Rule 901 as simply "a special
19 aspect of relevancy." Fed. R. Evid. 901(a) (Advisory Committee
20 Notes).

21      Rule 901(a) only requires the government to make a prima
22 facie showing of authenticity or identification "so that a
23 reasonable juror could find in favor of authenticity or
24 identification." United States v. Chu Kong Yin, 935 F.2d 990,
25 996 (9th Cir. 1991); see also United States v. Blackwood, 878
26 F.2d 1200, 1202 (9th Cir. 1989); United States v. Black, 767 F.2d

27

28                              75

1  1334, 1342 (9th Cir. 1985).  Once the government meets this

2  burden, "the credibility or probative force of the evidence

3  offered is, ultimately, an issue for the jury."  <u>Black</u>, 767 F.2d

4  at 1342.

5      The authenticity of proposed exhibits may be proven by

6  circumstantial evidence.  <u>United States v. Natale</u>, 526 F.2d 1160,

7  1173 (2d Cir. 1975); <u>United States v. King</u>, 472 F.2d 1, 9-11 (9th

8  Cir. 1973).  Moreover, the prosecution need only prove a rational

9  basis from which the jury may conclude that the exhibits did, in

10 fact, belong to the defendant.  Federal Rule of Evidence 401(a);

11 <u>United States v. Blackwell</u>, 694 F.2d 1325, 1330 (D.C. Cir. 1982);

12 <u>United States v. Sutton</u>, 426 F.2d 1202 (D.C. Cir. 1969).

13     To be admitted into evidence, a physical exhibit must be in

14 substantially the same condition as when the crime was committed.

15 The court may admit the evidence if there is "a reasonable

16 probability the article has not been changed in important

17 respects."  <u>United States v. Harrington</u>, 923 F.2d 1371, 1374 (9th

18 Cir. 1991).  This determination is to be made by the trial judge

19 and will not be overturned except for clear abuse of discretion.

20 Factors the court may consider in making this determination

21 include the nature of the item, the circumstances surrounding its

22 preservation, and the likelihood of intermeddlers having tampered

23 with it.  <u>See</u> <u>United States v. Kaiser</u>, 660 F.2d 724, 733 (9th

24 Cir. 1981); <u>Gallego v. United States</u>, 276 F.2d 914, 917 (9th Cir.

25 1960).

26

27

28                              76

1    In establishing chain of custody as to an item of physical
2 evidence, the government is not required to call all persons who
3 may have come into contact with the piece of evidence. <u>Reyes v.</u>
4 <u>United States</u>, 383 F.2d 734 (9th Cir. 1967); Gallego, 276 F.2d at
5 917.  Moreover, a presumption of regularity exists in the
6 handling of exhibits by public officials.  <u>Kaiser</u>, 660 F.2d at
7 733; <u>United States v. De Bright</u>, 730 F.2d 1255, 1259 (9th Cir.
8 1984) (<u>en banc</u>); <u>Harrington</u>, 923 F.2d 1371, 1374 (9th Cir. 1991).
9 Therefore, to the extent that alleged or actual gaps in the chain
10 of custody exist, such gaps go to the weight of the evidence
11 rather than to its admissibility.  <u>Gallego</u>, 276 F.2d at 917.

12         a.    Photographs

13    Photographs may be authenticated by a witness who
14 "identif[ies] the scene itself [in the photograph] and its
15 coordinates in time and place." <u>See</u> <u>Lucero v. Stewart</u>, 892 F.2d
16 52, 55 (9th Cir. 1989).

17         b.    Recorded Conversations[26]

18    Audio recordings are admissible upon a showing that "the
19 recording is accurate, authentic and generally trustworthy."
20 <u>United States v. King</u>, 587 F.2d 956, 961 (9th Cir. 1978).
21 The Ninth Circuit has held that recordings:

22 _____

23    [26]    Transcripts of recorded English language conversations,
such as the ones that will be introduced by the government at
24 trial, may be used to assist the court and the jury in
identifying speakers and in following the recordings and do not
25 constitute evidence.  <u>United States v. Taghipour</u>, 964 F.2d 908,
910 (9th Cir. 1992) (transcripts may be used during trial and may
26 be used by juries in deliberation); <u>United States v. Tornabene,</u>
687 F.2d 312, 317 (9th Cir. 1982); <u>United States v. Turner</u>, 528
27 F.2d 143, 167 (9th Cir. 1975).

28                                   77

1     [a]re sufficiently authenticated under Federal Rule of
      Evidence 901(a) if 'sufficient proof has been
2     introduced so that a reasonable juror could find in
      favor of authenticity or identification. [Citing
3     cases.]  This is done by proving a connection between
      the evidence and the party against whom the evidence
4     is admitted, and can be done by both direct and
      circumstantial evidence.

5

6  United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir.

7  1995), modified, 98 F.3d 1100 (9th Cir. 1996) (allowing into

8  evidence recordings of the torture of DEA Special Agent Camarena

9  which were in the possession of a co-defendant).

10      Rule 901(b)(5) sets a low threshold for voice identifications

11  offered to determine the admissibility of recorded conversations.

12  Under this rule, audio recordings may be authenticated by persons

13  who are not parties to the recorded conversation, as long as the

14  person can identify the voices on the recording.  Fed. R. Evid.

15  905(b)(5); Torres, 908 F.2d at 1425; United States v. Thomas, 586

16  F.2d 123, 133 (9th Cir. 1978).  A witness's opinion testimony in

17  this regard may be based upon his having heard the voice on

18  another occasion under circumstances connecting it with the

19  alleged speaker.  Fed. R. Evid. 901(b)(5); Torres, 908 F.2d at

20  1425 ("Testimony of voice recognition constitutes sufficient

21  authentication."); United States v. Bassey, 613 F.2d 198, 202 n.2

22  (9th Cir. 1979); United States v. Turner, 528 F.2d 143, 163 (9th

23  Cir. 1975).  If the identifying witness is "'minimally familiar'

24  with the voice he identifies, Rule 901(b) is satisfied." United

25  States v. Plunk, 153 F.3d 1011, 1022-23 (9th Cir.), amended, 161

26  F.3d 1195 (9th Cir. 1998).

27

28                          78

The speaker's identity also can be established by
circumstantial evidence.  Fed. R. Evid. 901(b)(5), (6).  Such
evidence may include: (1) defendant's identification of himself
during the conversation either by surname, first name or nickname
(United States v. Vento, 533 F.2d 838, 864 (3d Cir. 1976); United
States v. Turner, 528 F.2d 143, 163 (9th Cir. 1975); Palos v.
United States, 416 F.2d 438, 440 (5th Cir. 1969)); (2) listing of
the telephone in the defendant's name or the location of the
telephone at the defendant's residence (Federal Rule of Evidence
901(b)(6) (call placed to phone number assigned to defendant plus
self-identification of recipient of call is sufficient to identify
defendant as recipient)); (3) the speaker's revelation of
information particularly known to the person he purports to be
(United States v. Sawyer, 607 F.2d 1190, 1193 (7th Cir. 1977);
United States v. Ross, 321 F.2d 61, 69 (2d Cir. 1963)); (4) the
giving of directions which prove to be correct, or returning a
call and referring to what was said in a previous conversation
(Sawyer, 607 F.2d at 1193); or (5) visual surveillance of the
defendant after the conversation doing what he said he would do
(United States v. McMillan, 508 F.2d 101, 105 (8th Cir. 1974);
United States v. Bonanno, 487 F.2d 654, 659 (2d Cir. 1973); see
also Van Ripper v. United States, 13 F.2d 961, 968 (2d Cir. 1926)
("[T]he substance of the communication may itself be enough to
make prima facie proof [of identity]")).

Although the overwhelming majority of recordings to be
introduced are clear in sound quality, recorded conversations can

1  serve as competent evidence even when they are partly inaudible
2  provided that the unintelligible portions are not so substantial
3  as to render the recording as a whole untrustworthy.  United
4  States v. Rrapi, 175 F.3d 742 (9th Cir. 1999); United States v.
5  Carlson, 423 F.2d 431, 440 (9th Cir. 1970).

6          c.   Handwriting

7      A lay witness may authenticate handwriting on a document by
8  stating how he or she became familiar with the handwriting in
9  question.  Hall v. United Insurance Company of America, 367 F.3d
10 1255, 1260-61 (11th Cir. 2004).  In laying the requisite
11 foundation, the witness should describe the instruments on which
12 the witness previously had observed the handwriting, and provide
13 information concerning the witness' relationship with the
14 signatory.  Id. at 1261.  For example, co-workers possessing
15 sufficient familiarity with a defendant's handwriting have been
16 permitted to authenticate the defendant's handwriting.  See United
17 States v. Tipton, 964 F.2d 650, 654-55 (7th Cir. 1992); United
18 States v. Whittington, 783 F.2d 1210, 1214-15 (5th Cir. 1986);
19 United States v. Barker, 735 F.2d 1280, 1283 (11th Cir. 1984).

20     2.   Items Found In A Defendant's Possession

21     Documents or items found in a defendant's possession are
22 admissible, either as adopted admissions or to show the
23 circumstantial relationship of the defendant to the documents.
24 United States v. Ospina, 739 F.2d 448, 451 (9th Cir. 1984).  For
25 instance, a calendar or ledger may be a party admission or co-
26 conspirator statement, depending upon the circumstances, if the
27
28                              80

1 identity of the author of the ledger is reasonably certain.
2 United States v. Smith, 893 F.2d 1573, 1576 (9th Cir. 1990).

3     3.  Duplicates

4     A duplicate is admissible to the same extent as an
5 original unless (1) a genuine question is raised as to the
6 authenticity of the original, or (2) under the circumstances, it
7 would be unfair to admit the duplicate instead of the original.
8 Fed. R. Evid. 1003; United States v. Smith, 893 F.2d 1573, 1579
9 (9th Cir. 1990); United States v. Leal, 509 F.2d 122, 125-26 (9th
10 Cir. 1975); United States v. Pacheco-Lovio, 463 F.2d 232, 233-34
11 (9th Cir. 1972); see also United States v. Skillman, 922 F.2d
12 1370, 1375 (9th Cir. 1990) (photocopy bearing extraneous
13 handwriting not connected to the defendant is admissible).

14     4.  Business Records

15     Fed. R. Evid. 803(6) excepts from the hearsay rule "a
16 memorandum, report, record, or data compilation, in any form, of
17 acts, events, conditions, opinions, or diagnoses, made at or near
18 the time by, or from information transmitted by, a person with
19 knowledge, if kept in the course of a regularly conducted business
20 activity, and if it was the regular practice of that business
21 activity to make the memorandum, report, record, or data
22 compilation, all as shown by the testimony of the custodian or
23 other qualified witness, unless the source of information or the
24 method or circumstances of preparation indicate lack of
25 trustworthiness."  If evidence meets the requirements for
26 admission under Rule 803(6), no further showing is necessary for
27

28                          81

1 admission under the Confrontation Clause. See <u>Ohio v. Roberts</u>,

2 448 U.S. 56, 66 n.8 (1980); <u>United States v. Ray</u>, 930 F.2d 1368,

3 1370 (9th Cir. 1990).

4     A document is admissible under Rule 803(6) if two

5 foundational facts are established: (i) the document was made or

6 transmitted by a person with knowledge at or near the time of the

7 incident recorded, and (ii) the document was kept in the course of

8 a regularly conducted business activity. See Ray, 930 F.2d at

9 1370; <u>Kennedy v. Los Angeles Police Dept.</u>, 901 F.2d 702, 717 (9th

10 Cir. 1989), <u>overruled on other grounds</u>, <u>Act Up!/Portland v.</u>

11 <u>Bagley</u>, 988 F.2d 868 (9th Cir. 1993). These foundational facts

12 may be established either through a custodian of records or "other

13 qualified witness." The phrase "other qualified witness" is

14 broadly interpreted to require only that the witness understand

15 the record keeping system. See <u>Ray</u>, 930 F.2d at 1370; <u>United</u>

16 <u>States v. Franco</u>, 874 F.2d 1136, 1139-1140 (7th Cir. 1989); <u>United</u>

17 <u>States v. Hathaway</u>, 798 F.2d 902, 906 (6th Cir. 1986). In

18 determining whether the foundational facts have been established,

19 the court may consider hearsay and other evidence not admissible

20 at trial. See Fed. R. Evid. 104(a), 1101(d)(1); <u>Bourjaily</u>, 483

21 U.S. at 178-79.

22     The government need not establish precisely when or by whom

23 the document was prepared; all the rule requires is that the

24 document be made "at or near the time" of the act or event it

25 purports to record. See <u>United States v. Huber</u>, 772 F.2d 585, 591

26 (9th Cir. 1985); <u>United States v. Bassey</u>, 613 F.2d 198, 201 n.1

27

28                    82

1 (9th Cir. 1979). Similarly, challenges to the accuracy or

2 completeness of the business records ordinarily go to the weight

3 of the evidence and not its admissibility. See, e.g., La Porta v.

4 United States, 300 F.2d 878, 880 (9th Cir. 1962).

5     5. Self-Authenticating Records

6     In order to accelerate the pace of this trial and to avoid

7 the need to call dozens of witnesses who would be called to

8 testify to matters that are beyond dispute, the government intends

9 to introduce a number of business records, including phone

10 records, and bank records, pursuant to Federal Rule of Evidence

11 902(11). The Federal Rules of Evidence provide that business

12 records may be admitted into evidence without a live witness if

13 they are accompanied by a written declaration from a custodian of

14 the records certifying that the records were made in accordance

15 with the requirements of Rule 803(6) of the Federal Rules of

16 Evidence. See Securities Exchange Commission v. Franklin, 348

17 F.Supp.2d 1159 (S.D. Cal. 2004); Rules 803(6) and 902(11), Federal

18 Rules of Evidence.

19     Specifically, Amended Rule 902 of the Federal Rules of

20 Evidence provides, in pertinent part:

21     902 Self Authentication: Extrinsic evidence of
    authenticity as a condition precedent to admissibility

22     is **not required** with respect to the following:
    . . .

23     (11) The **original or a duplicate of a domestic
    record of regularly conducted activity** that would be

24     admissible under Rule 803(6) **if accompanied** by a written
    **declaration** of its custodian or other qualified person .

25     . . **certifying** that the record–

26     (A) was made at or near the time of the occurrence
    of the matters set forth by, or from information

27

28         83

1    transmitted by, a person with knowledge of those
     matters;

2

3           (B) was kept in the course of the regularly
     conducted activity; and

4           (C) was made by the regularly conducted activity as
     a regular practice.

5

6    A party intending to offer a record into evidence under
     this paragraph must provide written notice of that
     intention to all adverse parties, and must make the

7    record and declaration available for inspection
     sufficiently in advance of their offer into evidence to

8    provide an adverse party with a fair opportunity to
     challenge them.

9

10   Fed. R. Evid. 902(11) (emphasis added).

11       6.   Charts and Summaries

12       In an effort to reduce the length of the trial, the

13   government intends to make use of summary witnesses and summary

14   charts to reduce otherwise voluminous records and testimony into a

15   format that is succinct and understandable.   Federal Rule of

16   Evidence 1006 provides that:

17       The contents of voluminous writings, recordings, or
         photographs which cannot conveniently be examined in court

18       may be presented in the form of a chart, summary, or
         calculation.   The originals, or duplicates, shall be made

19       available for examination or copying, or both, by the parties
         at a reasonable time and place.   The court may order that

20       they be produced in court.

21   The Advisory Committee Notes to Rule 1006 add that: "[t]he

22   admission of summaries of voluminous books, records, or documents

23   offers the only practicable means of making their contents

24   available to judge and jury.   The rule recognized this practice,

25   with appropriate safeguards."

26

27

28                              84

1    A chart or summary may be admitted as evidence where the
2 proponent establishes that the underlying documents are
3 voluminous, admissible and available for inspection.  <u>See</u> <u>United</u>
4 <u>States v. Myers</u>, 847 F.2d 1408, 1411-1412 (9th Cir. 1988); <u>United</u>
5 <u>States v. Johnson</u>, 594 F.2d 1253, 255-1257 (9th cir. 1979).  While
6 the underlying documents must be "admissible," they need not be
7 admitted."  See <u>Meyers</u>, 847 F2d at 1412; <u>Johnson</u>, 594 F.2d 233,
8 239 (7th Dir. 1983); <u>Barsky v. United States</u>, 339 F.2d 180 (9th
9 Cir. 1964).

10    Summary charts may be used by the government in opening
11 statement.  Indeed, "such charts are often employed in complex
12 conspiracy cases to provide the jury with an outline of what the
13 government will attempt to prove."  <u>United States v. De Peri</u>, 778
14 F.2d 963, 979 (3rd Cir. 1985) (approving government's use of
15 chart); <u>United States v. Rubino</u>, 431 F.2d 284, 290 (6th Cir.
16 1970)(same).

17    Summary charts need not contain the defendant's version of
18 the evidence and may be given to the jury while a government
19 witness testifies concerning them.  <u>See</u> <u>United States v. Radseck</u>,
20 718 F.2d 233, 239 (7th Cir. 1983); <u>Barsky</u>, 339 F.2d at 181.  In
21 addition, summary charts are admissible under Federal Rule of
22 Evidence 611(a), which permits a court to "exercise reasonable
23 control over the mode and order of interrogating witnesses and
24 presenting evidence so as to (1) make the interrogation and
25 presentation effective for ascertainment of the truth, (2) avoid
26 needless consumption of time, and (3) protect witnesses from
27
28                              85

1 harassment or undue embarrassment." <u>United States v. Poschatta</u>,

2 829 F.2d 1477, 1481 (9th Cir. 1987); <u>United States v. Gardner</u>, 611

3 F.2d 770, 776 (9th Cir. 1980).

4 　　　Typically, charts used under Rule 611(a) for "pedagogical

5 purposes," or as "testimonial aids," should "not be admitted into

6 evidence or otherwise be used by the jury during deliberations."

7 <u>United States v. Wood</u>, 943 F.2d 1048, 1053 (9th Cir. 1991) ("We

8 have long held that such pedagogical devices should be used only

9 as a testimonial aid, and should not be admitted into evidence or

10 otherwise be used by the jury during deliberations."); <u>see also</u>

11 <u>United States v. Abbas</u>, 504 F.2d 123 (9th Cir. 1974) (better

12 practice is that charts used as testimonial aids not be submitted

13 to jury).   However, charts may be used under Rule 611(a) and then

14 subsequently admitted into evidence in those instances in which

15 the defense has had opportunity to challenge the information

16 contained in the chart.   For example, in <u>Gardner</u>, the district

17 court admitted, over defense objection, a chart used by a

18 government witness as a testimonial aid that summarized facts and

19 calculations already in evidence.   <u>Gardner</u>, 611 F.2d at 776.   The

20 Ninth Circuit held that the use of this chart as a testimonial aid

21 was appropriate under Rule 611(a), and that the chart was properly

22 admitted into evidence under Rule 1006:   "Having thus utilized the

23 chart without objection with a full opportunity for the defendant

24 to challenge the facts, figures, calculations and underlying

25 documents upon which the chart was based, it was not reversible

26 error to admit the chart in evidence."   <u>Id.</u> at 776; <u>see also</u>

27

28 　　　　　　　　　　　　　　　　　86

1  United States v. Olano, 62 F.3d 1180, 1204 (9th Cir. 1995); United
2  States v. Baker, 10 F.3d 1374 (9th Cir. 1993) (charts admitted
3  after court examined them outside presence of jury, defendants had
4  opportunity to review charts and cross-examine witness, and court
5  gave limiting instruction that charts were not themselves
6  substantive evidence).

7       Summary charts of information contained in ledgers and other
8  documents are admissible where the ledgers are available to
9  defendant for inspection.  United States v. Catabran, 836 F.2d 453
10 (9th Cir. 1982).  Similarly, a chart summarizing unavailable
11 documents is admissible under Fed. R. Evid. 1004 if the underlying
12 materials are "lost or destroyed" or "not obtainable."  Fed. R.
13 Evid. 1004(1) and 1004(2).

14      A summary witness may properly testify about, and use a chart
15 to summarize, evidence that has already been admitted.  As the
16 Ninth Circuit has recognized, the court and jury are entitled to
17 have a witness "organize and evaluate evidence which is factually
18 complex and fragmentally revealed."  United States v. Shirley, 884
19 F.2d 1130, 1133-34 (9th Cir. 1989)(agent's testimony regarding her
20 review of various telephone records, rental receipts, and other
21 previously offered testimony held to be proper summary evidence,
22 as it helped jury organize and evaluate evidence; summary charts
23 properly admitted); United States v. Lemire, 720 F.2d 1327,
24 1348(D.C. Cir. 1983).  A summary witness also may rely on the
25 analysis of others as the use of others in the preparation of
26 summary evidence goes to the weight and not the admissibility of

27

28                                87

1  the evidence.  United States v. Soulard, 730 F.2d 1292, 1299 (9th

2  Cir. 1984); see Diamond Shamrock Corp. v. Lumbermens Mutual

3  Casualty Co., 466 F.2d 722, 727 (7th Cir. 1972) ("It is not

4  necessary . . . that every person who assisted in the preparation

5  of the original records or the summaries be brought to the witness

6  stand.").

7  B.    ADMISSIBILITY OF WITNESS TESTIMONY

8        1.    Direct And Adopted Admissions By Party Opponent

9        A statement is not hearsay, but rather constitutes an

10 admission by a party opponent, if the statement is offered against

11 a party and is the party's own statement in either an individual

12 or representative capacity.  Fed. R. Evid. 801(d)(2)(A); Burreson,

13 643 F.2d at 1349.  Similarly, a statement made by a party-opponent

14 and offered against that party is not hearsay if it is a

15 "statement of which the party has manifested an adoption or belief

16 in its truth."  Fed. R. Evid. 801(d)(2)(A).  With respect to

17 adoptive admissions, the Court must find sufficient foundational

18 facts that a jury could reasonably conclude that the defendant

19 actually heard; understood and acceded to the statement(s).

20 Ospina, 739 F.2d at 451 (writings in residence of defendant and

21 acted upon by defendant are adoptive admissions and therefore non-

22 hearsay); United States v. Valles-Vallencia, 811 F. 2d 1232, 1237

23 (9th Cir. 1987) (handwriting on ledgers are adoptive admissions).

24       When the government admits a portion of a defendant's prior

25 statement under Rule 801(d)(2)(A), the defendant may not put in

26 additional out-of-court statements by him because such statements

27

28                              88

1 are hearsay when offered by the defendant.  Fed. R. Evid.

2 801(d)(2); <u>United States v. Nakai</u>, 413 F.3d 1019, 1022 (9th Cir.

3 2005) (recognizing that exculpatory out-of-court statements that a

4 defendant makes to a witness constitute inadmissible hearsay)

5 (citing <u>Williamson v. United States</u>, 512 U.S. 594, 598-601

6 (1994)); <u>United States v. Ortega</u>, 203 F.3d 675, 681-82 (9th Cir.

7 2000) (defendant prohibited from eliciting his own exculpatory

8 statements during cross examination of government agent because to

9 permit otherwise would be to put such statements "before the jury

10 without subjecting [defendant] to cross-examination, precisely

11 what the hearsay rule forbids."); <u>United States v. Fernandez</u>, 839

12 F.2d at 639, 640 (9th Cir. 1988)(same).

13     The only potential limitation of this principle is the "rule

14 of completeness" set forth in Federal Rule of Evidence 106, which

15 has been applied by some courts to require that all of a

16 defendant's prior statements be admitted where it is necessary to

17 place an admitted statement in context or to avoid misleading the

18 trier of fact.  It is entirely proper, however, to admit segments

19 of a statement without including everything, and adverse parties

20 are not entitled to offer additional statements just because they

21 are there and the proponent has not offered them.  <u>United States</u>

22 <u>v. Collicott</u>, 92 F.3d 973, 983 (9th Cir. 1996); <u>United States v.</u>

23 <u>Marin</u>, 669 F.2d 73, 84 (2d Cir. 1982).  Furthermore, Rule 106 does

24 not render admissible evidence which is otherwise inadmissible

25 under the hearsay rules.  <u>See Collicott</u>, 92 F.3d at 983 (hearsay

26 not admitted regardless of Rule 106).

27

28                                  89

2.   <u>Confession of a Co-Defendant/*Bruton* Considerations</u>

While a defendant's own admissions may be offered against him under Rule 801(d)(2)(A), a defendant is deprived of his Sixth Amendment right to confrontation when a non-testifying co-defendant's confession that implicates the defendant is introduced in a joint trial, even if the jury is instructed to consider that confession only against the co-defendant.   <u>Bruton v. United States</u>, 391 U.S. 123, 135-36 (1968).   However, a mutually inculpatory confession by a non-testifying defendant can be introduced in a joint trial provided that a proper limiting instruction is given and "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."   <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987).   In addition, a confession by a non-testifying co-defendant may properly be considered by the trier of fact if it does not expressly implicate another defendant but rather becomes incriminating only after it is linked with other evidence introduced at trial.   <u>Id.</u> at 208-09.

3.   <u>Expert Testimony</u>.

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question.   Fed. R. Evid. 702.   An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact.   Fed. R. Evid 704; <u>Fleishman</u>, 684 F.2d at 1335.

4.   Opinion Testimony of Non-Experts

Fed. R. Evid. 701 allows lay witnesses to provide opinion testimony as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

To that end, an experienced government agent may provide opinion testimony even if that opinion is based in part on information from other agents familiar with the issue.  United States v. Andressen, 813 F.2d 1450, 1458 (9th Cir. 1987); United States v. Golden, 532 F.2d 1244, 1248 (9th Cir. 1976).  An experienced government agent also may testify as to his opinions and impressions of what he observed.  As the court stated in United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982), "opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion."

5.   Hearsay

a.   Definition

Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).

b.   Statements Not Introduced for the Truth of the
Matter Asserted (e.g., Effect on Hearer)

Statements offered for the effect they have on the hearer
(e.g., to show a party's knowledge) are not hearsay.  United
States v. Castro, 887 F.2d 998, 1000 (9th Cir. 1987); Orsini v.
O/S Seabrooke O.N., 247 F.3d 953, 960 n.4 (9th Cir. 2001).  A
witness also may testify to what he or she understood a declarant
to mean with respect to a statement made by the declarant to the
witness.  United States v. Brooks, 473 F.2d 817, 818 (9th Cir.
1973) (per curiam).

c.   State of Mind Exception

Federal Rule of Evidence 803(3) provides that the hearsay
rule does not exclude a "statement of the declarant's then
existing state of mind."  Fed. R. Evid. 803(3).  The three factors
bearing on the foundational inquiry on admissibility under Federal
Rule of Evidence 803(3) are contemporaneousness, chance for
reflection, and relevance.  United States v. Miller, 874 F.2d
1255, 1264 (9th Cir. 1989) (upholding exclusion of defendant's
statement about his state of mind two hours prior to the statement
because of chance for reflection and opportunity to fabricate).

d.   Prior Inconsistent Statements

Prior inconsistent statements of a non-defendant witness are
admissible for impeachment purposes under Federal Rule of Evidence
613.  See Fed. R. Evid. 613(a), (b).  In addition, such statements
are admissible as substantive evidence offered for the truth of
the matter asserted provided that the foundational requirements
set forth in Federal Rule of Evidence 801(d)(1) are satisfied.

92

1  <u>United States v. Armijo</u>, 5 F.3d 1229, 1232 (9th Cir. 1993).  Under

2  Rule 801(d)(1), a statement is not hearsay if "[t]he declarant

3  testifies at the trial or hearing and is subject to cross-

4  examination concerning the statement, and the statement is

5  inconsistent with the declarant's testimony, and was given under

6  oath subject to the penalty of perjury at a trial, hearing, or

7  other proceeding, or in a deposition."  Fed. R. Evid. 801(d)(1).

8         e.  <u>Prior Consistent Statements</u>

9      Under Federal Rule of Evidence 801(d)(1)(B), an out-of-court

10  statement is not hearsay if the declarant testifies at the trial

11  and is subject to cross-examination concerning the statement, and

12  the statement is "consistent with the declarant's testimony and is

13  offered to rebut an express or implied charge against the

14  declarant of recent fabrication or improper influence or motive."

15  Rule 801(d)(1)(B); <u>see</u> <u>United States v. Bao</u>, 189 F.3d 860, 864

16  (9th Cir. 1999); <u>United States v. Frederick</u>, 78 F.3d 1370, 1377

17  (9th Cir. 1996);  <u>United States v. Stuart</u>, 718 F.2d 931, 934 (9th

18  Cir. 1983).  However, "[p]rior consistent statements may not be

19  admitted to counter all forms of impeachment or to bolster the

20  witness merely because [the witness] has been discredited . . . .

21  The Rule speaks of a party rebutting an alleged motive, not

22  bolstering the veracity of the story told."  <u>Tome v. United</u>

23  <u>States</u>, 513 U.S. 150, 157-58 (1995).  For example, in <u>Tome</u>, the

24  Supreme Court held "that prior consistent statements made after

25  the date of the alleged motivation to lie are inadmissible."

26  Frederick, 78 F.3d at 1377; <u>see</u> <u>Tome</u>, 513 U.S. at 167.

27

28                           93

1    To establish the admissibility of a prior consistent
2 statement under Rule 801(d)(1)(B), the following foundational
3 factors must be satisfied: "(1) the declarant must testify at
4 trial and be subject to cross-examination; (2) there must be an
5 express or implied charge of recent fabrication or improper
6 influence or motive of the declarant's testimony; (3) the
7 proponent must offer a prior consistent statement that is
8 consistent with the declarant's challenged in-court testimony;
9 and, (4) the prior consistent statement must be made prior to the
10 time that the supposed motive to falsify arose." <u>Collicott</u>, 92
11 F.3d at 979.

12    6.   <u>Hostile Witnesses</u>

13    The government may seek permission to use leading questions
14 in addressing certain witnesses who have close ties to, or who
15 otherwise are aligned with, certain defendants.  Under Federal
16 Rule of Evidence 611(c), "when a party calls a hostile witness, an
17 adverse party, or a witness identified with an adverse party,
18 interrogation may be by leading questions."  Although prior to
19 Rule 611(c)'s adoption, a party wishing to ask leading questions
20 on direct examination had to show "actual hostility" by the
21 witness or that the witness was an adverse party, Rule 611(c)
22 "significantly enlarged the class of witnesses presumed hostile,
23 and therefore subject to interrogation by leading questions
24 without further showing of actual hostility." <u>Haney v. Mizell</u>
25 <u>Memorial Hosp.</u>, 744 F.2d 1467, 1477-78 (11th Cir. 1984) (internal
26 quotation marks omitted).  A trial court has broad discretion in

27

28                              94

determining whether a particular witness should be deemed a hostile witness for purposes of this rule.  See <u>United States v. Goode</u>, 814 F.2d 1353, 1355 (9th Cir. 1987).

    7.   <u>Witness Invocation Of The Fifth Amendment Right Against Self Incrimination</u>

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V.  The Fifth Amendment protects a defendant from making statements that are: (1) compelled; (2) testimonial; and (3) self-incriminating.  The Supreme Court has held that compelled testimony, such as sworn trial testimony, is self-incriminating if reasonable cause exists to believe that the testimony either would support a conviction or would provide a link in the chain of evidence leading to a conviction.  <u>United States v. Hoffman</u>, 341 U.S. 479, 486 (1951).  If, however, the threat of future prosecution is "remote, unlikely or speculative, the privilege does not apply."  <u>United States v. Antelope</u>, 395 F.3d 1128, 1134 (9th Cir. 2005) (citing <u>Brown v. Walker</u>, 161 U.S. 591, 596-97 (1896) for proposition that Fifth Amendment protection does not properly extend to offenses for which the statute of limitations has run); <u>see also</u> <u>United States v. Vavages</u>, 151 F.3d 1185, 1192 (1998) (noting that "fear of perjury can typically form a valid basis for invoking the Fifth Amendment only where the risk of prosecution is for perjury of the witness' past testimony" and finding "a witness may not claim the privilege of the Fifth Amendment out of fear that he will be prosecuted for perjury for what he is about to say.  The shield against self-incrimination in

1  such a situation is to testify truthfully, not to refuse to

2  testify on the basis that the witness may be prosecuted for a lie

3  not yet told.").

4      Non-defendant witnesses cannot avoid testifying at trial

5  through a blanket invocation of the Fifth Amendment privilege

6  against self-incrimination.  <u>Antelope</u>, 395 F.3d at 1134.  Instead,

7  in instances in which the witness has provided the government with

8  advance notice of the intent to invoke the Fifth Amendment

9  privilege against self-incrimination, the witness should be

10  questioned on the stand, but outside the presence of the jury, to

11  determine whether the invocation is appropriate.  <u>Vavages</u>, 151

12  F.3d at 1192.  Moreover, in the event that a non-defendant witness

13  properly invokes the Fifth Amendment, the government can compel

14  the witness to testify through the issuance of use immunity to

15  that witness.  <u>U.S. v. Doe</u>, 125 F.3d 1249, 1252, 1254 (9th Cir.

16  1997).

17         8.   <u>Privilege Waiver Issues</u>

18      It is well established that the attorney-client privilege can

19  be waived when a party places privileged matters in controversy.

20  <u>See, e.g.</u>, <u>United States v. Amlani</u>, 169 F.3d 1189, 1194-95 (9th

21  Cir. 1999) (finding that defendant waived privilege by

22  affirmatively raising issue in attorney-disparagement claim and as

23  enforcement of the privilege would deny the opposing party access

24  to information vital to the defense of the claim).  In an effort

25  to challenge the government's evidence on count one-hundred-eight,

26  which charges Arneson with having made a false statement, it is

27

28

96

the government's understanding that defendant may attempt to introduce testimony from the three attorneys who represented Arneson at his failed proffer:  Jeffrey Eglash, Thomas Holliday, and Stephen Miller.  Depending of the subject matter of their testimony, it is possible that such testimony will constitute a waiver of the attorney-client privilege as to Arneson's discussions with counsel on, at a minimum, issues such as: (1) whether he conducted law enforcement database inquires on Pellicano's behalf; (2) the number of such database inquiries that Arneson performed on Pellicano's behalf; (3) Arneson's reason for conducting such inquiries; (4) whether Arneson understood that he was not permitted to provide Pellicano with such information; and (5) whether Arneson received payment, in whole or in part, for providing Pellicano with such information.

### 9.   Cross-Examination of Defendant

A defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony.  The scope of a defendant's waiver is co-extensive with the scope of relevant cross-examination.  United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver.  Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony").

1    While Federal Rule of Evidence 404(b) "restricts the use of
2  evidence solely for purposes of demonstrating a criminal
3  proclivity, [i]t does not proscribe the use of other act evidence
4  as an impeachment tool during cross-examination." <u>United States</u>
5  <u>v. Gay</u>, 967 F.2d 322, 328 (9th Cir. 1992).  Furthermore, Federal
6  Rule of Evidence 609(a) permits the credibility of a defendant to
7  be impeached by evidence of felony convictions of the defendant or
8  any crimes involving dishonesty or false statements, provided that
9  the conviction was sustained or the defendant was released from
10 prison on the conviction within the past ten years.

11      10.  <u>Cross Examination - General Witnesses</u>

12      Under Federal Rule of Evidence 608, the credibility of a
13 witness may be supported or attacked by evidence in the form of:
14 (1) prior fraud convictions; (2) prior felony convictions
15 sustained within the past ten years; and (3) opinion or reputation
16 testimony provided that the testimony refers only to the witness'
17 character for truthfulness or untruthfulness.  Fed. R. Evid. 608.
18 Moreover, reputation or opinion evidence relating to truthfulness
19 may only be admitted if the witness' character for truthfulness
20 has been attacked.  Fed. R. Evid. 608(a).  Similarly, specific
21 instances of conduct of a witness may, in the court's discretion,
22 be inquired into on cross-examination of the witness only if the
23 conduct concerns his character for truthfulness or untruthfulness.
24 Such conduct, however, may not be proved by extrinsic evidence.
25 Fed. R. Evid. 608(b).

26
27
28

98

11.   <u>Defendant's Character Witnesses</u>

The Supreme Court has recognized that character evidence -- particularly cumulative character evidence -- has weak probative value and great potential to result in confusion of the issues and prejudice the jury.  <u>Michelson v. United States</u>, 335 U.S. 469, 480, 486 (1948).  The Court has thus given trial courts wide discretion to limit the presentation of character evidence.  <u>Id.</u> at 486.

Rule 404(a) of the Federal Rules of Evidence governs the admissibility of character evidence.  Rule 404(a) permits a defendant to introduce evidence of a "pertinent" trait of character.  For example, evidence of defendant's family or employment status is irrelevant to whether defendant is believable and law-abiding, and is thus inadmissible.  <u>See</u> <u>United States v. Santana-Camacho</u>, 931 F.2d 966, 967-68 (1st Cir. 1991) (testimony of defendant's daughter purportedly showing that defendant was a good family man was inadmissible character evidence inasmuch as such character traits were not pertinent to charged crime of illegally bringing aliens into the United States).

Moreover, the <u>form</u> of the proffered character evidence must be proper.  Federal Rule of Evidence 405(a) sets forth the sole methods by which character evidence may be introduced.  It specifically states that where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation; and (2) by testimony as to opinion.  Thus, defendant may not introduce specific instances of his good conduct through

the testimony of others.  <u>Michelson</u>, 335 U.S. at 477 ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits.").

On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait at issue. <u>See</u> Fed. R. Evid. 405(a).  In particular, a defendant's character witnesses may be cross-examined about their knowledge of the defendant's past crimes, wrongful acts, and arrests.  <u>See</u> <u>Michelson</u>, 335 U.S. at 481.  The only prerequisite is that there must be a good-faith basis that the incidents inquired about are relevant to the character trait at issue.  <u>See</u> <u>United States v. McCollom</u>, 664 F.2d 56, 58 (5th Cir. 1981).

12.   <u>Defendant's Testimony Regarding Character/Impeachment By Contradiction</u>

Unlike character witnesses, who must restrict their testimony to opinion or appraisal of a defendant's reputation, a defendant-witness may cite specific instances of conduct as proof that he possessed a relevant character trait.  <u>United States v. Giese</u>, 597 F.2d 1170, 1190 (9th Cir. 1979).  However, "[o]nce a witness (especially a defendant-witness) testifies as to any specific fact on direct testimony, the trial judge has broad discretion to admit extrinsic evidence tending to contradict the specific statement, even if such statement concerns a collateral matter in the case."  <u>Id.</u> at 1190 (citation omitted).  Thus, if defendant testifies to specific instances of conduct supportive of

1 good character, he opens the door to rebuttal evidence on all

2 reasonably related matters, be they "collateral" or not.[27] <u>Giese</u>,

3 597 F.2d at 1190.

4 C. MISCELLANEOUS

5 1. <u>Judicial Notice</u>

6 Federal Rule of Evidence 201 provides that, if requested by a

7 party and supplied with the necessary information, a court must

8 take judicial notice of facts that are not subject to reasonable

9 dispute in that they are either (1) generally known within the

10 territorial jurisdiction of the trial court or (2) capable of

11 accurate and ready determination by resort to sources whose

12 accuracy cannot reasonably be questioned. Judicial notice may be

13 taken at any stage of the proceedings. For example, the Ninth

14 Circuit has ruled that materials from proceedings in another

15 tribunal are appropriate for judicial notice under Federal Rule of

16 Evidence 201. <u>Biggs v. Terhune</u>, 334 F.3d 910, 916 n.3 (9th Cir.

17 2003) (The court shall instruct the jury that it may, but is not

18 required to, accept as conclusive any fact judicially noticed).

19 Fed. R. Evid. 201).

20

21

22     [27] The distinction between the proper use of extrinsic evidence to impeach by contradiction under Rule 607 and the

23 impermissible use of extrinsic evidence under Rule 608 was explained by the Ninth Circuit in <u>United States v. Castillo</u>, 181

24 F.3d 1129 (9th Cir. 1999). As the <u>Castillo</u> Court noted, Rule 608(b) prohibits the use of extrinsic evidence of conduct to

25 impeach a witness' credibility in terms of his general veracity. In contrast, the concept of impeachment by contradiction permits

26 courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence.

27

28                               101

2.   <u>Reciprocal Discovery</u>

The government has requested reciprocal discovery and the Court has ordered all parties to produce all Rule 16 materials in their possession.  Virtually no reciprocal discovery has been provided.  To the extent that there exists reciprocal discovery to which the government is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure and which the defense has not produced prior to trial, the government reserves the right to seek to have such documents precluded should a defendant attempt to introduce or use them at trial.  <u>See</u> <u>United States v. Young</u>, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

3.   <u>Waiver of Rule 12(b) Motions</u>

Federal Rule of Criminal Procedure 12(b)(3) requires that defenses and objections based on defects in the institution of the prosecution, defenses and objections based on defects in the indictment or information, motions to suppress evidence, and requests for discovery under Rule 16 be raised prior to trial.  A defendant's failure to raise any such motions prior to trial constitutes waiver, and the Court should not allow any such motions to be brought after jeopardy has attached.  Fed. R. Crim. Pro. 12(e); <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348

102

1  (9th Cir. 1996); <u>United States v. Miller</u>, 984 F.2d 1028 (9th Cir.

2  1993).

3  DATED: February 28, 2008

4                              Respectfully submitted,

5                              THOMAS P. O'BRIEN
                               United States Attorney
6
                               CHRISTINE C. EWELL
7                              Assistant United States Attorney
                               Chief, Criminal Division
8

9                              _____
                               DANIEL A. SAUNDERS
10                             KEVIN M. LALLY
                               Assistant United States Attorneys
11                             Violent & Organized Crime Section

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    -103-

## CERTIFICATE OF SERVICE BY MAIL

I, <u>SONIA ACEVEDO</u>, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California, that my business address is Office of United States Attorney, U.S. Courthouse, 312 N. Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action.

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District court for the Central District of California, at whose direction the service by mail described in this Certificate was made on; that on <u>February 29, 2008</u>, I deposited in the United States mails in at the U.S. Courthouse at 312 North Spring Street, Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, copies of:

### TRIAL MEMORANDUM

addressed to:   Anthony J. Pellicano
                Reg. No. 21568-112
                c/o MDC Legal Center
                P.O. Box 1500
                Los Angeles, CA  90053

at <u>his</u> known address, at which place there is a delivery Service by United States mail.

This Certificate is executed on certify <u>February 29, 2008</u> under penalty of perjury that the foregoing is true and correct.


SONIA ACEVEDO