1  TERREE A. BOWERS (SBN 089334)
   HOWREY LLP
2  550 South Hope Street, Suite 1100
   Los Angeles, California  90071
3  Telephone:  (213) 892-1800
   Facsimile:  (213) 892-2300
4  Email:  bowerst@howrey.com

5  PATRICIA L. GLASER (SBN 055668)
   CHRISTENSEN, GLASER, FINK, JACOBS,
6  WEIL & SHAPIRO, LLP
   10250 Constellation Boulevard, 19th Floor
7  Los Angeles, California 90067
   Telephone:  (310) 553-3000
8  Facsimile:  (310) 556-2920
   Email:  pglaser@chrisglase.com

9
   Attorneys for Defendant TERRY CHRISTENSEN
10

```
              FILED
  CLERK, U.S. DISTRICT COURT

        AUG - 5 2008

  CENTRAL DISTRICT OF CALIFORNIA
  BY                    DEPUTY
```

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14  UNITED STATES OF AMERICA,          )  Case No. CR 05-1046(E)-DSF
                                       )
15              Plaintiff,             )  **DEFENDANT TERRY**
                                       )  **CHRISTENSEN'S NOTICE OF**
16      vs.                            )  **MOTION AND MOTION *IN LIMINE***
                                       )  **TO EXCLUDE IRRELEVANT**
17                                     )  **REFERENCES FROM ALEC GORES'**
    ANTHONY PELLICANO                  )  **TESTIMONY CONCERNING ANY**
18  and TERRY CHRISTENSEN,             )  **CONTACTS WITH PATRICIA L.**
                                       )  **GLASER, PURSUANT TO FEDERAL**
19              Defendants.            )  **RULES OF EVIDENCE 401, 402 AND**
                                       )  **403; MEMORANDUM OF POINTS**
20                                     )  **AND AUTHORITIES**
                                       )
21                                     )  **[FILED UNDER SEAL]** DSF
                                       )
22                                     )  The Honorable Dale S. Fischer
                                       )
23  _____  )  Trial Date: July 16, 2008

24

25

26

27

28

1     Defendant Terry Christensen ("Christensen"), by and through his attorneys of

2  record, Terree A. Bowers and Patricia L. Glaser, hereby moves the Court *in limine* to

3  exclude irrelevant references to any contacts with Patricia L. Glaser from Alec Gores'

4  testimony.

5     This motion is based on the attached memorandum of points and authorities, the

6  files and records of this case, and upon any evidence or argument that may be presented

7  to the Court at any hearing on the motion.

8

9  DATED:  July 31, 2008                    Respectfully submitted,

10

11                                          By: _____

12                                              TERREE A. BOWERS
                                                PATRICIA L. GLASER

13
                                            Attorneys for Defendant
14                                          TERRY CHRISTENSEN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT TERRY CHRISTENSEN'S NOTICE OF MOTION AND MOTION *IN LIMINE* TO EXCLUDE IRRELEVANT REFERENCES
FROM ALEC GORES' TESTIMONY CONCERNING ANY CONTACTS WITH PATRICIA L. GLASER

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The government intends to call Alec Gores ("Gores") in its case-in-chief.  Gores will testify about hiring Anthony Pellicano ("Pellicano") to investigate his wife-at-the-time, Lisa Gores.  In the previous trial, Gores testified that he initially was looking for someone to do a background check on one of his employees.  (Exhibit A, 4/4/2008 Trial Transcript (A.M. Session) at pp. 49-50).  Gores incorrectly claimed that Patty Glaser provided him the name and telephone number of Pellicano.  (*Id.*).  After Gores contacted Pellicano about the background check, Gores independently raised the issue of having Pellicano investigate Lisa Gores.  (*Id.* at pp. 50-51).

Gores did not tell Ms. Glaser anything about his retention of Pellicano to investigate Lisa Gores.  (Exhibit B, 9/25/2003 Grand Jury Transcript at pp. 29-30).  Ms. Glaser was totally unaware of any of the work that Pellicano did for Gores.  (*Id.* at pp. 29-30).  Gores' only relevance to the instant trial is his retention of Pellicano to investigate Lisa Gores, of which Glaser, and indeed Terry Christensen, were unaware and played no role.

## II.    GORES' REFERENCE TO GLASER IS IRRELEVANT

The government is calling Gores to establish that Pellicano recorded conversations between Lisa and Tom Gores (Alec's brother).  The government contends that the recordings are evidence of another Pellicano wiretap, even though there is no evidence of the methodology Pellicano used to obtain the alleged conversations.  Ostensibly, the government will introduce the recording (the only third-party recording in the case) to demonstrate Pellicano's "capability" to wiretap.  Similarly, the government has claimed that evidence of other purported wiretaps shows that Pellicano was capable of achieving the goals of the charged conspiracy and committing the crime that Christensen is alleged to have aided and abetted.  Gores' claim that Glaser gave him Pellicano's contact information has nothing to do with the government's reasons for calling Gores.  Federal Rules of Evidence 401 and 402.

1    The government also may claim that Gores' contention shows that Christensen
2  used Pellicano before the Lisa Bonder litigation and somehow rebuts Christensen's
3  claim that the Bonder case was the first time he had ever hired Pellicano. Gores'
4  reference to Glaser does not in any way suggest that Christensen had used Pellicano
5  before. Even assuming, *arguendo*, that Glaser gave Gores Pellicano's telephone
6  number, and she did not, it does not follow that Glaser had used Pellicano in any of her
7  cases. Pellicano was well known and his name naturally came up when people were
8  looking for an investigator. Federal Rules of Evidence 401 and 402.

9    The government has searched all of Pellicano's records, and there is not a scintilla
10 of evidence suggesting that Glaser ever retained Pellicano, or Christensen used
11 Pellicano before the Lisa Bonder litigation. If the government had any such evidence,
12 they would use it and not resort to mere insinuations through Gores' mistaken memory.

13 **III.    THE GORES' REFERENCE TO GLASER IS EXTREMELY**
14 **PREJUDICIAL, AND PURSUANT TO THE BALANCING TEST OF RULE**
15 **403, IT SHOULD BE EXCLUDED**

16    Christensen has chosen to be represented by his partner, Glaser, and knowingly
17 waived all potential or actual conflicts. Such a waiver does not give the government
18 *carte blanche* to attempt to distort or misuse the evidence of that relationship to its
19 advantage, however. The jury knows that Glaser and Christensen belong to the same
20 firm. Christensen has accepted any consequences arising from the juror's knowledge of
21 that relationship. But the Court should be on guard for disguised efforts by the
22 government to tarnish Glaser's reputation and thereby jeopardize Christensen's defense.
23 The government is still bound by the Constitution, the federal rules, and its status as an
24 officer of the Court.

25    Federal Rule of Evidence 403 requires the Court to exclude even relevant
26 evidence if its probative value is outweighed by danger of unfair prejudice, confusion,

27
28

1 or misleading the jury. Gores' claim that Glaser provided Pellicano's telephone number

2 is exactly the type of evidence that should be excluded because:

- The reference could give rise to unwarranted and improper speculation as to Glaser's use of Pellicano which would require additional explanation and evidence to overcome;

- The reference might negatively influence the jury's view of Glaser and undermine her ability to conduct Christensen's defense;

- The reference might cause jurors to assume that the Christensen firm used Pellicano on a regular basis. (An assumption that is incorrect and would have to be countered with additional evidence).

- The issue is a tangential matter at best, that would cause delay because of Christensen's need to counter any misimpression that might arise if the Court allows the testimony to be admitted.

14 Rule 403 provides the Court with ample justification for keeping Gores'

15 testimony concerning Glaser from being elicited.

## III.    CONCLUSION.

17 For the foregoing reasons, Christensen requests the Court to exclude any

18 testimony from Gores concerning his claim that Glaser provided him with Pellicano's

19 name and telephone number.

21 DATED: July 31, 2008                    Respectfully submitted,

By: _Terree A. Bowers_
TERREE A. BOWERS
PATRICIA L. GLASER

Attorneys for Defendant
TERRY CHRISTENSEN

- 3 -

**EXHIBIT  A**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---

THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | CR 05-1046(E)-DSF |
| Anthony Pellicano, et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

Day 18 (A.M. Session)

Los Angeles, California

Friday, April 4, 2008

Pamela A. Seijas, CSR, FCRR
Official Reporter
Roybal Federal Building
255 East Temple Street
Room 181-I
Los Angeles, California  90012
(213) 687-0446

1          Does the Government have another witness?

2          MR. LALLY:  Yes, Your Honor.  The Government calls

3    Alec Gores.

4          THE CLERK:  Please stand right there.

5       Alec E. Gores, Government's witness, was sworn

6          THE CLERK:  Please have a seat.  Please state and

7    spell your full name for the record.

8          THE WITNESS:  Alec E. Gores, A-L-E-C, G-O-R-E-S.

9          THE COURT:  You may proceed.

10                    DIRECT EXAMINATION

11   BY MR. LALLY:

12   Q.   Good morning, Mr. Gores.  How are you?

13   A.   Good morning.  Good, thank you.

14   Q.   Mr. Gores, what do you do for a living?

15   A.   I buy companies.

16   Q.   Does your -- do you have a name for your company?

17   A.   The Gores Group.

18   Q.   And was it one time known as the Gores Technology Group?

19   A.   Correct.

20   Q.   Are you presently married?

21   A.   No.

22   Q.   Were you previously married to Lisa Gores?

23   A.   Yes.

24   Q.   Over what period of time were you married to Lisa Gores?

25   A.   I know it was up to 2000, and I forget the exact date that

Page 49

1    we got married.  We were married for five, six years.

2    Q.    Have you ever hired a private investigator Anthony

3    Pellicano?

4    A.    Yes.

5    Q.    When did you hire Mr. Pellicano?

6    A.    I believe it was sometime the end of 2000.

7    Q.    And do you see Mr. Pellicano in the courtroom?

8           THE COURT:  Mr. Pellicano is raising his arm.

9           THE WITNESS:  Yes.

10   BY MR. LALLY:

11   Q.    When you say the end of 2000, December 2000, approximately?

12   A.    I believe so, yes.

13   Q.    Why did you hire defendant Pellicano?

14   A.    Originally he was referred to me by our -- by my law firm

15   to do some --

16   Q.    Well, first, let me ask you, what was your law firm?

17   A.    Christensen Miller.

18   Q.    And what attorney from Christensen Miller recommended

19   defendant Pellicano?

20   A.    Patti Glaser.

21   Q.    And what did Ms. Glaser recommend you hire Mr. Pellicano

22   for?

23   A.    For doing some background check on an employee that we

24   hired.

25   Q.    Did you ultimately hire defendant Pellicano for that

1    purpose?

2    A.   No.

3    Q.   Did you, however, speak with defendant Pellicano at that

4    approximate time?

5    A.   Yes.

6    Q.   And what did you speak with him about?

7    A.   Initially about doing background check.   And then --

8    Q.   But you didn't proceed with that ultimately?

9    A.   I don't recall that I did.

10   Q.   Did you ask him to perform any investigative services on

11   your behalf, besides the potential background check that you

12   didn't go forward with?

13   A.   Yes.   Afterwards.

14   Q.   What did you ask him to do?

15   A.   I initially had asked him if he knew anyone.   I asked him

16   that I had suspected my wife was cheating on me, and if he knew

17   anybody that would do some work to find that out for me.

18   Q.   And what was his response?

19   A.   He basically said, "Come and talk to me about that.   You

20   don't need to talk to your lawyers about that."

21   Q.   Now, you indicated that you believe that your wife was

22   having an affair.

23        Why did you believe that she was having an affair?

24   A.   It was going on for few months where I suspected she

25   wasn't, you know, acting properly and she wasn't showing up at

1  places and things like that.  So I got -- I was suspicious.  And

2  then when I got real suspicious, I looked at some phone bills,

3  and it started to look obvious that maybe she was doing

4  something.

5  Q.   Who did you believe your wife was having an affair with?

6  A.   I wasn't sure, but I had -- at some point I had some

7  suspicions it might have been my brother.

8  Q.   What is your brother's name?

9  A.   Tom.

10 Q.   When defendant Pellicano indicated that this was something

11 that he could handle, did you schedule a meeting with him?

12 A.   Yes.

13 Q.   And in connection with that meeting, did defendant

14 Pellicano advise you to bring along some money?

15 A.   Yes.

16 Q.   How much money did he advise you to bring along?

17 A.   If I recall correctly the first time, I believe it was

18 $5,000.

19 Q.   And was it cash or checks?

20 A.   I believe at that time it was cash.

21 Q.   Did you meet with defendant Pellicano?

22 A.   Yes.

23 Q.   Where did you meet with him?

24 A.   I recall -- if I recall correctly, it was at his office.

25 Q.   Now, during this meeting, did defendant Pellicano advise

Page 52

1  you of his -- his standard retainer?

2  A.   I don't recall, but I knew that I had to make another

3  payment.  But I don't recall the conversation at the time.

4  Q.   Do you recall what that payment was?

5  A.   I believe the first payment was $5,000.

6  Q.   That was the cash?

7  A.   Yes.  And the second payment, I believe it was $25,000.  I

8  have to look at the records, but I believe that's what it was.

9  Q.   I can help you by looking at the records now.

10       At this point the Government would seek to introduce

11  Exhibit 404, which is a series of wire transfers accompanied by

12  a custodian of records declaration.

13            THE COURT:  Any objection?

14            THE DEFENDANT (PELLICANO):  No objections.

15            THE COURT:  That's admitted.  Thank you.

16            (Government's Exhibit 404 was received)

17  BY MR. LALLY:

18  Q.   Mr. Gores, looking at this document, which details a wire

19  transfer from Gores Technology Group to Pellicano Investigative

20  Agency in the amount of $25,000 on 12/15/2000, do you believe --

21  do you remember this being the $25,000 payment that you made to

22  retain defendant Pellicano in December of 2000?

23  A.   Yes.

24  Q.   And with the date 12/15/2000, does that correspond with the

25  time of -- or the approximate time of your initial meeting and

1          (Recess taken)

2              (Jury Out)

3          THE COURT:  I have a letter from the juror we spoke to

4    the other day with new information.

5          MR. SAUNDERS:  I am sorry.  Should the witness step

6    out?

7          THE COURT:  It doesn't matter.  I am going to give the

8    letter to Mr. Pierson so that anybody who wants to come up and

9    look at it can see it.  It will be filed under seal, so we

10   shouldn't reveal the contents.  If anyone wants to have a

11   further discussion with this juror about the details, that will

12   be done in camera, so let me know what your views are so

13   hopefully we can let him know what we're going to do today or no

14   later than Monday.

15         MR. HUMMEL:  Will do, Your Honor.  Thank you.

16             (Recess taken)

17       (A.M. proceedings adjourned at 10:47 a.m.)

18                 CERTIFICATE

19

20       I hereby certify that pursuant to Section 753, Title 18,
     United States Code, the foregoing is a true and correct
21   transcript of the stenographically reported proceedings held in
     the above-entitled matter and that the transcript page format is
22   in conformance with the regulations of the Judicial Conference
     of the United States.

23

24   _____          _____

25   Pamela A. Seijas, CSR No. 3593               Date
     Official Reporter

**EXHIBIT B**

FEDERAL GRAND JURY

CENTRAL DISTRICT OF CALIFORNIA


Proceedings had before the Grand Jury of

the United States of America, in and for

the Central District of California, at

the United States District Courthouse,

13th Floor, 312 North Spring Street,

Los Angeles, California, Thursday, September 25,

2003.


PRESENT:

    KEVIN LALLY
    Assistant U.S. Attorney

WITNESS:

    ALECE ELIAS GORES


REPORTED BY:

    STACEY L. WISHNER, CSR NO. 11538


      ALSSI BARNEY UNGERMANN, INC.
      Certified Shorthand Reporters
      29219 Canwood Street, Suite 210
      Agoura Hills, California  91301
        Telephone (888) 326-5900

CONFIDENTIAL

DIS32691

1           THE WITNESS:  Never.

2           THE FOREPERSON:  Was Ms. Glaser involved

3  in your case, or was she aware of the processes that

4  Mr. Pellicano used?

5           THE WITNESS:  Never, no.

6           THE FOREPERSON:  Now, Mr. Pellicano told

7  you that the trip to Hawaii would involve one of his

8  children who was handicapped.  Which child was that?

9           THE WITNESS:  I don't know.  I have a boy

10  with cerebral palsy, and we shared that.  He has a boy,

11  I believe, that has -- he's autistic, I believe.  We

12  kind of shared that.  I'm not sure of the age, which

13  age level.

14           A JUROR:  I have one question.  When you

15  hired Anthony, in the conversations you guys had, do

16  you think that he knew how much money you were worth,

17  you know, for him to just come up and ask you that?

18           THE WITNESS:  That's a good question.  I

19  think somebody asked me that.  I'm not sure if it was

20  someone who made a contact earlier this morning, but I

21  believe that -- I don't know this for a fact, but he

22  could have quickly probably figured out what I was all

23  about from that standpoint, yes.  I wasn't some guy up

24  and down the street, that I was somebody that had money

25  and was wealthy, that kind of a thing.

28

CONFIDENTIAL

DIS32718

1     Q.    BY MR. LALLY:  Presumably when you met

2  with Mr. Pellicano, you had to provide him with

3  background information, where you lived, and things of

4  that sort?

5     A.    I don't really remember whether I did

6  that or not.  It's possible I gave him my office.  I

7  know he had my name, those types of things.  So I don't

8  know whether he got on some computer and found out it

9  or read it.  It's pretty easy to find out what I do.

10  We have a web site, and things of that nature, if

11  somebody wants to kind of find out that.

12         A JUROR:  Well, Ms. Glaser, she worked

13  for you; right?

14         THE WITNESS:  Yes.

15         A JUROR:  So she would know roughly how

16  much dollars and cents in the ballpark of what you

17  could do; right?

18         THE WITNESS:  Yes.

19         A JUROR:  And she recommended Anthony to

20  you?

21         THE WITNESS:  Right.  But just to clarify

22  that, she recommended Anthony for a different situation

23  all together.  I never went back and told Glaser or

24  anybody in that firm my situation.  This was very

25  personal, and I wasn't going to share it with anyone.

29

                            DIS32719

1        So, Ms. Glaser, just to clarify the

2   record, had no knowledge until you guys told me that I

3   told them, and they fell off their chair when they

4   heard the story and how it would get connected.  She

5   had no clue.

6        The other case got settled pretty

7   quickly.  We never involved them in that; so she had no

8   clue that was going on.

9        A JUROR:  I just have one question.  So

10  the initial recommendation by Ms. Glaser for Pellicano

11  was for the potential lawsuit?

12       THE WITNESS:  Yes.

13       A JUROR:  Now, was there a lawsuit?

14       THE WITNESS:  No.  It was settled.  She

15  settled it.  It was settled pretty quickly.

16       A JUROR:  And Pellicano was never

17  involved in it?

18       THE WITNESS:  He never was involved in

19  it.  In the first discussion I with him after the

20  conversation on the phone, when I met him face to face,

21  it was all about my wife.

22       A JUROR:  Your personal?

23       THE WITNESS:  Exactly, yes.

24       MR. LALLY:  Any additional questions?

25       Seeing no hands, that will conclude our

30

1    questioning of Mr. Gores.

2              THE WITNESS:  Thank you very much.

3              (Whereupon the proceedings were concluded

4        at: 10:20 A.M.)

5                        *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

31

CONFIDENTIAL                                    DIS32721

1

2

3                    REPORTER'S CERTIFICATE

4

5        I CERTIFY THAT THE FOREGOING IS A CORRECT

6    TRANSCRIPT FROM THE RECORD OF PROCEEDINGS

7    IN THE ABOVE-ENTITLED MATTER.

8

9    _Stacey Wishner_                    10·7·03

10   STACEY L. WISHNER, CSR # 11538              DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      32

CONFIDENTIAL                                        DIS32722

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             )  ss.:
COUNTY OF LOS ANGELES        )

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 550 South Hope Street, Suite 1100, Los Angeles, California 90071.

     On July 31, 2008, I served on the interested parties in said action the within:

**DEFENDANT TERRY CHRISTENSEN'S NOTICE OF MOTION AND MOTION *IN LIMINE* TO EXCLUDE IRRELEVANT REFERENCES FROM ALEC GORES' TESTIMONY CONCERNING ANY CONTACTS WITH PATRICIA L. GLASER, PURSUANT TO FEDERAL RULES OF EVIDENCE 401, 402 AND 403; MEMORANDUM OF POINTS AND AUTHORITIES; [FILED UNDER SEAL]**

by placing a true copy thereof in a sealed envelope(s) addressed as stated on the attached mailing list and causing such envelope(s) to be deposited in the U.S. Mail at Los Angeles, California.

[X]    (MAIL) I am readily familiar with this firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

[ ]    (EXPRESS MAIL) I am readily familiar with this firm's practice for collection and processing of Express Mail to be sent by the United States Postal Service.  Under that practice, the Express Mail would be deposited on that same day in the ordinary course of business in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service or receipt of Express Mail.

     I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

     Executed on July 31, 2008, at Los Angeles, California.

Yvonne A. Kubicek
(Type or print name)

*Yvonne A Kubicek*
(Signature)

1

**<u>SERVICE LIST</u>**

2
Anthony J. Pellicano                In Propria Persona
Register No. 21568-112, 6 North

3
Metropolitan Detention Center
P.O. Box 1500

4
535 North Alameda Street
Los Angeles, California 90053

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28