# Exhibit A

1  THOMAS P. O'BRIEN
   United States Attorney
2  CHRISTINE C. EWELL
   Assistant United States Attorney
3  Chief, Criminal Division
   DANIEL A. SAUNDERS (Cal. Bar #161051)
4  daniel.saunders@usdoj.gov
   KEVIN M. LALLY (Cal. Bar #226402)
5  kevin.lally@usdoj.gov
   Assistant United States Attorneys
6  Violent & Organized Crime Section
   1500 United States Courthouse
7  312 North Spring Street
   Los Angeles, California 90012
8  Telephone: (213) 894-2272/2170
   Facsimile: (213) 894-3713
9
   Attorneys for Plaintiff
10 United States of America

11                  UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,      )   No. CR 05-1046(E)-DSF
                                  )
14                 Plaintiff,     )   GOVERNMENT'S POSITION
                                  )   REGARDING WITNESS PHYLLIS
15            v.                  )   MILLER'S INVOCATION OF HER
                                  )   FIFTH AMENDMENT RIGHT AGAINST
16 ANTHONY PELLICANO, et al.,     )   SELF INCRIMINATION;
                                  )   DECLARATION OF DANIEL A.
17                 Defendants.    )   SAUNDERS; EXHIBITS
                                  )
18                                )
                                  )
19                                )
                                  )
20 _____)

21      Plaintiff United States of America, by and through its

22 counsel of record, Assistant United States Attorneys Daniel A.

23 Saunders and Kevin M. Lally, hereby files this memorandum of

24 points and authorities in support of its position regarding

25 witness Phyllis Miller's invocation of her Fifth Amendment right

26 against self incrimination.

27      This filing is based on the attached memorandum of points

28 and authorities, the declaration of Assistant United States

Attorney Daniel A. Saunders and exhibits attached thereto; the files and records of this case, and any additional evidence or argument the Court may wish to consider.

DATED: April 27, 2008          Respectfully submitted,

                               THOMAS P. O'BRIEN
                               United States Attorney

                               CHRISTINE C. EWELL
                               Assistant United States Attorney
                               Chief, Criminal Division


                               _____
                               DANIEL A. SAUNDERS
                               KEVIN M. LALLY
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

I.
INTRODUCTION

Based upon representations that her cross-examination may expose her to legal jeopardy, Phyllis Miller, who was called as a government witness to authenticate two documents related to the largely, if not completely, collateral issue of defendant Mark Arneson's mortgage refinancing and bankruptcy filing, has asserted her Fifth Amendment right against self-incrimination. The government respectfully submits that there exists a legitimate possibility that Ms. Miller could be compelled to complete her testimony through a grant of immunity.  However, before this can occur, it is necessary to first define the appropriate scope of cross-examination, as much of what defendant Arneson's counsel, Chad Hummel, has alluded to using as impeachment evidence is likely beyond the scope of legitimate cross-examination.  To that end, Mr. Hummel should be required to provide a detailed proffer as to types of impeachment that could give rise to criminal exposure so that the government and the Court can determine if statutory immunity can be used to secure the completion of this testimony.  Should this not occur and Ms. Miller, on her attorney's advice, continues to assert her Fifth Amendment privilege against self-incrimination, then the government respectfully submits that, in accordance with Ninth Circuit precedent, Ms. Miller's testimony should be stricken. Furthermore, in an abundance of caution, the government would submit that all additional testimony regarding defendant Arneson's bankruptcy filing be stricken, with the jury receiving

1 an appropriately strong curative instruction to disregard this

2 testimony.

## II.
## STATEMENT OF FACTS

I.   <u>CHARGED CONDUCT FOR WHICH DEFENDANT ARNESON STANDS TRIAL</u>

Defendant Arneson is charged in the current indictment with one count of RICO, one count of RICO conspiracy, 17 counts of honest services wire fraud, 17 counts of unauthorized computer access of United States agency information, five counts of identity theft, and five counts of computer fraud.  These charges all pertain directly to defendant Arneson's alleged illegal accessing of confidential law enforcement databases on behalf of co-defendant Anthony Pellicano.

II.   <u>GOVERNMENT'S CASE-IN-CHIEF</u>

Over the six weeks of the government's case-in-chief, the government presented overwhelming evidence of defendant Arneson's guilt on the charged counts, all of which, when considered against defendant Arneson's trial testimony, directly or indirectly addressed defendant Arneson's credibility for truthfulness.  Multiple former employees of the Pellicano Investigative Agency consistently testified to defendant Arneson having provided confidential DMV and criminal history information as a matter of routine practice in the great majority of Pellicano's investigations over the course of several years.  The government further introduced audits of defendant Arneson's computer database access from 1999 through 2002, containing page after page of computer inquiries pertaining to subjects of those investigations, as well as their friends, family members, and

business associates.   Furthermore, the government introduced documents recovered from defendant Pellicano's computers directly corresponding to defendant Arneson's unauthorized inquiries, including reformatted reports and scans of computer database printouts, several still bearing defendant Arneson's name.   In addition, numerous victims of these illegal computer inquiries took the stand and testified that they had no interaction with the LAPD at the time of the inquiries, had not committed any crimes, and had never given defendant Arneson permission to obtain their personal information or to turn it over to defendant Pellicano.   The government also introduced testimonial and documentary evidence of substantial payments, both by check and in cash, from Pellicano to defendant Arneson.   Finally, the government introduced unimpeached evidence of the LAPD policies regarding computer access, which restrict authorized access of law enforcement databases to those with a "right to know" and a "need to know," i.e., to use for official law enforcement purposes only.

III.  DEFENDANT ARNESON'S CASE-IN-CHIEF

    A.   Testimony of Defendant Arneson

        i.   General testimony

    Defendant Arneson testified in his defense.   During this testimony, he claimed that he repeatedly "crossed the line" by providing confidential information from restricted law enforcement databases to defendant Pellicano.   According to defendant Arneson, his actions were justified as part of a mutually beneficial relationship that he developed with defendant Pellicano in which he provided defendant Pellicano with this

1    information in return for a steady flow of tips from defendant

2    Pellicano regarding allegedly important law enforcement matters.

3    Defendant Arneson further testified that, while he accepted more

4    than $180,000 from defendant Pellicano over a four year period

5    and was on call to defendant Pellicano 24 hours a day, he never

6    accepted any money for the thousands of criminal history and DMV

7    database inquiries that he conducted of Pellicano investigative

8    targets as he knew doing so would be wrong.

9              ii.   1998 Bankruptcy petition

10        After briefly discussing the nature of his relationship with

11   defendant Pellicano, defendant Arneson, in response to a series

12   of questions posed by Mr. Hummel, interjected into the

13   proceedings the collateral issue of a 1998 bankruptcy petition

14   filed in his name.   Specifically, defendant Arneson testified

15   that, while he has never filed for bankruptcy, he received

16   notification from the United States Bankruptcy Court in 1998 that

17   a bankruptcy petition had been filed in his name.   (RT 4/11/08

18   a.m. 96:3-17).   Defendant Arneson further testified that, upon

19   receiving advice from unidentified clerks at the bankruptcy

20   court, he "did nothing" after learning about the petition and

21   eventually the petition was dismissed.   (RT 4/11/08 a.m. 96:18-

22   97:6).   In addition, he testified that he had no knowledge as to

23   who filed the bankruptcy petition and further noted that the

24   signature on the document, while in his name, was not his.   (RT

25   4/11/08 a.m. 97:11-98:7).   Finally, defendant Arneson attempted

26   to bolster this testimony by noting that his relationship with

27

28

defendant Pellicano was never influenced by his financial condition.[1] (RT 4/11/08 a.m. 98:8-11).

B.   Testimony of LAPD Officers Who Were Supervised by Defendant Arneson

After trumpeting throughout the case that he proudly and openly used defendant Pellicano's tape enhancement services to benefit the LAPD, defendant Arneson called three officers who formerly worked under his supervision.  Each officer provided testimony undercutting defendant Arneson's credibility.  For example, Officers Lo, Rowan and Randall testified that they had no knowledge of defendant Pellicano having been a law enforcement source: to the contrary, they made clear that the great majority of vice investigations arise from citizen complaints rather than source information.  Furthermore, Officers Lo and Randall each testified that, while they once went to defendant Pellicano's office to drop off a tape recording, they did not specifically know why defendant Pellicano had been selected for the task.  Moreover, all three officers testified on cross-examination that they clearly understood that police database information can be used only for official law enforcement purposes, and that to do otherwise would violate their duty of honesty and integrity to the LAPD and to the citizens of Los Angeles.  Officer Randall further testified that it would be completely inappropriate under any circumstances to disclose confidential information from police databases to an outside source or informant in exchange

---

[1]     Defendant Arneson responded "no" to the question "Did you ever provide law enforcement information to [defendant] Pellicano because you were in desperate financial shape and needed extra money?"  (RT 4/11/08 a.m. 98:8-11).

for information.  Finally, all three officers discussed that their opinion of defendant Arneson as an officer would change negatively if they had known that he shared the identity of undercover officers with defendant Pellicano, which defendant Arneson claimed that he had done.

C.   Government's Cross-Examination of Defendant Arneson

I.   Impeachment unrelated to bankruptcy

The government's cross-examination of defendant Arneson lasted more than six hours over the course of two court days.[2] During this time, the government impeached defendant's credibility in a host of areas completely separate and apart from the issue of the bankruptcy petition.  For example, the government established that defendant: (1) had chosen to retire rather than face an Internal Affairs interview related to his work for defendant Pellicano; (2) had written a letter to Lieutenant Donald Hooper in December 2002 claiming never to have received any law enforcement information from defendant Pellicano, which defendant testified was false; (3) had never documented in any LAPD report, or told any supervisor, partner, or other person about, defendant Pellicano's alleged role as a law enforcement source; (4) was aware of defendant Pellicano's wiretapping capabilities and telephone company contacts; (5) had lied to the FBI (or, in his words, told "a mistruth") when he claimed never to have come into the station on a day off to do computer inquiries for Pellicano; (6) had falsely minimized to

_____

[2]   The government initiated cross-examination at approximately 12:30 p.m. on April 11, 2008, and concluded its cross-examination shortly after 12:30 p.m. on the next trial date, April 16, 2008.

1   the FBI, as between 50 and 100, the total number of computer

2   inquiries he conducted for Pellicano; (7) had knowingly

3   investigated for Pellicano the victim in a pending homicide case

4   in Long Beach; (8) had failed to report any of his time

5   performing computer inquiries for Pellicano in his daily

6   Sergeant's Reports, instead falsely characterizing the time in

7   such ways as "administrative duties" or "meeting with ABC

8   retailers"; (9) had understood he was not being paid by the

9   citizens of Los Angeles to spend time at his computer terminal

10   during his duty hours conducting inquiries for Pellicano; (10)

11   claimed to have never asked Pellicano who the people were that he

12   was being asked to investigate because he didn't care; (11) had

13   lied to the jury (or, in his words, been "facetious") when he

14   claimed on direct examination to have been "30,000 feet in the

15   air" when a particular inquiry was made with his password and

16   serial number; (12) had claimed to have verified the presence of

17   an individual at an address for a search warrant when that

18   individual had been dead for two months; (13) had suffered severe

19   financial problems in 1997 and 1998, had filed a declaration to

20   that effect in his divorce proceeding, and had faced foreclosure

21   of his home; (14) had misrepresented the circumstances of his

22   inquiries on Anita Busch to the FBI in his proffer session,

23   repeatedly modifying his story to comport with the evidence

24   revealed to him; (15) had testified to the jury that Pellicano

25   was trying to lure Jan Portocarrero back from Peru when, in fact,

26   a recorded conversation showed Pellicano telling Portocarrero to

27   stay where he was; (16) had obtained information on informant

28   Jeffrey Piland that Pellicano passed on to Portocarrero in a

1  recorded conversation the next day; (17) had not had any LAPD

2  permit to do outside work after April 2002, in violation of LAPD

3  policy; (18) had received itemized checks from Pellicano for

4  hourly surveillance and security work separate and apart from his

5  monthly $2500 retainer; (19) could not identify any legitimate

6  work he did in exchange for any of the 10 payments charged as

7  bribes in this case; and (20) had known at the time he conducted

8  his inquiries for Pellicano that he was violating the law and

9  LAPD policy.

10              ii.   Bankruptcy petition

11      On the second day of cross-examination, the government

12  followed up on the testimony elicited during defendant Arneson's

13  direct examination regarding his personal finances and the filing

14  of a bankruptcy petition in his name.[3]  In doing so, the

15  government pursued three basic lines of questioning.  First, the

16  government established that in 1997 and 1998, defendant Arneson

17  experienced a personal financial crisis that caused him to come

18  within approximately one day of the foreclosure of his Rancho

19  Palos Verdes residence.  During the course of this questioning,

20  defendant Arneson conceded that, in February 1997, he submitted a

21  sworn declaration that he and his ex-wife experienced chronic

22  money problems and further conceded that, in 1998, First American

23  Title Company, which held the second mortgage on defendant's

24  personal residence, sought to foreclose on the property.  (RT

25  4/16/08 a.m. 62:23-63:17; 65:7-68:17).

26  _____

27      [3]   The questioning relating to the bankruptcy petition was
    completed in approximately one hour and is covered within 40

28  pages of the 262-page transcript of defendant Arneson's cross-
    examination.

Second, the government sought to establish defendant Arneson's knowledge of, and correspondence with, select individuals who assisted defendant Arneson in obtaining the refinancing that permitted him to stave off the foreclosure of his Rancho Palos Verdes residence.  To that end, defendant Arneson was questioned about David and Phyllis Miller, Sandra Olin and Mary Perkins.  Of these individuals, defendant Arneson claimed only to specifically recall knowing David Miller, whom defendant Arneson stated was a financial consultant who went to police stations serving as an advisor to police officers. Defendant Arneson, however, testified that Mr. Miller neither served as his personal financial advisor nor did he ever assist defendant Arneson in any way, including in the refinancing of his home.  (RT 4/16/08 a.m. 63:23-64:14).  However, when shown a series of loan-related documents under his letterhead and/or signature[4] -- including letters and facsimiles sent to Ms. Olin and Ms. Perkins, defendant conceded that, while he did not recall

---

[4]     For example, defendant Arneson acknowledged that he personally completed the last two pages of the Uniform Residential Loan Application (Exhibit 631), which contained an escrow date of September 8, 1998 for account number WV25141.  (RT 4/16/08 a.m. 71:13-24).  Defendant Arneson further confirmed that a September 4, 1998 facsimile (Exhibit 632) referencing escrow number WV25141 that was sent under his name to Sandra Olin at National Loan Center and "cc'd" to Phyllis Miller, which stated "[t]hank you for all of your assistance in making this happen" may have been a fax thanking Ms. Olin for her help in securing the refinancing of his property.  (RT 4/16/08 a.m. 74:13-76:12; RT 4/16/08 p.m. 36:13-17).

the specific documents, they appeared to relate to his efforts to secure a second mortgage on his residence.[5]

Third, the government sought to establish that, on the day before his personal residence was subject to a foreclosure sale, defendant Arneson filed for Chapter 13 bankruptcy, that he did so through the filing of a bankruptcy petition that contained material falsehoods, and that he had lied to the jury when he testified that he had neither filed nor authorized this bankruptcy filing.  To that end, the government introduced the certified copies of both the voluntary petition for bankruptcy filed in defendant's name (Exhibit 633) and the summary of schedules related to the bankruptcy petition (Exhibit 634).[6] Upon reviewing the documents, defendant Arneson again testified that he did not file them nor did he authorize anyone to file bankruptcy on his behalf.  Defendant Arneson further testified that, despite believing that a fraudulent bankruptcy petition that had been filed including David Miller's name and business address under the listing of creditors, he had no idea who filed the petition, he never investigated the issue, and he never filed a criminal complaint regarding this act.

---

[5]    As defendant Arneson affirmatively had raised the collateral issue of his bankruptcy on direct examination, the government was permitted to introduce extrinsic evidence under Federal Rule of Evidence 607, pursuant to the doctrine of impeachment by contradiction.  Had he not done so, introduction of extrinsic evidence on this issue would have been foreclosed under Federal Rule of Evidence 608.

[6]    In doing so, the government had defendant confirm that information such as his social security number and address were accurate and then highlighted a series of inaccuracies in the petition under the theory that the inaccuracies represented false statements to the bankruptcy court.

However, despite these contentions, defendant Arneson could not explain why he drafted letters contemporaneously with the bankruptcy filing that attempted to justify the filing of the petition and described the ultimate resolution of the matter. For example, defendant Arneson was shown a two page letter, dated August 13, 1998 to John Mason at Vista Mortgage Company. After confirming that the letter was prepared on his letterhead and contained his signature (Exhibit 636), defendant Arneson was shown the following sections of the letter:

> A concern generated by the underwriter has mandated a response to address a financial position.  The recent filing of Chapter 13 was predicated on the adverse actions pursued by FATCOA.[7]  Their bid to undermine the loan process was specifically directed to gain control of the property through false pretense.  The negative impact of the assault created the necessity to protect the residence against a hostile entity.

> * * * *

> However, their purposeful attempt to illegally gain control of the property forced an alternative action to protect the property and my credit status.

> * * * *

> The Chapter 13 filing was specifically engaged to counter the hostile take over of FATCOA to gain control of the residence.

> * * * *

> It was with great reluctance that I submitted to Chapter 13 filing for protection.

> * * * *

---

[7]   FATCOA is the acronym for First American Title Company, which defendant Arneson conceded was the company that was attempting to foreclose on his property.  (RT 4/16/08 p.m. 45:170-24).

13

> Advice received from my financial advisory team and attorney convinced me to apply for the legal and rightful protection afforded under Chapter 13.[8]

(RT 4/16/08 p.m. 45:25-47:15).  When questioned about the substance of this letter, defendant Arneson did not disavow authoring it.  Instead, he initially noted that the content of the letter "may have been from information I had received" before later claiming that he did not presently recollect drafting the contents of the letter.  (RT 4/16/08 p.m.45:25-48:3).

Similarly, defendant Arneson was then shown a letter (Exhibit 637) under his letterhead and signature to Sandra Olin that advised Ms. Olin that the bankruptcy petition had been dismissed, attached a copy of the order of dismissal, and requested that Ms. Olin proceed with the refinancing of the $85,000 second mortgage for his Rancho Palos Verdes residence. (RT 4/16/08 p.m. 50:4-51:8).  Defendant Arneson confirmed that he had written this letter.  (RT 4/16/08 p.m. 51:6-8).

In addition to the documents admitted into evidence after being authenticated by defendant Arneson, several pieces of correspondence relating to the bankruptcy petition and defendant Arneson's loan application were conditionally admitted. Among these documents were two documents drafted by Phyllis Miller (Exhibits 638, 640).  Exhibit 638 consisted of a letter dated August 17, 1998 from Ms. Miller to Vista Mortgage Company

---

[8]   While not specifically read to defendant Arneson, the letter proceeds to state "[t]he filing negated FATCOA's hostile attempts to sell the property and allowed a sufficient time to facilitate the loan." and that "on August 7, 1998, the Chapter 13 filing was dismissed.  This is another illustration of my commitment to the property and financial obligation."

1   that referenced back to defendant Arneson's August 13, 1998

2   letter to Vista and which advised Vista Mortgage that: (1)

3   defendant Arneson filed for bankruptcy on the day of the

4   scheduled foreclosure as a preventative measure to protect the

5   property; (2) defendant Arneson has maintained excellent credit

6   throughout the proceedings; and (3) Sandra Olin would be able to

7   provide proof that the bankruptcy petition had been dismissed.

8   Exhibit 640 consisted of a facsimile from Ms. Miller to Sandra

9   Olin advising Ms. Olin that "Mark has been working extra hours

10  and private assignments for Mark Ent. to make up for this

11  expensive loan."[9]

12       D.   Re-direct Examination of Defendant Arneson

13       Mr. Hummel began his redirect examination not by addressing

14  the bankruptcy petition but rather by having defendant Arneson

15  explain to the jury his "acceptance of responsibility" for

16  "crossing the line" with respect to those instances in which he

17  obtained and provided confidential information from restricted

18  law enforcement databases to defendant Pellicano.  (RT 4/16/08

19  p.m. 75:25-76:13).  Mr. Hummel then proceeded to question

20  defendant Arneson about his May 5, 2003 interview with Special

21  Agent Ornellas and AUSA Saunders and his July 9, 2003 proffer

22  session, including statements that he made at the proffer session

23  regarding defendant Pellicano's wiretapping program, the nature

24  of his fee relationship with defendant Pellicano, and the fact

25  _____

26       [9]   Defendant Pellicano's bank records establish that,
    instead of the standard $2,500 monthly payment to defendant
27  Arneson, defendant Pellicano paid defendant Arneson $6,850 in
    August 1998, $6,000 in September 1998, and $5,440 in October
28  1998.

15

1  that he accessed restricted LAPD databases on defendant

2  Pellicano's behalf.  (RT 4/16/08 p.m. 76:18-88:14).

3       Only after fully addressing these matters did Mr. Hummel

4  direct a brief line of questioning towards the 1998 bankruptcy

5  petition.[10]  During the questioning that followed, defendant

6  Arneson reiterated that: (1) he did not sign the petition;(2) the

7  petition was deficient in that it failed to list all of his

8  debts; (3) the petition was eventually dismissed; (4) he never

9  used the bankruptcy court to relieve any debts; and (5) he did

10 not recall authorizing anybody to file a bankruptcy petition on

11 his behalf.  (4/16/08 p.m. 89:3-91:18).

12      After this brief discussion, Mr. Hummel again returned to

13 the database inquiries conducted by defendant Arneson for

14 defendant Pellicano.  In doing so, Mr. Hummel addressed several

15 of the criminal cases in which defendant Arneson provided

16 defendant Pellicano with confidential information regarding co-

17 defendants, witnesses and an investigator at the district

18 attorney's office.  (RT 4/16/08 p.m. 91:19-92:15).  Finally, Mr.

19 Hummel addressed a series of issues, including whether defendant

20 Pellicano was a "rat" with respect to individuals with Italian

21 surnames, work defendant Pellicano did for the LAPD, the lies

22 told by defendant Arneson in his letter to Lieutenant Hooper,

23 and, once again, the database inquiries that defendant Arneson

24 conducted for defendant Pellicano and defendant Arneson's

25

26  _____

27      [10]   The redirect examination covers 25 pages of the
reporter's transcript, four of which involved questions
28 pertaining to the bankruptcy petition.

1   knowledge as to wiretapping conducted by defendant Pellicano.

2   (RT 4/16/08 p.m. 93:4-99:5).

3          E.    Re-cross-examination of defendant Arneson

4          On re-cross-examination, defendant Arneson answered only two

5   questions regarding the bankruptcy petition.  (101:24-102:3,

6   102:19-25).  The remainder of the questioning focused on: (1)

7   defendant Arneson's claim that he had lied to Lieutenant Hooper

8   allegedly to protect the integrity of pending investigations; (2)

9   his claim that he provided defendant Pellicano with information

10  regarding the use and identities of undercover officers in the

11  Portocarrero investigation; (3) the number of individuals for

12  whom he conducted database inquiries on defendant Pellicano's

13  behalf; (4) the fact that defendant Pellicano never sought

14  defendant Arneson's assistance in marketing his wiretapping

15  program to the LAPD; and (5) how individual officers are not

16  authorized to set their own rules regarding which laws to follow.

17  (RT 4/16/08 p.m. 100:1-101:23, 103:1-111:14).

18
19          F.    Defendant Arneson's Motion to Strike Questioning and
                 Testimony Regarding Purported Bankruptcy Filing and
20               Preclude Further Evidence and Argument on Subject

21          After the completion of defendant Arneson's testimony but

22  prior to resting his case-in-chief, defendant Arneson moved to

23  strike all testimony relating to the bankruptcy filing and to

24  preclude any further evidence or argument on the subject.

25  Through this motion, defendant Arneson conceded that, since his

26  counsel "briefly inquired about the filing in his direct

27  examination," extrinsic evidence on the issue could be introduced

28  by the government under Federal Rule of Evidence 607 pursuant to

                                17

1   the doctrine of impeachment by contradiction.   However, defendant

2   Arneson argued that the extrinsic evidence presented by the

3   government through its cross-examination of defendant Arneson

4   should have been precluded pursuant to Rule 403 as such evidence

5   "resulted in undue delay, a waste of time, and the needless

6   presentation of cumulative evidence."   Specifically, defendant

7   Arneson argued:

> Here, the government's efforts to impeach [defendant]
> Arneson by presenting twelve separate exhibits on a
> disputed collateral issue for the course of over an
> hour violated Rule 403. [Defendant] Arneson is being
> tried in this case for alleged involvement in a RICO
> enterprise for conduct including wire fraud and
> identity theft -- not bank fraud or loan fraud or
> perjury in connection with the bankruptcy filing.   The
> issue of whether [defendant] Arneson filed any
> fraudulent bankruptcy application is clearly
> collateral.   Opening up a mini-trial about the suspect
> bankruptcy adds nothing to issues in dispute in the
> case.

15  The Court denied this motion.

16  IV.   THE TESTIMONY OF PHYLLIS MILLER

17        A.   Examination by Parties

19  The government called Phyllis Miller to authenticate

19  Exhibits 638 and 640, both of which had been conditionally

20  admitted during defendant Arneson's cross-examination.[11]   On

21  direct examination, Ms. Miller testified that she previously met

22  defendant Arneson through her husband David Miller when her

_____

[11]   The government also intends to call Sandra Olin of the
National Loan Center to authenticate several conditionally
admitted documents that were maintained in the National Loan
Center's file for defendant Arneson's 1998 refinancing of his
Rancho Palos Verdes residence.   Ms. Olin has been advised of the
present proceedings and has indicated that she has no qualms with
proceeding with her testimony.

1  husband, who had contacts within the LAPD, asked her to assist

2  defendant Arneson in locating a lender to refinance defendant

3  Arneson's personal residence.  (RT 4/25/08 a.m. 102:22-103:11).

4  Ms. Miller further testified that, to accommodate this request,

5  she put defendant Arneson in contact with Sandra Olin of the

6  National Loan Center, who assisted him with the refinancing.  (RT

7  4/25/08 a.m. 103:20-104:3).  Ms. Miller then testified that she

8  subsequently learned of defendant Arneson's bankruptcy through

9  Ms. Olin and completed her direct examination by authenticating

10  Exhibits 638 and 640.  (RT 4/25/08 a.m. 104:11-108:3).

11       On cross-examination, Ms. Miller testified that she had

12  never previously seen Exhibit 634, which was the summary of

13  schedules filed with the United States Bankruptcy Court in 1998

14  and that she did not recognize the handwriting on the document.

15  (RT 4/25/08 a.m. 117:2-118:22).  When shown a public filing that

16  she recognized to have been signed by her husband and then being

17  asked to compare the handwriting on that document with Exhibit

18  634, Ms. Miller confirmed that "it does look like my husband's

19  handwriting [on the bankruptcy petition]."  (RT 4/25/08 a.m.

20  118:24-120:12).  Ms. Miller was then asked "did you and your

21  husband file a bankruptcy petition fraudulently on behalf of Mr.

22  Arneson in July 1998?"  Before she could answer this question,

23  the Court excused the jury and sought appointment of counsel for

24  Ms. Miller. (RT 4/25/08 a.m. 120:13-15).

25       Deputy Federal Public Defender Angel Navarro was appointed.

26  (RT 4/25/08 p.m. 33:25-34:4).  After being advised that Mr.

27  Hummel claimed to have impeachment evidence that could subject

28  Ms. Miller to legal jeopardy, DFPD Navarro advised the Court that

1   he would be instructing his client to invoke her Fifth Amendment

2   right against self incrimination.   (RT 4/25/08 p.m. 20:8-23:14;

3   34:6-9).

4        B.   Known Scope of Cross-Examination

5        While Mr. Hummel has refused to provide a detailed proffer

6   of the scope of his intended cross-examination, he has stated

7   that he intends to cross-examine Ms. Miller regarding numerous

8   frauds that she purportedly committed with her husband David

9   Miller that were designed to bilk financially troubled people out

10  of their properties.   Mr. Hummel further has represented that he

11  had:

12       certified records going back to 1997, including the
         file where Mr. Arneson's bankruptcy was fraudulently
13       filed by these people and her husband . . . I will
         prove it up through document after document after
14       document that this woman is a fraud.   There are forged
         signatures.   Allegations have been sustained by courts
15       throughout the State of California regarding her
         forging documents, regarding forging documentation,
16       regarding her falsifying even the CTI bankruptcy, which
         is on the same printing and letterhead as [defendant]
17       Arneson's bankruptcy.

18  (RT 4/25/08 a.m. 109:12-110:7).   In subsequent discussions with

19  the Court, Mr. Hummel has stated:

20       I will say as to the bankruptcy fraud, the statute has
         run.   As to other impeachment materials, the statute
21       may not have run.   This has been, with the Millers, a
         massive fraud over the years.   Mr. Miller, we believe
22       was convicted in 2002 of forgery and fraud on the
         elderly.   We believe that the issue relating to
23       [defendant] Arneson had to do with an attempt by the
         Millers to defraud him of his property.   The letters
24       that were introduced, over objection, were although
         signed by [defendant] Arneson, we believe were placed
25       for him by the Millers after they deliberately ruined
         his credit in an effort to put him in a weakened
26       financial situation so they could take his property.
         This is clearly their work.   This is not his signature
27       on the bankruptcy.   It is his signature on some of the
         letters, but they created the problem, and that's the
28       issue that we're dealing with.

(RT 4/25/08 122:4-20).

III.
ARGUMENT

I.   PERMISSIBLE SCOPE OF POTENTIAL CROSS-EXAMINATION

   A.   The Compelling Need for an Offer of Proof

     Before a proper assessment can be made as to whether Ms. Miller can properly invoke her Fifth Amendment right against self-incrimination and whether an extension of immunity could adequately address the potential legal jeopardy faced by Ms. Miller, it is first necessary to define what Ms. Miller's potential legal exposure is.  However, under the present procedural posture, such a determination cannot be properly made as Mr. Hummel has refused to provide the Court, the government, or Ms. Miller's counsel with anything other than a sweeping declaration that Ms. Miller faces legal jeopardy and the Court has precluded the government from having any discussions with Ms. Miller's counsel on the issue of her potential exposure given that she is on cross-examination.  The government respectfully submits that Mr. Hummel should be required to provide a detailed proffer to allow the parties to make educated determinations regarding the critical legal issues facing Ms. Miller and this Court.  Failure to do so will all but guarantee that Ms. Miller will continue to assert the Fifth Amendment on advice of counsel who, for obvious reasons, will not permit his client to proceed blindly into a cross-examination that could result in the potential filing of criminal charges.  Similarly, without such information, the government and the Court cannot properly assess

21

the viability of either compelling Ms. Miller's testimony by issuing immunity to secure her testimony.[12]

From the limited amount of information that has been provided to date, however, it appears that Mr. Hummel intends to pursue a line of cross-examination that significantly exceeds the scope of permissible cross-examination under the Federal Rules of Evidence.  In fact, despite filing within the past week a motion to strike all past and future questioning regarding the 1998 bankruptcy petition on the grounds that this topic is "clearly collateral" and that "opening up a mini-trial about the suspect bankruptcy adds nothing at issue in dispute in this case," Mr. Hummel is now attempting to create just such a mini-trial on the credibility of a witness who was called to authenticate two documents relating exclusively to this collateral matter.

While the government does not contest that Ms. Miller is subject to appropriate cross-examination as to the two documents that she was called to authenticate as well as her knowledge of the Arneson bankruptcy filing and residential loan refinancing, the government respectfully submits that Federal Rules of Evidence 608 and 609 preclude virtually all of the potential impeachment that Mr. Hummel has indicated that he intends to pursue.

---

[12]   For example, the conduct at issue may involve offenses punishable only under state law.

B.   <u>Permissible Impeachment Under Fed.R.Evid. 608</u>

    I.   <u>Ms. Miller cannot properly be impeached based upon issues relating solely to credibility for which she could validly exercise her Fifth Amendment privilege against self-incrimination</u>

Federal Rule of Evidence 608(b) expressly provides that "[t]he giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination when examined with respect to matters that relate only to character for truthfulness." <u>See</u>, <u>United States v. Black</u>, 767 F.2d 1334, 1341 (9th Cir. 1985) (inquiry is governed not by what the witness actually discusses on direct, but rather on whether the cross-examination is "reasonably related" to the subjects covered by the defendant's testimony"); <u>United States v. Cuozzo</u>, 962 F.2d 945, 948 (9th Cir. 1992) ("[A] witness may be found to have waived her right to refuse to testify regarding prior bad acts so long as the testimony is otherwise admissible under Fed. R. Evid. 403, and so long as it is being offered for a purpose reasonably related to a material issue raised in the defendant's testimony on direct examination"). As this Court previously has found in precluding the government from cross-examining defendants Kevin Kachikian and Rayford Turner with impeachment information relating to bankruptcy fraud, mortgage fraud and tax fraud, this provision precludes inquiry into topics that are relevant only for the purposes of impeachment of credibility for which a witness would possess a valid Fifth Amendment right.

As noted above, Ms. Miller was called to authenticate two documents relating to defendant Arneson's mortgage refinancing,

1  on of which includes a reference to the 1998 bankruptcy petition.

2  Mr. Hummel, however, has indicated that he intends to cross-

3  examine Ms. Miller about multiple frauds against parties

4  completely unrelated to defendant Arneson for which Ms. Miller

5  purportedly has criminal exposure.  Based upon the record

6  presently before the Court, the government respectfully submits

7  that the only relevance of such impeachment material would be to

8  attack Ms. Miller's credibility.  This is particularly true given

9  the state of the record – i.e. defendant Arneson's unequivocal

10  denials that he personally filed the bankruptcy petition and Ms.

11  Miller's admission that the Arneson bankruptcy petition was

12  drafted in her husband's handwriting.  Thus, under Rule 608(b),

13  Mr. Hummel should be precluded from pursuing these other areas of

14  impeachment with Ms. Miller.

15           ii.   <u>Ms. Miller cannot properly be impeached through
16                 the use of extrinsic evidence as to other alleged
                   bad acts</u>

17       To the extent that Mr. Hummel has expressed an intention to

18  use extrinsic evidence in the form of documents or witness

19  testimony to impeach Ms. Miller's testimony, such impeachment

20  also would be precluded under Federal Rule of Evidence 608(b),

21  which explicitly provides that "[s]pecific instances of the

22  conduct of a witness, for the purpose of attacking or supporting

23  the witness's credibility, other than conviction of a crime as

24  provided in Rule 609, may not be proved by extrinsic evidence."

25  Fed. R. Evid. 608(b); <u>see</u> <u>United States v. Chu</u>, 5 F.3d 1244, 1249

26  (9th Cir. 1993) ("Rule 608(b) prohibits the introduction of

27  extrinsic evidence where the only theory of relevance is

28  impeachment by prior misconduct."); <u>Lewy v. Southern Pacific</u>

Transp. Co., 799 F.2d 1281, 1299 n.13 ("Federal Rule of Evidence
608(b) prohibits the use of extrinsic evidence to prove specific
instances of conduct on the part of a witness that are intended
to undermine her credibility."); see also United States v. Lew,
875 F.2d 219, 222-23 (9th Cir. 1989); United States v. Polizzi,
801 F.2d 1543, 1551 (9th Cir. 1986); United States v. Wood, 550
F.2d 435, 441 (9th Cir. 1976).  Thus, "[i]t is error to attack a
witness's credibility by using extrinsic evidence of his conduct
that has not resulted in conviction of a crime."  United States
v. Cluck, 544 F.2d 195, 196 (5th Cir. 1976); see United States v.
DiMatteo, 716 F.2d 1361, 1367 (11th Cir. 1983) ("Given the fact
that the extrinsic evidence was admitted solely to attack the
credibility of the witness, and the fact that Fed. R. Evid.
608(b) specifically prohibits such a use of extrinsic evidence,
the trial court's ruling was in error."), vacated on other
grounds, 469 U.S. 1101 (1985).

     Again, Mr. Hummel has sweepingly stated that he intends to
impeach Ms. Miller with specific instances of past conduct to
include her husband's prior fraud conviction and "document after
document after document [establishing] that this woman is a
fraud."[13]  (RT 4/25/08 a.m. 109:12-110:7).  Ms. Miller has no
prior convictions and therefore, under Federal Rules of Evidence

---

     [13]   While it is not clear whether Mr. Hummel, when
referencing adverse credibility findings by courts is lumping Ms.
Miller in with her husband, the government notes that this Court
previously sustained Mr. Hummel's objections of the government's
attempts to elicit similar information from defendant Arneson –
specifically, United States District Judge Edward Rafeedie's
express adverse credibility finding against defendant Arneson in
the Taves case.  (RT 4/16/08 a.m. 18:12-20:12).

609, she cannot properly be impeached by evidence of a conviction

of a crime, including convictions sustained by her husband.

Furthermore, to the extent that the Court permits Mr. Hummel to

inquire as to specific instances of past conduct that are

probative of truthfulness or untruthfulness, under Rule 608, no

extrinsic evidence can properly be used to prove the fact at

issue.[14]

        iii.    <u>Evidence of other alleged bad acts should not
be permitted under Federal Rules of Evidence
401 and 403</u>

To the extent that defendant Arneson intends to have a mini-

trial on alleged misconduct engaged in by Ms. Miller or her

husband beyond what their involvement in the Arneson bankruptcy

and loan refinancing, the government respectfully submits that

the evidence in support of such a proceeding would be barred by

Federal Rule of Evidence 401, as such evidence will not have a

tendency to make any fact that is of consequence in this trial

more or less probable than it would be without the evidence.  Ms.

Miller has testified that her husband's handwriting is on the

bankruptcy petition.  This testimony is consistent with defendant

Arneson's testimony that he did not file the document and would

not provide any additional explanation as to defendant Arneson's

own letters indicating that he authorized the bankruptcy.  Forays

into other alleged past acts by the Millers will not alter the

calculus on an issue that defendant Arneson has conceded to be

---

[14]     On the present state of the record, such evidence would
not be admissible under the doctrine of impeachment by
contradiction as the witness has not made the type of unequivocal
denial of wrongdoing that triggers this doctrine.  <u>United States
v. Castillo</u>, 181 F.3d 1129 (9th Cir. 1999).

collateral to the true issues before this jury.  Moreover, even if relevant, such evidence should be precluded under Federal Rule of Evidence 403, as its marginal probative value would be substantially outweighed by the risk of confusion of the issues and the risk that the jury will be misled as to the true issues before it.[15]

II.   THE APPROPRIATE MEANS TO PROCEED

   A.   Appropriate Means To Proceed Should Cross-Examination Be Limited To Ms. Miller's Conduct As It Relates To The 1998 Bankruptcy Filing And Loan Refinancing

   Should the Court conclude that Mr. Hummel is precluded under Rule 608(b) from pursuing any area of inquiry for which Ms. Miller retains a legitimate right to invoke the Fifth Amendment privilege against self-incrimination, Ms. Miller testimony can be compelled as: (1) the statute of limitations has run on any potential charge of bankruptcy fraud arising from 1998 filing of a bankruptcy petition in defendant Arneson's name; and (2) to the extent that Ms. Miller potentially provided a false statement to the FBI regarding her involvement in the filing of the bankruptcy petition, the government will seek Court ordered immunity under Title 18, United States Code, Section 6001.  This will allow Ms. Miller to continue with her testimony and be subject to cross-examination by Mr. Hummel regarding all aspects of her involvement, if any, in the actual filing of the bankruptcy petition.

_____

   [15]   The government recognizes that defendant Arneson's credibility, like that of each of the defendants in this trial, is a matter of significant importance to the jury.  The means by which this credibility is addressed must be consistent with the Rules of Evidence.

B.   <u>Appropriate Means to Proceed Should Ms. Miller Remain Subject to the Threat of Unspecified Criminal Exposure</u>

I.   <u>Testimony Regarding the Bankruptcy Petition Should be Stricken and a Strong Curative Instruction Should be Provided</u>

Should the procedural posture not change and Ms. Miller is required to proceed under the specter that she may be questioned regarding alleged criminal conduct for which the statute of limitations has not yet run, then it is all but certain that she will invoke her Fifth Amendment right against self-incrimination and not testify.[16]  When a witness invokes the Fifth Amendment while testifying in trial, the Ninth Circuit repeatedly has ruled that "the general rule in such cases calls for the exclusion of the direct testimony unless the refusal to answer affects only collateral matters," in which case, the prior testimony need not even be stricken.  <u>Denham v. Deeds</u>, 954 F.2d 1501, 1503 (9th Cir. 1992); <u>United States v. Wilmore</u>, 381 F.3d 868, 873 (9th Cir. 2004); <u>United States v. Negrete-Gonzalez</u>, 966 F.2d 1277, 1280 (9th Cir. 1992); <u>Toolate v.Borg</u>, 828 F.2d 571, 572-73 (9th Cir. 1987).  In adopting this rule, the Ninth Circuit has found that "striking a witness' entire testimony is an extreme sanction, not to be lightly imposed" and may be applied "only when the question asked pertains to matters directly affecting the witness'

---

[16]   Should this occur, the Ninth Circuit has provided conflicting instructions as to whether this invocation should be made in the presence of the jury.  While the general rule is that witnesses who express an intent to invoke the Fifth Amendment should not be called to do so in the presence of the jury, the Ninth Circuit in <u>United States v. Seifert</u>, 648 F.2d 557, 560 (9th Cir. 1980) stated that a witness who has refused to testify on selective points could be required to make the invocation before the jury.

testimony; the judge may not use the sanction when the privileged answer pertains to a collateral matter." Negrete-Gonzalez, 966 F.2d at 1280 (concluding that witnesses refusal to identify drug supplier in drug trafficking case collateral).  In defining what constitutes a "collateral" matter, the Ninth Circuit has stated "collateral means that the evidence does not speak directly to the matters put at issue by the indictment." Williams v. Borg, 139 F.3d 737, 742 (9th Cir. 1998).  When exercised, the district court's ruling to strike testimony is subject to an abuse of discretion review on appeal.  Id. at 1279.

When witness testimony is stricken, it should be accompanied by a sufficiently strong curative instruction advising the jury that the stricken testimony is not evidence and should not be considered in any way during their deliberations.  As juries are presumed to follow curative instructions, the Ninth Circuit has recognized that there are "very few cases where such curative measures have been found inadequate." United States v. Valdez-Soto, 31 F.3d 1467, 1173 (9th Cir. 1994); see also United States v. Charmley, 764 F.2d 675, 677 (9th Cir. 1985) ("where evidence heard by the jury is later ruled inadmissible, a cautionary instruction is usually sufficient to cure any alleged prejudice to the defendant").  Similarly, the Supreme Court has ruled that "we normally presume a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." Greer v. Miller, 483 U.S. 756, 767 n.8 (1987).

In the present case, the government intended to present Ms. Miller's testimony as classic impeachment by contradiction on the collateral issue of defendant Arneson's bankruptcy.  As such, under a strict reading of Ninth Circuit precedent, the striking of her testimony would not necessarily be required. Nevertheless, recognizing that this Court also has found that the evidence of the bankruptcy touches on defendant Arneson's financial condition and the attendant inference that his financial condition could have caused defendant Arneson to accept payment from defendant Pellicano in return for conducting database inquiries, the government submits that the striking of Ms. Miller's testimony would be necessary should she continue to invoke the Fifth Amendment.  Furthermore, while not required under the caselaw, given the unique factual posture at issue here, the government respectfully submits that the Court should provide the remedy that defendant Arneson recently requested -- it should strike the testimony relating to the bankruptcy and should strongly instruct the jury that it is to disregard this testimony.

ii.  <u>A mistrial is not required</u>

In <u>United States v. Escalante</u>, 637 F.3d 1197, 1202 (9th Cir. 1980), the Ninth Circuit found that "it s widely held that courts have the power to declare a mistrial whenever in their opinion, taking all of the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. . . [T]he power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."  The <u>Escalante</u> court further

explained that cautionary instructions are the preferred

alternative to declaring a mistrial and that a mistrial is only

appropriate "where there has been so much prejudice an

instruction is unlikely to cure it." Id. at 1203.   In the

context when a witness invokes the Fifth Amendment during trial

testimony, the Ninth Circuit, in Valdez-Soto, 31 F.3d at 1474,

identified the types of cases where curative instructions are

typically deemed inadequate and found that they include

situations such as when: (1) the witness has a "special

relationship" with the defendant; (2) the prosecutor knows the

witness is likely to invoke the Fifth Amendment to identifiable

lines of questioning; or (3) where the witness' testimony adds

critical weight to the prosecution's case through the witness'

status as a co-defendant, through continued questioning despite

the invocation of the Fifth Amendment or through the absence of

corroborative evidence of the key element of the crime.

None of the circumstances identified by the Valdez-Soto

court exists here.   On the contrary, Ms. Miller was a

foundational witness on a largely, if not completely, collateral

issue.[17]   Furthermore, as to the issue of prejudice, the

government respectfully submits that this case is not one of

those rare instances in which a curative instruction would be

---

[17]   While defendant Arneson unquestionably can be found
guilty of all of the crimes charged regardless of whether the
jury makes any findings as to his financial well-being in 1998,
the government notes that there is independent evidence that
defendant was suffering financial hardships at that time,
including a declaration that he admitted filing in his divorce
proceedings referencing the chronic financial problems
experienced by defendant and his ex-wife.

ineffective.  On the contrary, the jury has heard eight weeks of testimony, the overwhelming majority of which has addressed, on some level, defendant Arneson's character for truthfulness. Moreover, the section of the cross-examination addressing the bankruptcy petition was simply one of almost two dozen areas of impeachment that defendant Arneson faced during the six hours of cross-examination.  When weighed against the quantum of evidence that is before the jury to consider on the issue of defendant's credibility as well as this jury's demonstrated ability to adhere to the Court's instructions, there is no reason to believe that any prejudice could not be cured through an appropriate limiting instruction.

DATED: April 27, 2008

                              Respectfully submitted,

                              THOMAS P. O'BRIEN
                              United States Attorney

                              CHRISTINE C. EWELL
                              Assistant United States Attorney
                              Chief, Criminal Division


                              _____
                              DANIEL A. SAUNDERS
                              KEVIN M. LALLY
                              Assistant United States Attorneys
                              Violent & Organized Crime Section