STEVEN F. GRUEL (CSBN 213148)

315 Montgomery Street, 9th Floor
San Francisco, California 94104
Telephone Number (415) 989-1253
Fax Number (415) 829-4304

www.gruellaw.com

Attorney for Anthony Pellicano

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          Vs.<br><br>ANTHONY PELLICANO,<br><br>                    Defendant. | )  No. CR-05-1046-DSF<br>)<br>)<br>)  ANTHONY PELLICANO'S REPLY<br>)  TO THE GOVERNMENT'S<br>)  OPPOSITION FOR BAIL<br>)  PENDING APPEAL<br>)<br>)  Title 18 U.S.C. § 3143(b)<br>)<br>)  Honorable Dale S. Fischer<br>)<br>)  Date:  August 13, 2012<br>)  Time:  8:30 a.m.<br>)  Courtroom: 840<br>)<br>) |

     ANTHONY PELLICANO, by and through his attorney, Steven F. Gruel,

hereby respectfully submits this Reply to the Government's Opposition To Mr.

Pellicano's Motion For Bail Pending Appeal.

<u>INTRODUCTION</u>

Since Mr. Pellicano filed his motion for bail pending appeal two relevant events occurred.  First, the Solicitor General of the United States decided ***not*** to seek a *Writ of Certiorari* to the United States Supreme Court in *United States v. Nosal*,  676 F.3d 854 (9th Cir. 2012).   Thus, as the Pellicano prosecutors correctly predicted on December 30, 2011, the *Nosal* decision "will impact and potentially could be dispositive of this Court's [the Ninth Circuit] consideration of multiple counts of convictions; in fact, it could impact many more counts than were at issue when the honest services-based stay was granted."   AUSA Lally further explained, "What is almost certain is that this Court's ruling [the *en banc Nosal* decision] significantly will impact the ultimate resolution of almost ***four dozen counts of conviction*** that wholly, or in part, relied upon §1030 violations."  (emphasis added). *See Gruel Declaration; Exhibit G.*  The decision in *Nosal*, in the prosecution's previous representation to the Ninth Circuit, creates a substantial question.

Second, notwithstanding the Ninth Circuit's stern admonishment that "any further requests for extension will be disfavored," the government nonetheless filed yet another request for more time to file its answering brief. Assuming that the government finally submits its answering briefs by the new filing date of September 14, 2012, it will have been an astonishing period of nearly two years

since Mr. Pellicano filed his appellate briefs.  Languishing in prison, unable to retrieve lost time, is wholly unjust given the state of the government's collapsing case coupled with the fact that Mr. Pellicano has already served 78 months in custody in this case.

Justice demands Mr. Pellicano's release on bond while his appeal is pending.  He has been in custody since November 17, 2003 (the first case), and has already served his sentences on all counts in this case except for the two legally flawed RICO counts which will not survive appeal. He has shown by clear and convincing evidence that he is not a danger or risk of flight.

Predictably the government submits an opposition to bail.  However, its arguments appear to have been dug up from a time capsule and are better suited for the long past February, 2006 detention hearing. The opposition relies upon stale allegations, events and phone conversations over a decade in age. The opposition fails to fully address the weakened condition of its prosecution.

On *present day* facts, Mr. Pellicano completely satisfies the statutory conditions that he, by clear and convincing evidence, is neither a danger to anyone or the community nor a flight risk.  Furthermore, the "substantial question" prong is abundantly satisfied notwithstanding the prosecution's attempt to dodge *Skilling* and *Nosal's* direct fatal blows to the two RICO counts.  The prosecution's retreat to the state bribery racketeering counts likewise fails.

Instead, the prosecution presents no real justification to now deny Mr. Pellicano bail pending appeal.  Along with outdated arguments, the prosecution gets entangled in hypocrisy, and often ignores, hides or stretches the truth (usually in  endless footnotes) and is reduced to hurling baseless brickbats at family members willing to serve as sureties.  Mr. Pellicano respectfully requests that this Court grant him bail pending appeal pursuant to Title 18 U.S.C. § 3143(b).

<u>REPLY TO OPPOSITION</u>

A. <u>Mr. Pellicano Is Not a Danger To Any Person or the Community</u>

Contrary to the prosecution's approach, the proper inquiry is whether Mr. Pellicano has shown by "clear and convincing" evidence that he is not a danger **NOW** – not six years ago.  The prosecution's reliance on Magistrate Judge Hillman's February 6, 2006, findings is obviously outdated.  The government provides no legal support that states that a defendant should be denied bail pending appeal if he was detained at the inception of the case.  Besides, in 2006, Mr. Pellicano had no ability to post bond.  Today, in addition to the higher court rulings that serve to reverse the RICO convictions, several family members are able to pledge collateral and sign as sureties.

1.  The Prosecution Does Not Deny That Mr. Pellicano
    <u>Would Be Released if He Had Cooperated</u>

The prosecution does not deny that on several occasions it approached Mr. Pellicano and his counsel with the prospect of freedom in exchange for cooperation.  The government downplays its repeated approaches to Mr. Pellicano by explaining that we should all know that seeking a defendant's cooperation is a natural, yet unsavory, aspect of any investigation and prosecution.  However, the government failed to complete, much less address, the other half of the "cooperation" equation. We all equally know that a cooperating defendant either receives no prison time or a reduced sentence. This case is replete with examples of the government handing out freedom for cooperation – even to "dangerous" people!

In December 2005, the two federal prosecutors with two FBI agents in this case took the extraordinary measure of driving from Los Angeles to the federal prison in Taft, California for a surprise visit on inmate Pellicano. They needed and wanted his cooperation in their investigation.  Mr. Pellicano said "no," and the four went back to Los Angeles empty handed.  As with the numerous cooperators in this case, if Mr. Pellicano had cooperated with his federal visitors he would not be in custody today.

While the prosecution is free to aggressively prosecute the non-cooperating defendant, it's simply unjust for it to define "danger" based upon whether one cooperates or not.  Put another way, if they believed that Mr. Pellicano was a true danger, they would have never sought his cooperation with the expectation of release. The prosecution cannot deny this in that examples of this hypocrisy readily exist in this case.

For instance, the prosecution considered co-defendant Mark Arneson a "danger" and argued for his detention pending appeal in that he was a former police officer and was alleged to have committed perjury at the trial.  The Ninth Circuit ultimately denied the prosecution's efforts and Mr. Arneson was released.

The prosecution's self-serving approach to labeling someone "dangerous" is evident when one considers that Sandra Carradine was ***convicted*** (not just alleged like Arneson) of perjury, cooperated, and was sentenced to two years probation based on the government's sentencing recommendation.  Not a day in prison. Also, Craig Stevens, a former police officer (like Arneson) with the Beverly Hills Police Department was convicted of seven felony counts consisting of deprivation of honest services, computer fraud and false statements and was sentenced to five years probation and a $10,000 fine. The government's sentencing recommendation for the dangerous former police officer was six months home confinment.  When, in 2010, the probation department advised the Court that Mr. Steven's was violating

probation with excessive alcohol abuse, the prosecution did nothing. *See Second Gruel Declaration, paragraph 3.*

Comically, the prosecution now maintains that it was not offering Mr. Pellicano a "get out of jail card," but merely seeking to obtain his "assistance in securing convictions against the full range of criminals . . . so that they all would be punished under the law." *Government Opposition, pages 19-20.* This disingenuous explanation runs contrary to the numerous instances where individuals received benefits for cooperating and, unless one is prosecuting a case in fantasyland, is contrary to the experience of all seasoned prosecutors.

By its actions, the prosecution has shown that whether someone is a "danger" really depends on whether that person assisted them or not. Against this uncontested backdrop, one clearly concludes that the prosecution's opposition to Mr. Pellicano's bail pending appeal strains to argue what it sincerely does not believe.

   2.  <u>The Sentencing Hearing – He Will Not Commit Another Crime</u>

On December 15, 2008, the Court sentenced Mr. Pellicano to 15 years in federal custody. By August 28, 2012, he will have served half of that sentence. Mr. Pellicano is 68 years old and would be 75 at the time he is currently scheduled to be released in March, 2019.

Understandably, the Court at sentencing deemed that Mr. Pellicano was unlikely ever to commit another crime again when released. True, the Court's finding was based in part because Mr. Pellicano would be 75 years at that time. released.   However, if the Court's finding was purely based on the amount of time served and his age, now in light of the fact that he served half of the Court's sentence, is Mr. Pellicano to be considered *half likely* to commit another crime?

It is plain to see that the reasoning behind the Court's determination, not just the pure passage of time, supports the finding that Mr. Pellicano would never commit another crime.  It is uncontested that Mr. Pellicano and PIA did work for clients as a business.  No one was ever investigated or any work done purely by Mr. Pellicano on his own.  He worked for those who hired him.  Now, Mr. Pellicano has no clients and no private investigator's license. The prosecution has not identified a single potential client who would hire Mr. Pellicano.  Plus, a simple condition of release could easily be fashioned to state that Mr. Pellicano note engage in any investigative services for anyone.

Likewise, PIA had employees and a network that included third parties such as police officers and phone company employees.   Today of course, Mr. Pellicano "masterminds" nothing.  He has no employees or any structure or third parties to assist him.  The prosecution has failed to identify a single person who would assist Mr. Pellicano in any fashion.

Mr. Pellicano has no funds or assets of any kind to start-up another private investigation company.  The prosecution has not produced a single dollar which could be used by Mr. Pellicano for nefarious purposes if released on bail.

In sum, the long running criminal enterprise mentioned by the prosecution no longer exists. The government's references to outdated events from trial testimony is irrelevant in 2012.  The back-handed compliment to Mr. Pellicano that he is a robust, bright and creative individual somehow capable of picking up where he left off should he released has no basis in fact.  Indeed, given the government's reasoning, Mr. Pellicano would be no less a danger in 2019.

To create the perception of "danger" the government simply points to the past and ignores that Mr. Pellicano has neither the means, desire or ability to perform any of the investigative services once provided to PIA's clients.

Consequently, we don't have to wait until 2019 to support the Court's finding that he will not commit anymore crimes.  That conclusion exists now.  The government's claimed "danger" is even more of an illusion when one considers that, as the Court and the prosecution note, the main "victims" of PIA's activities were entities like institutions and concepts as the judicial process. The government cannot point to a single individual who somehow is placed in danger when Mr. Pellicano is released.

### 3. <u>Once Again, the Repeated Claims of Witness Intimidation</u>

A favorite tune often song by the prosecution is that Mr. Pellicano engaged in witness intimidation.  The prosecution, more than once, claimed that Mr. Pellicano indirectly threatened Tarita Virtue and conspired to intimidate Alex Proctor.  However, the prosecution never brought their self-serving suspicions to a grand jury for indictment.  In fact, Judge Tevrizian served as an independent fact-finder in March 2003 and denied the prosecution's motion to revoke Mr. Pellicano's bail predicate on the claim that he threatened Tarita Virtue.

Although denied without prejudice, the prosecution never brought this baseless claim to Judge Tevrizian again.  Instead, the government had no hesitation when Mr. Pellicano, under intense pretrial supervision, left the district's supervision and stayed in San Diego in July, 2003 and Las Vegas in November, 2003.   A prosecutor's genuine concern of a defendant's participation in witness intimidation would never permit stipulating to leaving the district's pretrial supervision and traveling to different parts of the country.

The same lack of sincerity is seen in considering the claim that Mr. Pellicano conspired to threaten Alex Proctor with Jerry Scalise.  This claim too has been previously dragged out from the prosecution's closet several times. No charges, of course, have ever been filed notwithstanding the prosecution's feigned grave concern over this "plot."   Now the government submits the Northern

District of Illinois 21 page plea agreement with Jerry Scalise to apparently show that he is a bad character. *Government Exhibit L.* Interestingly enough, nowhere in this plea agreement is there any mention of a plan to intimidate Alex Proctor with Mr. Pellicano. Either the Central District of California prosecutors never investigated this "crime" with the Northern District of Illinois, or the latter simply put no stock in the former's claims.

The practice of hurling allegations to support a high sentence or in seeking detention is not unique to Mr. Pellicano. In arguing against Ray Turner's release pending appeal, the government claimed that it was investigating Mr. Turner on additional charges focusing on loan and tax fraud. *See Second Gruel Declaration, Exhibit D.* After using the allegations to successfully detain Mr. Turner, no charges are believed to have ever been filed against Tuner as represented.

In short, when convenient, the prosecution tosses allegations of additional uncharged criminal activity to achieve a specific goal. When pressed, the prosecution either fails (as did before Judge Tevirzian) or folds. The claims of "threats" by Mr. Pellicano are without substance.

4.  <u>Mr. Pellicano Has Served The Concurrent State Sentence</u>

Mr. Pellicano entered a "no contest" plea to a single count and received no additional prison time. Mr. Pellicano's no contest plea was driven by the fact that he suffered from blepharospasm for which he received no treatment while housed

at the Los Angeles County Jail.  *See Second Gruel Declaration, paragraph 5.*

The lack of treatment for this disorder was exacerbated in that as the case neared

trial, the state prosecutor Ronald Goudy, told the Court that he intended to drop

and refile the charges at the last minute notwithstanding Mr. Pellicano's desire to

go to trial within the time provided by law.  Mr. Goudy produced a letter stating

witness Anita Busch suffered from some medical situation, and he said that trial

would be delayed at least another 120 days.  *Id.*  Rather than endure the lack of

treatment at the L.A. County Jail for another 4 months, Mr. Pellicano pled "no

contest."  Judge William Sterling sentenced Mr. Pellicano and ordered that he be

immediately returned to the Federal Prison in Safford.

   The California Department of Corrections and Rehabilitation has completely

discharged Mr. Pellicano from that state case. *See Second Gruel Declaration,*

*Exhibit E.*

   5.  Pretrial Release During the November 2002 Explosives Case

   A reading of the Fifth Superseding Indictment shows that nothing in the RICO

counts or other charges allege or contains violence or threats of violence. (Docket

# 959).  Reduced to its simplest form, the prosecution's best description of the case

was that PIA illegally obtained information about individuals for clients.

   Mr. Pellicano was first arrested in November 2002 after a search warrant of

PIA found a few hand guns, explosives and cash. Mr. Pellicano was released on

bail and PIA came to an end.  With a series of search warrants the FBI seized most of everything in PIA. We know that Mr. Pellicano was released on bail in that first case and one year later, in November 2003, he voluntarily surrendered three months early to begin his sentence and has remained in custody ever since.

During the prosecution of that first case along with the investigation of this case, Mr. Pellicano did not flee nor did he endanger anyone or the community. The simple truth is that the government cannot point to anything rising from Mr. Pellicano's November, 2002 pretrial release in the explosives case that supports a 2012 claim that he is a danger.  Although given the opportunity to show that during his pretrial release, PIA engaged in work for clients, forged new relationships with police officers or phone company employees or did any business whatsoever, the prosecution, as it did with the Tarita Virtue claim, offers nothing.  Just as the Court determined that he was not a danger in 2002, Mr. Pellicano is even less of a danger in 2012.

As with the threadbare claims of witness intimidation, there is no proof that Mr. Pellicano obstructed justice while on release in 2002.  As before, the prosecution's claims, possibly fearing a similar response as with Judge Tevirizan's denial of the claim of a threat on Tartia Virtue, of threats and obstruction were never presented to a grand jury or charged against Mr. Pellicano.

6. <u>Blepharospasm Affects Mr. Pellicano's Sight</u>

Blepharospasm is a brain disorder which causes the eyelids to involuntary shut as long as 20 to 30 seconds.  Mr. Pellicano has suffered from this disorder for over three years.  He does not purport to be infirm or too old.  But, while his movements are impaired by this brain disorder, with treatment he can function normally.

The government maintains that Mr. Pellicano's prison reports show him to be receiving treatment for this brain disorder.  That is false.  In fact, the government relies upon an outdated report that was generated while Mr. Pellicano was in Safford, Arizona.  *See Government Exhibit O*.   Mr. Pellicano has been at Big Spring, Texas since May 5, 2011 and although he has attempted to get treatment, he has yet to receive medical attention for his disorder.  *See Second Gruel Declaration, paragraph 12.*

On June 29, 2012 (three days after the government's opposition to bail pending appeal was filed) Mr. Pellicano was transported to the neurological clinic of Dr. Abdul Kadir in Odessa, Texas to receive treatment for his disorder. *Id*.  Dr. Kadir was unable to provide treatment for Mr. Pellicano because he was trained for the necessary procedures to treat the disorder.  Mr. Pellicano was returned to Big Spring, Texas where to date he has yet to receive any treatment. *Id*.

### B. Mr. Pellicanos Is Not A "Runner" and No Flight Risk

Plain and simple, Mr. Pellicano is not a "runner." If he was, he could have easily fled in 2002 and 2003 during the first prosecution. The FBI through a series of search warrants had everything from PIA and was conducting interviews of cooperators. Mr. Pellicano did not flee. He did not flee from Las Vegas or San Diego although aware that the government had all of his computers. In fact, he self-surrendered three months early to begin his 30 month sentence.

The prosecution looks to the PIA's past dealings and former clients as somehow providing an indicator that Mr. Pellicano is a flight risk. Without a shred of evidence, the government surmises that there exist wealthy individuals "whom likely remain loyal" to Mr. Pellicano who would assist him in absconding. *Government Opposition, page 29.* We, of course, are left to guess what mystery individuals the government means or how they arrived at this grave concern.

Funds to flee can be quickly earned, the prosecution believes, if Mr. Pellicano sells his "life story." The comment is utter nonsense and, frankly, shows the thinness of the government's arguments for continued detention pending appeal. One response can be equally absurd, if he flees because he sold "his story," arrest him at the book signing!

Mr. Pellicano's own words summarize his position the best:

"Mr. Pellicano adamantly declares that there is no running in him. He simply would never think of running like a coward. He simply is not by evidence of his demeanor and character. If he wanted to opt out all he had to do is chose to testify and render cooperation to the prosecution as they had alluded to on numerous occasions. Those conversations are well known to the prosecution and if they truthfully related those conversations to the Court the Court would have a true understanding of what occurred and when.

"Mr. Pellicano is no runner. If he wanted to run, he would have ran many years ago.  He chose to face the music and clearly did so. The government has used every effort to continue these proceedings which indicate to Mr. Pellicano that he will prevail."

"Mr. Pellicano is simply not a danger to the community or flight risk and the prosecution knows this.  He has not the means, nor desire to be anything but a good father, son and family member and to spend the remaining life he has in peace." *Second Gruel Declaration, paragraph 13.*

### C. Sureties Stand Ready to Support A Bond / Conditions of Release

Undersigned counsel has discussed with Mr. Pellicano's family the demands and expectations of a surety.  They stand ready to sign a bond pledging their support for Mr. Pellicano.  Pretrial Services is equipped and capable of conducting any independent background investigation on these sureties.

This Court is not limited in the type of conditions of release it could fashion to address any concern for safety and flight.   Moreover, the Court can order that Mr. Pellicano be placed on electronic monitoring while on release, have a custodian

and report daily to pretrial services.   The option of a half-way house is always available as a condition for a defendant's release.

### D. Substantial Questions Exist To Support Release

It is not rocket science to conclude that the government's RICO convictions are going to be reversed, or at a minimum, that a substantial questions exists as to their viability.  The Supreme Court's limiting definition of "honest services" to bribery and kickbacks as defined in *Skilling v. United States*, 130 S.Ct 2896 (2010) clearly shows that the definition provided to the Jury in instruction number 42 was improperly broad and incorrect.  *See Second Gruel Declaration, Exhibit A.*

Similarly, the government's stretching of the Computer Fraud and Abuse Act (CFAA)  to encompass the authorized data base access of Arneson, Steven, Wright and Turner fails in light of the Ninth Circuit's decision in *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012).  *See Second Gruel Declaration, Exhibits B and C.* There is no question that those who accessed data bases had the authority to do so --- the prosecution said so in its December 6, 2007, Fifth Superseding Indictment (Docket # 959).  Arneson (paragraph 6), Stevens (paragraph 8), Wright (paragraph 12) and Turner (paragraph 13) were all authorized to access their respective data bases.  The Ninth Circuit concluded that the CFAA is an anti-hacking statute and, with the government's charge and evidence, no computer hacking occurred in this case. Hence, the instructions 45, 66, 67, 68 and 69 were in error.

Also, although the Ninth Circuit denied Ray Turner's June 27, 2012 renewed motion for bail pending appeal, its decision provided no analysis or commentary beyond stating that Mr. Turner did not satisfy his burden.  It would be misleading to suggest that the Ninth Circuit denied bail because of any analysis of *Nosal* to the facts of this case.

Furthermore, in disputing whether Mr. Pellicano has raised a substantial question on appeal, the government largely ignores the devastating effect on its case of the post-verdict decisions in *Skilling* and *Nosal*.  Instead, it focuses on the predicate acts of racketeering that the jury found based on Mr. Pellicano's supposed commission of bribery in violation of California Penal Code § 67.  *Gov. Bail Opp.* at 33-34.   But the government fails to acknowledge that—as Mr. Pellicano's opening memorandum noted (p. 11)—he also has raised a substantial question whether the evidence was sufficient with regard to those predicate acts, because his alleged conduct *does not constitute bribery* under California law.  *See also Pellicano Op. Br.* 56-57 (9th Cir.); *Arneson Op. Br.* 13-17 (9th Cir.).  Not only would the failure of those predicate acts (along with those undermined by *Skilling* and *Nosal*) *eliminate* his RICO convictions, but those predicate acts also were, as the government emphasizes, the key driver of Mr. Pellicano's sentence.

The state law on which these predicate acts depend makes it a crime for a person to "give[] or offer[] any bribe to any executive officer in this state, with

intent to influence him in respect to any act, decision, vote, opinion, or other proceeding as such officer." Cal. Penal Code § 67. A "bribe," in turn, is defined as "anything of value . . . asked, given, or accepted with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." *Id.* § 7(6).

As the specific references to "decision," "vote," "opinion," and "proceeding" confirm, these statutes address attempts to influence an executive officer in his *official* actions. Even at its broadest, in applying to "any act," § 67 requires that it be an "act . . . *as such officer*," and "bribe" is correspondingly defined to require an "action" in one's "*public or official capacity*." Although the prosecution need not prove "a *specific* official action" to have been the object of the bribe, the bribe must at least relate to matters that would involve "one or more instances, types, or courses of *official action*." *People v. Gaio*, 81 Cal. App. 4th 929-28, 931 (2000) (emphasis added); *see also People v. Lips*, 59 Cal. App. 381, 389 (1922) (describing "acts" done in officer's "official capacity" as those that "properly belong to the office and are intended by the officer to be official") (internal quotation marks omitted). In sum, violation of § 67 requires an attempt "to *alter the outcome of any matter* that could conceivably come before the official." *Gaio*, 81 Cal. App. 4th 929 (internal quotation marks omitted; emphasis

added); *see id.* at 933 (same); *id.* at 931-32 (identifying three such matters in upholding conviction).

Thus, the cases applying this California law to law enforcement officers invariably involve efforts to compromise the officer's official acts as such officers in enforcing the laws. *See*, *e.g.*, *People v. Hallner*, 43 Cal.2d 715 (1954) (seeking action on application for permit); *People v. Jackson*, 42 Cal.2d 540 (1954) (preventing enforcement of vice laws); *People v. Markham*, 64 Cal. 157 (1883) (preventing arrest); *People v. Ah Fook*, 62 Cal. 493 (1881) (releasing arrestee); *see also People v. Strohl*, 57 Cal.App.3d 347 (1976) (preventing arrest); *People v. Guillory*, 178 Cal.App.2d 854 (1960) (releasing arrestee); *People v. Eads*, 124 Cal.App.2d 393 (1954) (preventing enforcement of gambling laws); *People v. Lips*, 59 Cal.App. 381 (1922) (releasing arrestee).

Here, there is no serious argument that Mr. Pellicano was seeking to compromise any official "act" of LAPD officer Arneson "as such officer," in asking him simply to run searches in a police database that did not bear on active investigations. Cal Penal Code § 67. The elicited conduct did not involve the compromise of any LAPD investigation, much less the attempt to evade arrest or otherwise prevent enforcement of the laws. It thus failed to involve any "official action," and no official "matter" was, or was expected to be, at issue. Indeed, on similar facts the en banc D.C. Circuit found no "official act" to have occurred

under a similar federal law.  *See Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007); *Pellicano Op. Br.* 56-57.  Although this Court sided with the *Valdes* dissent in denying a motion to strike the bribery predicate acts from the indictment, the fact of the disagreement within that court highlights the seriousness of the question that Mr. Pellicano is raising on appeal.  There is—at the very least—a "substantial question" whether or not his action constitutes bribery under state law and thus could be a predicate act, and that suffices for purposes of bail.

<u>CONCLUSION</u>

This case not about organized crime or terrorism where an existing organization exists which could assist a member flee or engage in more misconduct.  As the government wrote "PIA was Pellicano."   PIA has been gone for a decade and there is nothing to believe that Mr. Pellicano has the means, capability, clients, third-party connections and desire to start another private investigation company. The motion for bail pending appeal boils down to this: Is justice advanced when a 68 year old defendant (who has already served half of a 15 year sentence and who is neither a ***present*** danger or flight risk) is provided bail and release with appropriate conditions as the long appellate process considers the substantial questions surrounding the remaining counts?  The answer is "yes."

Respectfully Submitted,

Dated:  August 6, 2012          _____/s/_____
                                STEVEN F. GRUEL
                                Attorney for Anthony Pellicano